## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JESUS NEHEMIAS MONTANO GUILLEN,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Case No. DLB-19-2317** |
| | * | |
| **ARMOUR HOME IMPROVEMENT, INC.,** *et al.*, | * | |
| | * | |
| **Defendants.** | * | |

## MEMORANDUM OPINION

Plaintiff Jesus Nehemias Montano Guillen filed suit against defendants Armour Home Improvement, Inc., Armour Construction LLC (collectively "Armour"), Robert Stouffer ("Robert"), and Christina Stouffer ("Christina") for violations of the Fair Labor Standards Act, 29 U.S.C. § 201 ("FLSA"), the Maryland Wage and Hour Law, Md. Code Ann. Lab. & Empl. § 3-401 ("MWHL"), and the Maryland Wage Payment and Collection Law, Md. Code Ann. Lab. & Empl. § 3-501 ("MWPCL"). ECF 1 (complaint) & 33 (amended complaint).[1] Guillen alleges that defendants failed to pay statutory overtime wages in violation of the three statutes and failed to pay earned wages in violation of the MWPCL. ECF 33, ¶¶ 15–29.

Now pending before the Court is defendants' motion for summary judgment. Defendants argue there is no genuine dispute of material fact that Christina was not Guillen's "employer" under the FLSA, MWHL, and MWPCL and that she is entitled to judgment as a matter of law on those claims. Defendants also argue that all claims should be dismissed because Guillen cannot meet his burden of proof that defendants had actual or constructive knowledge that he worked

---

[1] The Court ordinarily would not refer to parties by their first names, but it does so here to simplify its discussion of the Stouffers' respective responsibilities and roles at Armour.

hours for which he was not paid.  ECF 48.  The motion has been fully briefed.  ECF 53 & 63.  No hearing is necessary.  Loc. R. 105.6 (D. Md. 2021).  For the reasons that follow, defendants' motion for summary judgment is granted as to Christina's status as an "employer," and the claims against her are dismissed.  The motion is denied with respect to the remaining claims.  Guillen has identified sufficient evidence for a reasonable factfinder to conclude that the defendants knew that he worked more hours than he was paid for.

## I.      Factual Background

Armour is a residential contracting and home improvement company operating in Maryland.  Robert owns and operates Armour.  ECF 48-4, at 9 (63:21–64:5); ECF 48-9, at 4 (26:21–27:6); ECF 53-2, at 19 (148:9–10).  Robert incorporated Armour Home on February 11, 2004, as the sole owner.  ECF 48-6; ECF 48-2, at 6 (39:15–41:1).  In 2016, Robert formed Armour Construction to better describe the type of work performed by Armour, which was not necessarily in a home.[2]  ECF 48-4, at 6 (41:7–21).  Prior to founding Armour, Robert worked for various contracting companies and passed Maryland's home improvement licensing exam.  ECF 48-4, at 3–5, 11–12 (29:14–38:8, 94:13–98:20).  Armour's tax documents identify Robert as the sole shareholder of Armour Home and the "sole member" of Armour Construction.  ECF 48-16.  In his capacity as owner, Robert meets and communicates with Armour's current and potential customers, prepares estimates, awards contracts for jobs, and supplies materials to job sites.  ECF 48-4, at 10 (73:5–21); ECF 48-7, ¶ 17.

---

[2] Details of the relationship between Armour Home and Armour Construction are not important to resolution of this motion.

Guillen worked for or with Armour during the relevant period of August 2016 to July 2018.[3]  Guillen's work included, but was not limited to, putting up drywall, framing, painting, plumbing, and cleanup work.  ECF 48-18, at 5 (78:19–79:9); ECF 63-6, ¶ 20.  Robert either contracted or "hired" Guillen.[4]  ECF 53-2, at 13 (88:20–89:8).  Guillen testified that Robert was his point of contact for jobs, providing information such as where to go and what materials to bring, responding to questions, and for the "first time on the job," appearing on site and telling him how he was supposed to do the work.  ECF 48-18, at 5–6 (77:17–82:21); ECF 63-6, ¶ 4; ECF 63-7, at 10–11 (177:13–188:1); *see also* ECF 48-19, at 5 (75:7–77:20) (coworker testimony that Robert scheduled and supervised work).  Robert testified that he only awarded Guillen contracts to be completed by a certain date, and it was up to Guillen to determine how and when to do the work.  ECF 53-12, at 8–9 (104:2–106:14).

Armour paid Guillen a flat hourly wage with no overtime adjustment.  ECF 53-2, at 14 (99:4–100:12).  Guillen was initially paid $15/hour, and his wage increased periodically to $25/hour.  ECF 53-4, at 3, 6 (49:11–51:16, 69:19–72:21); ECF 63-6, ¶ 8.  Guillen testified he

---

[3] Guillen's relationship with Armour lasted from sometime in 2012 to sometime in the summer of 2018.  ECF 48-4, at 10 (70:3–8); ECF 48-18, at 14–15 (140:17–144:19); ECF 53-4, at 2 (47:3–15); ECF 63-7, at 12 (190:1–8).  His potential recovery is limited by the FLSA (two or three-year statute of limitations, 29 U.S.C. § 255(a)) and the MWHL and MWPCL (three-year statute of limitations, Md. Code Ann., Cts. & Jud. Proc. § 5-101).  Because Guillen filed suit in August 2019, his potential recovery for unpaid wages does not extend beyond August 2016.

[4] Defendants maintain that Armour has no employees and works exclusively with independent contractors.  ECF 48-4, at 9 (64:6–65:3); ECF 48-7, at 9; ECF 48-9, at 10 (88:18–19).  Armour paid some of its workers/contractors by the job, using an invoice system; it paid others by the hour.  ECF 53-2, at 18 (122:2–144:5); ECF 53-12, at 13 (163:14–165:6).  Armour requires either some or all workers it regards as independent contractors to sign an "independent contractor agreement."  ECF 48-1, at 7–8; *but see* ECF 53-11, at 9 (50:13–52:4) (deposition testimony of another worker claiming he never signed anything for Armour).  Guillen signed a version of this agreement on May 3, 2012.  ECF 48-17.  The parties dispute whether Guillen was an employee or an independent contractor, but that issue is not before the Court on this motion.

would typically be on the job site from 8:00 a.m. to 6:00 p.m. when working a job for Armour. ECF 33, ¶ 11; ECF 53-4, at 12–13 (121:13–125:15); ECF 53-11, at 5 (30:17–31:5); ECF 63-6, ¶ 15; *but see* ECF 53-12, at 11–12 (137:17–138:4 (Robert testimony that Guillen could and did show up after 8:00 a.m.). Guillen also testified that he spent between thirty minutes and one hour nearly every morning, prior to 8:00 a.m., at one of several construction supply stores purchasing materials for the day's work at Robert's direction. ECF 48-18, at 6, 10 (82:1–84:9, 109:19–112:21); *see also* ECF 53-11, at 7–8 (40:10–43:20) (coworker joined Guillen on these morning runs); *but see* ECF 48-4, at 13 (138:5–140:7) (Robert testified that Guillen was not required to purchase supplies each morning). Guillen stated he would go straight to the jobsite only one or two days a month. ECF 48-18, at 11 (122:11–123:4). Additionally, Guillen worked Saturdays when a job required it, until the job was finished. ECF 48-18, at 16 (173:1–13). Guillen claims this occurred an average of two Saturdays a month, an average of seven to nine hours each time. ECF 48-18, at 16 (173:1–22); ECF 63-6, ¶ 9. Overall, Guillen alleges he worked "no less than 50 hours per week" for Armour. ECF 33, ¶ 11; ECF 53-4, at 11–12 (120:9–121:21) (Guillen testified he reported between ninety-two and one hundred hours each two-week period); *see also* ECF 53-11, at 10 (57:2–6) (coworker testimony that he and Guillen worked fifty-eight to sixty hours each week).

Guillen reported his working hours every two weeks to Robert or Christina, Robert's spouse, one of whom would cut him a check. ECF 48-7, ¶ 11. ECF 48-18, at 3 (59:4–14); ECF 53-2, at 15 (109:4–15); ECF 53-12, at 13 (163:9–164:18). Robert would occasionally respond that the reported hours were too high. ECF 53-12, at 10 (110:1–12); *see also* ECF 48-19, at 7 (103:19–105:9) (coworker believed Robert did not accept more than 100 hours per pay period); ECF 53-11, at 12 (63:5–16) (coworker testimony that Robert would say reported hours were "too many"). Other times, Armour would not pay the correct amount, and Guillen would reach out to Robert or

Christina to resolve the discrepancy.  ECF 48-18, at 3 (59:15–60:7); ECF 53-4, at 5 (67:6–68:21). Guillen never reported the time he spent prior to 8:00 a.m. purchasing supplies because he believed it was Armour's company policy to only count hours after 8:00 a.m.  ECF 48-18, at 4 (75:1–19); ECF 48-19, at 8 (112:10–15).  He did report his time spent on mid-day supply runs.  ECF 48-18, at 11 (123:8–12).  He also reported his Saturday hours.  ECF 48-18, at 16 (173:1–22).

The parties dispute the role and responsibilities of Christina at Armour.  Defendants characterize Christina as an "office assistant or manager" who primarily assisted Robert in administrative tasks and worked less than twenty-five hours per week.  ECF 48-1, at 13.  Guillen asserts that Christina was an owner and officer of Armour who set worker schedules and made decisions about his pay, among other duties.  ECF 53, at 4.

Christina was not involved in Armour's founding.  ECF 48-4, at 6 (40:1–4); ECF 48-9, at 3 (15:9–16:5).  She began assisting Robert with Armour in 2004 or 2005.  ECF 48-9, at 3 (15:9–16:12); ECF 53-2, at 4 (21:12–20).  Christina considers raising her children, who were born in 2004 and 2006, to be her full-time job.  ECF 48-9, at 4 (26:13–20); ECF 53-2, at 4 (21:2–11). Initially, she spent less than ten hours per week performing work for Armour.  ECF 53-2, at 5 (22:1–20).  From 2016 to 2018, she "did whatever [she] could to help [Robert] run his company," including answering phones, monitoring and responding to emails, managing customer files, managing advertising and marketing, scheduling home estimates, typing contracts, ordering office supplies, and occasionally transporting materials.  ECF 48-9, at 4, 16 (26:1–12, 146:15–21); ECF 48-10, ¶ 17; ECF 53-2, at 5 (24:11–16); ECF 53-3.  She also assisted Robert with entering financial information into Armour's computer accounting program, including expenses attributable to purported "subcontractors" like Guillen.  ECF 53-2, at 11 (80:7–81:15); *see also* ECF 48-10, ¶ 17

(Christina would "manage accounts receivable and payable").   Robert viewed her role as "administrative."  ECF 48-4, at 8–9 (61:19–62:11); ECF 48-8, ¶ 4.

Christina does not draw a salary from Armour.  ECF 48-4, at 9 (62:12–19).  Her only disclosed income from 2016–2018 consisted of $10,000–12,000 annually in rent payments from Armour to her for leasing a part of her and Robert's house as office space, which she testified were a "paper trail for tax purposes."  ECF 48-11; ECF 53-2, at 6, 11–12 (55:21–57:19, 81:16–83:3). Christina has a joint bank account with Robert, in which Robert deposits profits from Armour. ECF 53-2, at 7 (60:4–17).  She is also a signatory on Armour's bank account, and she has infrequently used that account to pay personal bills and expenses.  *Id.* at 7–9 (61:8–66:2).  Christina would prepare and sign checks for business expenses from Armour's account at Robert's direction. ECF 48-9, at 15 (111:7–20).  This occasionally included Guillen's wage payments, which Christina calculated based on the number of reported hours and Guillen's hourly wage.  ECF 48-9, at 14 (109:4–110:11).  Christina testified she learned Guillen's hourly wage from Robert.  *Id.*

Christina testified by affidavit that she has no decision-making authority at Armour; rather, she conveys information to and from Robert, seeks Robert's express approval and direction before issuing checks from Armour's account, and has never set wages, hired or fired workers, determined schedules, or directed crews.  ECF 63-2, ¶¶ 3–9.  Christina did not keep track of her hours assisting Armour, ECF 53-2, at 5 (24:18–25:4), but she testified she would spend between fifteen and twenty-five hours each week performing the above work, ECF 48-10, ¶ 20.

Guillen testified that both Robert and Christina would inform him of which specific paint colors to purchase for a job.  ECF 53-4, at 10 (111:11–20).  In a subsequent affidavit, he additionally claimed that both Robert and Christina would text him requests to pick up specific materials, frequently using the SKU number of the product.  ECF 53-5, ¶ 3.  He also claimed that

6

both Robert and Christina were involved in scheduling the jobs he worked and would text him the addresses of jobs. *Id.* ¶ 2. He stated, "[i]f Mr. Stouffer was busy . . . he would tell me to call or text Mrs. Stouffer and she would convey the directions to me." *Id.* ¶ 4. On his morning supply runs, Guillen would have the store call Armour to approve his purchases, and Christina would approve them. ECF 53-4, at 9 (82:22–84:9); *see also* ECF 53-11, at 8 (43:17–45:14) (coworker assumed Guillen spoke to Christina to approve purchases).

Christina represented herself as an officer of Armour on two occasions. The first instance, in June 2008, saw Christina sign Armour's articles of revival as the "last acting secretary." ECF 53-7, at 3. Christina testified that she did so on the advice of Armour's accountant that Robert could not sign as both president and last acting secretary. ECF 48-9, at 6 (38:5–40:18). The second instance, in April 2017, saw Christina sign a letter verifying Guillen's employment and salary as Armour's "vice president." ECF 48-13. Guillen requested this letter to help him secure an apartment and gave instructions regarding what it should contain, ECF 48-14, but it was Christina's idea to sign as "vice president," ECF 48-9, at 18–20 (165:12–170:2). Robert was aware of Guillen's request and testified that he gave Christina the go-ahead. ECF 48-8, ¶ 8. Separately, the record also contains a loan application purportedly in Christina's name that identifies her as a "general manager" at Armour with a $147,000 salary. ECF 53-1. Defendants dispute whether it is Christina's signature on the application. ECF 63, at 13; ECF 63-2, ¶ 16.

Christina often communicated with Armour's customers over email. ECF 57-1 & 64.[5] She testified that "I always speak to my husband before responding as I'm not on jobs and know exactly

---

[5] Pursuant to a stipulated order, email communications between Christina and Armour's customers, ECF 57-1, were filed under seal to protect customers' identities. *See* ECF 45 & 59. Defendants' unopposed motion to seal additional email communications, ECF 65 (regarding ECF 64), is granted. The Court's references to these sealed files do not contain any personal identifying information or other proprietary or sensitive information.

what is going on." ECF 48-9, at 17 (153:2–8).  A substantial majority of Christina's emails before
the Court either use the royal "we" (e.g., "We will confirm start date . . . as we get closer and know
when next available crew will be," ECF 57-1, at 1) or expressly defer to Robert (e.g., "I just spoke
with Rob and he said he can make that work," ECF 64, at 6).  A handful use "I" language (e.g., "I
will let the crew know of the below items and see what they can finish tomorrow," ECF 57-1, at
27).  Her emails routinely state that she is "in the field." *See, e.g.,* ECF 57-1, at 3.  She testified
this was code for running errands or transporting her children.  ECF 63-2, ¶ 10.

Guillen filed his complaint on August 12, 2019.  ECF 1.  He amended his complaint on
August 14, 2020.  ECF 33.  After the close of discovery, defendants filed this motion for summary
judgment.  ECF 48.

## II.     Standard of Review

Summary judgment is appropriate when the movant "shows that there is no genuine dispute
as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a).  The Court must "view the evidence in the light most favorable to the nonmoving party"
and avoid "weigh[ing] the evidence or mak[ing] credibility determinations."  *Lee v. Town of
Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017) (quoting *Jacobs v. N.C. Admin. Office of the Courts*,
780 F.3d 562, 568–69 (4th Cir. 2015)).  However, the Court must also abide by its "affirmative
obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial.'"
*Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*,
818 F.2d 1126, 1128 (4th Cir. 1987) (internal quotation marks omitted).

"When a party has submitted sufficient evidence to support its request for summary
judgment, the burden shifts to the nonmoving party to show that there are genuine issues of
material fact." *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  "To create a genuine issue

for trial, 'the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.'" *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)).  To survive summary judgment, "there must be evidence on which the [factfinder] could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019).

## III.    Discussion

Defendants' summary judgment motion raises two questions: (1) does Christina qualify as an "employer" under the FLSA and the related state statutes and (2) can Guillen prove defendants had knowledge of the pre-8:00 a.m. hours he claims he was not paid for?

### A.  Whether Christina qualifies as an employer

The FLSA defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  This definition "is to be interpreted broadly to achieve Congress's intent to provide a remedy to employees for their employers' wage and hour violations."  *Gionfriddo v. Jason Zink, LLC*, 769 F. Supp. 2d 880, 890 (D. Md. 2011) (citing *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006)).  Courts look at the "economic reality" of an individual's status in the workplace to determine whether an employer-employee relationship exists.  *Id.*  The "economic reality" test is also used to determine whether an individual qualifies as an employer under the MWHL and MWPCL.  *Pinnacle Grp., LLC v. Kelly*, 178 A.3d 581, 603 (Md. Ct. Spec. App. 2018).

The economic reality test considers "different sets of relevant factors based on the factual challenges posed by particular cases."  *Newell v. Runnels*, 967 A.2d 729, 772 (Md. 2009) (quoting

*Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 142 (2d Cir. 2008)).  In this context, the focus is on "whether a particular individual had sufficient operational control within a business enterprise to be considered an 'employer' for purposes of the FLSA."  *Garcia v. Frog Island Seafood, Inc.*, 644 F. Supp. 2d 696, 721 (E.D.N.C. 2009) (quoting *Miller v. Colorcraft Printing Co.*, No. 3:03cv51-T, 2003 WL 22717592, at *3 (W.D.N.C. Oct. 16, 2003)).  On this "control" question, relevant factors include: (1) the power to hire and fire the employee; (2) supervision and control of employee work schedules or conditions of employment; (3) determination of the rate and method of payment; and (4) maintenance of employment records.  *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 83 (4th Cir. 2016); *Pinnacle Grp.*, 178 A.3d at 603 (noting same four factors are used for "employer" determinations under MWHL and MWPCL.  These factors are not exclusive, and no one is dispositive.  *Kerr*, 824 F.3d at 83; *Campusano v. Lusitano Const. LLC*, 56 A.3d 303, 310 (Md. Ct. Spec. App. 2012).  Courts have also weighed "an individual's operational control over significant aspects of the business and an individual's ownership interest in the business[,]" which "suggest that an individual controls a corporation's financial affairs and can cause the corporation to compensate (or not to compensate) employees . . . ."  *Campusano*, 56 A.3d at 310 (quoting *Baystate Alternative Staffing v. Herman*, 163 F.3d 668, 678 (1st Cir. 1998)).

Several courts have considered whether the spouse of a business owner is an "employer," a question that "turns on the nature of the spouse's involvement in the business."  *Morataya v. Nancy's Kitchen of Silver Spring, Inc.*, No. GJH-13-1888, 2015 WL 165305, at *4–5 (D. Md. Jan. 12, 2015) (holding spouse was not an employer where she "assist[ed] her husband with the business, [was] involved with writing and distributing paychecks, but otherwise ha[d] minimal involvement with employees"); *see also, e.g., Solis v. Best Miracle Corp.*, 709 F. Supp. 2d 843,

849–50 (C.D. Cal. 2010) (holding spouse was an employer because he could hire/fire, controlled schedules, signed paychecks, and maintained employment records); *Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 265 (S.D.N.Y. 2008) (holding spouse was employer because she could hire/fire, set schedules, monitored performance, paid wages, and was an owner); *Marroquin v. Canales*, 505 F. Supp. 2d 283 (D. Md. 2007) (holding spouse was not an employer because she had no decision-making responsibilities and did not hire/fire, decide wages, or direct employees); *Messmer v. Colors In Bloom, Inc.*, 67 F. App'x. 719, 721–22 (3d Cir. 2003) (holding spouse was not an employer because he was not an owner, officer, or director, and he would only "visit[] the shop to collect receipts and assist[] his wife with operations during her illness"); *Reich v. Circle C. Invs., Inc.*, 998 F.2d 324 (5th Cir. 1993) (holding spouse was an employer because he could hire/fire, supervised employees, signed payroll checks, and spoke for the business during the investigation of FLSA violations).

Defendants argue that, under the economic realities test, there is no genuine dispute of material fact that Christina was not Guillen's "employer" under the FLSA and state statutes. In response, Guillen points to facts bearing on the economic reality "control" factors that he maintains are material and disputed. Specifically, Guillen claims Christina is not entitled to summary judgment because she:

> (1) identified herself as Armour's Secretary and Vice President, including, on one occasion to Plaintiff; (2) served as Armour's "General Manager" and drew an annual salary of $147,000.00; (3) made decisions about Plaintiff's pay, and wrote and signed some of Plaintiff's checks; (4) had authority to, and did, direct Armour's "crews," which included Plaintiff, to work on specific jobs; (5) set Plaintiff's work schedule by scheduling jobs; (6) regularly worked in the field and visited job sites Plaintiff was working on; (7) was a signatory on Armour's corporate bank account; (8) used corporate funds to pay personal and business expenses; (9) regularly communicated with customers, vendors, and contractors about Armour's jobs, payments, scope of work, and pricing; (10) maintained employment records such as I-9 [Forms]; and ([11]) maintained Armour's financial records.

ECF 53, at 4–5.  The Court will address each assertion in the framework provided by the economic realities test.  To preview, the economic realities of Guillen's work with Armour, and particularly the working relationship between him and Christina, are sufficiently clear that the Court must conclude, as a matter of law, that Christina was not Guillen's "employer."

Regarding the first factor—the power to hire and fire Guillen—there is no record evidence that Christina had the authority to hire or fire any workers.  Robert initiated Armour's relationship with Guillen, ECF 53-4, at 2–3 (46:4–51:16); ECF 63-6, ¶ 4, and Guillen has not identified any instance where Christina hired or fired a worker.  Instead, Guillen testified only that he believed Christina could fire him.[6]  ECF 53-5, ¶ 7.  There is thus no genuine dispute that Christina lacked the authority to hire or fire workers.

As to the second factor—the supervision and control of Guillen's work schedule and conditions of employment—there is no genuine dispute of material fact that Christina did not supervise or control either.  Christina testified she did not schedule Armour's crews or direct them to specific jobs.  ECF 53-2, at 15 (109:16–21); ECF 63-2, ¶¶ 9, 13.  Guillen testified in an affidavit filed after defendants' motion for summary judgment that Christina "was involved with scheduling the jobs" he worked and "would send [him] text messages containing the address."  ECF 53-5, ¶ 2.  He further stated that Christina texted him instructions to pick up specific materials and would "convey" directions to him when Robert was busy.  *Id.*  ¶¶ 3–4.  He asks the Court to infer Christina's authority to schedule crews from language in her emails with customers about crew availability and an "installation ledger."  ECF 53, at 25–26 (citing ECF 57-1).  Finally, he cites an

---

[6] Guillen's affidavit, which was prepared after the defendants filed for summary judgment, does not state that Guillen observed Christina hire or fire.  Rather, he states that his belief that Christina could fire him was based on her title, her "time in the field visiting [his] job sites" and his involvement in scheduling.  ECF 53-5, ¶ 2.  The Court addresses each of these points below.

isolated statement in his deposition that "Mr. or Mrs. Stouffer" would tell him which color of paint to buy for a painting job.  ECF 53-4, at 10 (111:14–20).  This evidence does not suggest Christina supervised or controlled Guillen's work schedule or conditions of employment.  At most, it indicates Christina assisted Robert by keeping track of job locations, communicating with customers about crew availability, and telling Guillen which products customers had requested and the addresses of worksites.  She only conveyed instructions, and nothing suggests she ever held Guillen accountable for following through.  The lack of evidence that Christina supervised Guillen is particularly notable because Guillen was given the opportunity during his deposition to discuss who supervised his work and set his schedules—how he learned which job was next, where to go, and what to do—and his testimony referred exclusively to Robert.  ECF 53-4, at 8–9 (77:17–81:18).  Even when the evidence is viewed in the light most favorable to Guillen, no reasonable factfinder could conclude that Christina exercised authority or control over Guillen's schedule and the conditions of his employment.

As to the third factor—determination of the rate and method of payment—the record is clear that Robert, not Christina, negotiated the rate, frequency, and method of Guillen's payment.  ECF 53-2, at 14–16 (99:4–110:11); ECF 53-4, at 2–4 (46:4–60:13); ECF 53-12, at 8–10 (104:5–112:19); ECF 63-6, ¶¶ 4, 12.  Robert testified he determined whether Guillen's reported hours were in line with Armour's expectations for a job.  ECF 53-12, at 10 (110:1–12).  Guillen testified he would ask Robert for raises, with no mention of Christina.  ECF 53-4, at 6 (72:2–6).  Defendants do not dispute Christina wrote checks to Guillen on occasion, but Christina testified that she learned Guillen's hourly wage from Robert and sought Robert's approval before issuing a check from the Armour account.  ECF 53-2, at 15–16 (109:4–111:20); ECF 63-2, ¶ 6.  Her testimony is corroborated by a text exchange from June 2018 in which Christina tells Guillen "Rob told me to

write you the check so that's what I did." ECF 63-4, at 3. Nothing in the record supports Guillen's assertion that Christina "made decisions about [his] pay," any more than a calculator decides what to display after the user presses enter. Christina's rote calculation of wage payments and preparation of checks do not render her an employer personally liable under the FLSA and Maryland equivalents. *See Morataya*, 2015 WL 165305, at *5 (holding calculation of wages and signing of paychecks "do not establish a material dispute over the existence of an employer-employee relationship"); *Marroquin*, 505 F. Supp. 2d at 299 (holding writing of paychecks did not make spouse an employer).

As to the fourth factor—the maintenance of employment records—there is evidence that Christina maintained some financial and employment records for Armour. The record contains one email from Christina regarding an individual's W-9 form that states: "I will print and keep this on file. We ask for everyone to fill out and sign a Form I-9 (Employment Eligibility Verification) for our records only because we issue 1099's. We will have you sign this Form when [B]obby writes you a check." ECF 57-1, at 36. Christina also testified that she shared responsibility for entering financial information, including payments to "subcontractors" like Guillen, into Armour's accounting software. ECF 53-2, at 11 (80:7–81:15). Thus, the Court will assume that Christina collected at least some employment forms and helped maintain Armour's accounting records.

The Court now turns to Guillen's remaining asserted facts that do not squarely fit within the discussion of the foregoing factors. First, Guillen claims that Christina identified herself as Armour's Secretary and Vice President. Defendants do not contest this point, but they claim the representations were not accurate and have ready explanations. ECF 48-1, at 14. The Court finds there is a genuine dispute over whether Christina was an officer of Armour; however, that fact is only material to the issue of Christina's "employer" status if Guillen can identify other evidence

of Christina's control over him and his work.  The law is concerned with the economic reality of

the relationship between Christina and Guillen, not Christina's formal title.  Absent other evidence

of control, officer status is not enough to give rise to employer liability under the FLSA and state

equivalents.  *Iraheta v. Lam Yuen, LLC*, No. DKC-12-1426, 2012 WL 5995689, at *3 (D. Md.

Nov. 29, 2012) (citing *Pearson v. Prof'l 50 States Prot., LLC*, No. RDB-09-3232, 2010 WL

4225533, at *4 (D. Md. Oct. 26, 2010)); *see also Pinsky v. Pikesville Recreation Council*, 78 A.3d

471, 493–94 (Md. Ct. Spec. App. 2013) (holding officers were not personally liable under the

MWPCL absent other evidence that they met the factors of the "economic reality" test).

Second, Guillen provided a loan application that identified Christina as a "general

manager" with an annual salary of $147,000.  ECF 53-1.  Defendants dispute that Christina

prepared or signed the application and provide evidence that the signature is distinct from

Christina's usual signature on numerous checks in the record.  ECF 63, at 13; ECF 63-2, ¶ 16.  The

Court finds there is a genuine dispute over whether Christina prepared the loan application and

represented herself as a manager with a high salary.  However, even assuming for purposes of this

motion that she did identify herself as a "general manager" on the loan application, the application

contains no representation about her powers and duties in that capacity.  While some courts have

considered "[a] person's job description" as part of the economic reality test, *Gionfriddo*, 769 F.

Supp. 2d at 890, a title is not a description, especially where the remainder of the record provides

no evidence of management.  Christina's claim to be the "general manager" of Armour on a loan

application does not indicate she exercised any control over Guillen or his work.

Third, Guillen notes that Christina was a signatory on Armour's corporate bank account

and would rarely use that account for personal expenses.  As explained above, check-writing

authority does not render the spouse of a business owner personally liable under the FLSA and

state equivalents.  *Supra*.  To the extent check-writing authority and the ability to functionally take profits may serve as evidence of an equitable ownership interest in the business, the Court reiterates that ownership, like officer status, is insufficient to trigger employer liability absent other evidence of control.  *Qun Lin v. Cruz*, 239 A.3d 720, 738 (Md. Ct. Spec. App. 2020) (citing *Pinnacle Grp., LLC v. Kelly*, 178 A.3d 581 (Md. Ct. Spec. App. 2018)).

Fourth, Guillen focuses on Christina's regular communication with customers, vendors, and contractors about Armour's jobs, payments, scope of work, and pricing.  The record contains numerous emails evidencing the substance and frequency of these communications.  Defendants testified that Christina performed administrative work, including communicating with customers on Robert's behalf.  ECF 48-4, at 9 (62:2–11); ECF 53-2, at 5 (24:11–16); ECF 63-2, ¶ 5.  A substantial majority of Christina's emails in the record use either the royal "we" or expressly state that Christina is communicating on behalf of Robert.  *See* ECF 57-1 & 64.  The few instances where she used "I" language are consistent with an administrative role; Christina simply tells customers that she will relay information to crews.  ECF 57-1, at 10, 14, 16, 19, 22.  Guillen has not identified any communication suggesting Christina's relay of information to crews amounted to supervision.  Nor has Guillen identified any communication indicating Christina decided Guillen's rate of pay or was authorized to hire or fire him or any other worker.

Finally, Guillen asserts that Christina sometimes joined Armour's crews "in the field." Defendants admit that Christina would occasionally deliver supplies to crews, ECF 63-2, ¶ 11, but they claim that when Christina told customers she was "in the field," it more often meant that she was running family errands, *id.* ¶ 10.  The Court finds Christina's occasional presence at job sites not to be material to her status as an employer.  When Guillen testified at his deposition who supervised and directed his work at job sites, he mentioned only Robert.  ECF 53-4, at 8–9 (80:8–

81:22). Even in his affidavit, Guillen does not claim that Christina exercised any control over him when she visited job sites. His affidavit states only that she would "deliver materials" and on occasion "talk to the customer" far enough away from him that he could not hear the conversation. ECF 53-5 ¶ 3. Christina's presence onsite—absent any evidence that she oversaw or supervised Guillen while there—does not indicate she exercised control over him.

The Court now considers these facts together. The Court will assume that Christina was an owner and officer of Armour and maintained certain employment and financial records. There is ample evidence that Christina wrote checks to Guillen, calculated his wage payments, occasionally delivered supplies to job sites, and communicated with customers. Under the economic realities test, these facts are not enough to permit a reasonable factfinder to conclude that Christina was Guillen's "employer" within the meaning of the FLSA, MWHL, and MWPCL. Christina lacks three of the four direct indicia of control. She did not hire or fire workers, did not supervise schedules or control conditions of employment, and did not determine the rate or method of payment. Her maintenance of records—collecting I-9s and recording payments made to workers—did not give her significant control over Guillen or his work.

The additional indicators of ownership interest, officer status, and operational control do not change this calculus. No evidence in the record suggests Christina had operational control over significant aspects of the business; rather, she provided administrative assistance to Robert and communicated on his behalf. And though the Court assumes Christina was an owner (due to her withdrawal of funds from Armour's account to pay for personal expenses) and an officer (due to her self-identification as such on more than one occasion) of Armour, those formalities must be joined with more evidence of control than Guillen has identified to carry weight. While an ownership interest and officer status might create an inference that an individual had the authority

17

to exercise control and an incentive to protect profits, *Campusano*, 56 A.3d at 310, that inference is not borne out by the remainder of the record.  The "building of one inference upon another" is not enough to survive summary judgment.  *Humphreys & Partners*, 790 F.3d at 540.

This case is analogous to *Morataya*, No. GJH-13-1888, 2015 WL 165305 (D. Md. Jan. 12, 2015), and *Marroquin*, 505 F. Supp. 2d 283 (D. Md. 2007).  Like the spouses in those cases, Christina was involved in her spouse's business, but she did not exercise control over workers.  Rather, she signed checks, relayed information, handled paperwork, and ran errands—all on Robert's behalf and with his approval.  In *Morataya*, the Court reasoned: "[The owner's spouse] did not have any control over the employees, including Plaintiff, or the day-to-day operations of [the business].  In fact, according to Plaintiff, it was [the owner] who hired her, set her pay rate, set her hours, promoted her, and supervised her."  *Morataya*, 2015 WL 165305, at *4.  Substitute the names and genders, and this reasoning would accurately describe the record before the Court.  Even if Christina was an owner and officer of Armour, and even if she maintained some employment records, the Court finds there is no genuine dispute of material fact that Christina was not Guillen's "employer" under the FLSA and related state statutes.

Accordingly, the Court grants summary judgment to Christina and dismisses the claims against her.

## B.  Defendants' knowledge of Guillen's alleged unpaid wages

Defendants argue that Guillen cannot meet his burden of proof that they knew he worked uncompensated overtime hours.  ECF 48, ¶ 9.  Under the FLSA and Maryland statutes, part of the plaintiff's burden is to prove that the employer had actual or constructive knowledge of the unpaid work.  *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 109 (4th Cir. 1988) (holding employer knowledge is required for employment status under the FLSA) (citing *Davis v. Food Lion*, 792 F.2d 1274,

1276 (1986)); *Marroquin*, 505 F. Supp. 2d at 297–98 (applying underlying burden-shifting framework to Maryland wage collection statutes); *Richardson v. All. Residential Co.*, No. ELH-18-1114, 2020 WL 551316, at *9 (D. Md. Feb. 4, 2020) (explaining knowledge requirement and applying to MWHL claim). Constructive knowledge exists where the employer "should have acquired knowledge of that work through reasonable diligence," a determination that "depend[s] on the facts of each case." *Richardson*, 2020 WL 551316, at *9 (citations omitted).

The Court finds there is a genuine dispute over whether defendants knew about Guillen's alleged unreported pre-8:00 a.m. hours. [7] Guillen testified that defendants would inform him what items to buy for the day, that defendants had to approve purchases over the phone, that defendants received a fax or receipt cataloguing the purchases, and that Robert would sometimes show up to the store before 8:00 a.m. to transport the purchases. ECF 53-4, at 9–11, 14, 16 (82:6–119:10, 172:14–22, 201:20–203:19). Additionally, Guillen testified that Rodolfo, a coworker and translator, told him an "instruction from the company" not to report any hours before 8:00 a.m., and that a different worker (Jose) had been fired for doing so. *Id.* at 7–8, 16 (75:1–77:16, 201:4–19). Another Armour worker, Salvador, testified that he was present for some of Guillen's morning supply runs, that he did not report his morning hours on the understanding that they were not supposed to be reported, and that he assumed defendants had given instructions about what to buy and that Christina approved the purchases over the phone. ECF 53-11, at 7–8, 12 (41:11–45:20, 62:15–65:3). Finally, defendants' emails to customers state that crews would arrive as early

---

[7] The Court addresses only defendants' knowledge of Guillen's pre-8:00 a.m. hours. While defendants also discussed Guillen's Saturday hours in their motion, ECF 48-1, at 19–20, Guillen's opposition clarified that Guillen reported his Saturday hours and those hours are relevant only to the extent that he is due overtime compensation, ECF 53, at 34. Because defendants did not discuss Guillen's Saturday hours in their reply, the Court will follow Guillen's request to "disregard" defendants' initial argument on that point. ECF 53, at 34.

as 8:00 a.m. "after picking up materials from local supplier on their way to job site."  ECF 57-1, at 7, 24; *see also* ECF 57-2, at 2.

Defendants focus on Guillen's deposition testimony: (i) that Guillen was paid based on the hours he reported, and that when the payments did not reflect those hours, he would complain until defendants paid him in full; (ii) that Guillen reported any hours spent on mid-day supply runs and was paid for them; and (iii) that Guillen's decision to not report his morning supply run hours was based on a conversation with another worker and thus not any conversation with the defendants or an actual policy.  These statements, even when considered collectively, do not establish as a matter of law that defendants lacked knowledge of Guillen's alleged uncompensated hours.

Guillen's failure to report his morning hours or complain about not being compensated for them does not conclusively prove defendants lacked actual or constructive knowledge of those hours.  Guillen has provided evidence from which a reasonable factfinder could conclude that defendants were themselves involved in his pre-8:00 a.m. supply runs—they picked the supplies, approved their purchase, and sometimes transported them to job sites.  To the extent that Guillen needs a reason for not reporting his morning hours while reporting the rest of his hours, he has one: he was told by another worker it was company policy not to report morning hours.  ECF 53-4, at 7–8 (75:12–19) ("Rodolfo told me that the hours at Home Depot were not to be paid . . . those were the instructions that he had. [] He was the interpreter.").  Guillen reported the hours that he believed he would be compensated for.  Indeed, Guillen had reason to believe that reporting his morning hours—or, by extension, complaining about the lack of compensation—could lead to him being "fired," as that was what he had heard happened to another worker.  ECF 53-4, at 16 (201:10–19).

For the same reasons, the fact that Guillen reported his hours spent on mid-day supply runs has no bearing on defendants' knowledge of whether Guillen was also spending time on morning supply runs.  Guillen believed he was entitled to pay for supply runs during the workday but not before the workday, and his reported hours reflected this belief.

Finally, the fact that Guillen's failure to report his morning hours arose from a conversation with another worker, Rodolfo, and not with defendants does not disprove defendants' knowledge of the alleged pre-8:00 a.m. hours.  While defendants may have a hearsay objection to Rodolfo's statements about Armour's "company policy," that argument does not undermine the facts in the record supporting defendants' involvement in the morning supply runs.[8]

Because Guillen has identified evidence in the record from which a reasonable factfinder could conclude that defendants knew about his alleged unpaid hours, the Court denies the defendant's summary judgment motion on this issue.  A separate Order shall issue.

DATED this 22nd day of February, 2022.

_____

Deborah L. Boardman
United States District Judge

---

[8] Defendants describe Rodolfo's statements as "hearsay" in a section header of their reply, but they do not develop the argument.  ECF 63, at 17.  "[H]earsay, like other evidence inadmissible at trial, is ordinarily an inadequate basis for summary judgment."  *Graves v. Lioi*, 930 F.3d 307, 325 n.15 (4th Cir. 2019) (quoting *U.S. Dep't of Hous. & Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Va., Inc.*, 64 F.3d 920, 926 (4th Cir. 1995)).  However, statements that are not hearsay or are subject to a hearsay exception can be properly considered. *See id.* (considering statements for the effect on the listener).  The Court considers Rodolfo's statements for their effect on Guillen and his state of mind (Guillen's decision to not report his morning hours); it does not consider them as evidence of the truth of the matter asserted (Armour had a policy against reporting morning hours).  Even without evidence of a company policy against reporting morning hours, the record still supports a genuine dispute over defendants' actual knowledge of the morning supply runs.