## IN THE UNITED STATES DISTRICT COURT
## <u>FOR THE DISTRICT OF MARYLAND</u>

| | |
|---|---|
| **JESUS NEHEMIAS MONTANO GUILLEN,** | * |
| | * |
| **Plaintiff,** | * |
| | * |
| **v.** | *       Civ. No. DLB-19-2317 |
| | * |
| **ARMOUR HOME IMPROVEMENT, INC.,** *et al.*, | * |
| | * |
| **Defendants.** | * |

### <u>MEMORANDUM OPINION</u>

Jesus Nehemias Montano Guillen filed suit against Armour Home Improvement, Inc. ("Armour Home"), Armour Construction LLC ("Armour Construction"), Robert Stouffer ("Mr. Stouffer"), and Christina Stouffer ("Mrs. Stouffer") for violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*. ("FLSA"), the Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. §§ 3-401 *et seq*. ("MWHL"), and the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§ 3-501 *et seq*. ("MWPCL"). ECF 1 & 33. Guillen claims that the defendants employed him as a construction worker but failed to pay him statutory overtime wages and compensate him at all for the time he spent before 8:00 a.m. picking up supplies and traveling to job sites. This Court held a four-day bench trial from February 13 to February 16, 2023. For the following reasons, the Court finds Mr. Stouffer, Armour Home, and Armour Construction violated the wage statutes and jointly owe Guillen $8,777.02 plus reasonable attorneys' fees and costs. Mrs. Stouffer, however, was not Guillen's "employer" under the statutes and is not liable for the wage violations.

## I.    Findings of Fact

Five witnesses testified at trial: Guillen, Mr. Stouffer, and Mrs. Stouffer; Salvador Alvarenga Quintanilla, a construction worker who worked for Armour with Guillen; and Emily Wilson, a paralegal who works for Guillen's counsel.[1]   The Court has considered the testimony and reviewed the trial exhibits.   Based on its assessment of the evidence and the credibility of the witnesses, and pursuant to Federal Rule of Civil Procedure 52, the Court makes the following findings of fact.   Unless otherwise stated, the Court's findings concern the period between August 2016 and August 2018, which, as explained below, is the relevant limitations period.

### A.   Armour's Business and Mr. Stouffer's Role

Mr. Stouffer is the founder and owner of Armour Home and Armour Construction.   (Robert Stouffer testimony, trial day 3).   Armour is a contracting and home improvement business operating in Maryland.   (*Id.*).   Mr. Stouffer started Armour Home around 1999 or 2000.   (*Id.*).   For the first several years, it was an S corporation.   (*Id.*).   He incorporated Armour Home in February 2004 as the sole owner.   (Pl. Ex. 12).   In 2006, Armour Home's corporate charter was forfeited. (Robert Stouffer testimony, trial day 3).   It was revived in 2008.   (Pl. Ex. 15).   The charter was forfeited again in 2010, and it has not been revived.   (Stipulation, trial day 3).   Subsequently, Mr. Stouffer created Armour Construction.   (Robert Stouffer testimony, trial day 3).   Armour Construction does business as "Armour Home Improvement, Inc.," and it operates using the Armour Home bank account.   (*Id.*).   All checks for Armour Construction's workers and suppliers are written from the Armour Home account.   (*Id.*).   At all times relevant to this action, Armour

---

[1] "Armour" refers to both Armour Home and Armour Construction.   The Court will distinguish between them when necessary.

Home and Armour Construction were an "Enterprise Engaged in Commerce" within the meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A)(i).  ECF 84 (Stipulation).

Mr. Stouffer does "pretty much everything" at Armour.  (Robert Stouffer testimony, trial day 3).  His responsibilities include conducting site visits, preparing estimates for jobs, advertising, communicating with customers, coordinating the schedules of the work crews, instructing workers about the expectations for specific jobs, and picking up and delivering tools and materials to job sites.  (*Id.*).  He also handles payments from customers, performs data entry into the company's QuickBooks accounting software, issues checks for vendors and workers, and files Armour's tax forms.  (Christina Stouffer testimony, trial day 1).  He solely is responsible for hiring and firing workers and determining their rate and method of payment.  (Robert Stouffer testimony, trial day 3).  Tax documents identify him as the sole shareholder of Armour Home and the sole member of Armour Construction.  (Def. Ex. 15).

**B.  Guillen's Work for Armour**

Between 2016 and 2018, Armour had three work crews, each with two or three workers. (Robert Stouffer testimony, trial day 3).  Guillen was a member of one of these crews.  (Jesus Guillen testimony, trial day 2).  Guillen graduated high school in El Salvador in 2001 or 2002. (*Id.*).  He began working construction-related jobs in 2004 or 2005.  (*Id.*).  He never received formal training to do the work of a construction worker.  (*Id.*).  He does not possess any work-related license or certificate, and he never has.  (*Id.*).  He can understand more English than he can speak, and he is most conversant in English when speaking about his work.  (*Id.*).  When he must communicate in English via text, he uses an app to translate between Spanish and English.  (*Id.*).

Guillen started working for Armour in 2011 or 2012.  (*Id.*).  He learned about the job through a member of his church who knew Jose Rivera, one of Armour's workers.  (*Id.*).  Rivera

brought Guillen to an Armour job, introduced him to Mr. Stouffer, and translated their initial conversation. (*Id.*). Mr. Stouffer asked Guillen about his skills, and Guillen said he could do demolition, painting, and drywall. (*Id.*). Mr. Stouffer offered to pay Guillen $15 per hour, contingent upon Guillen providing proof of insurance, and Guillen accepted.[2] (*Id.*). After his first meeting with Mr. Stouffer, Guillen worked jobs for Armour until August 2018. (*Id.*). He received several raises during this period, each of which he negotiated with Mr. Stouffer. (*Id.*). Between 2016 and 2018, his rate of pay was $25 per hour. (*Id.*). Armour provided him with annual 1099 Forms. (*Id.*). Guillen testified he did not work jobs other than those he worked for Armour. (*Id.*). Mr. Stouffer testified that he believed Guillen could and did work other jobs, including on weekends. (Robert Stouffer testimony, trial day 3). The Court finds that, even if Guillen did work on the occasional non-Armour job, he worked almost exclusively for Armour.

Guillen's work involved demolition, drywall construction, and painting, among other things. (Jesus Guillen testimony, trial day 2). While working for Armour, he learned how to do plumbing and electrical work. (*Id.*). He provided his own transportation and his own small tools. (*Id.*). He had his own measuring tape, hammer, square, pencils, waist pouch, short ladders, drill, and stilts. (*Id.*). Armour supplied larger tools, including large ladders, a machine to cut tile, a nail gun, a table saw, and a miter saw. (*Id.*). Guillen kept his tools in his van, which had shelves for tools, materials, screws, and bolts. (Robert Stouffer testimony, trial day 3; Salvador Alvarenga testimony). Guillen registered his van as a commercial vehicle so he would not be ticketed for transporting cargo over a certain weight. (Jesus Guillen testimony, trial day 2). Guillen sometimes

---

[2] Guillen purchased insurance, but he did not renew it after the first year. (Jesus Guillen testimony, trial day 2). Mr. Stouffer did not inquire about Guillen's insurance after Guillen first purchased it. (Robert Stouffer testimony, trial day 3).

purchased tools on the Armour account to receive a discount, and the cost of the tools was deducted from one of his subsequent paychecks.  (*Id.*, trial day 3; Pl. Ex. 2, pg. 7).

Initially, Guillen worked on a crew with Rivera.  (Jesus Guillen testimony, trial day 2). After Rivera left, Guillen worked with others, including Alvarenga and, most recently, Axel Garcia.  (*Id.*; Salvador Alvarenga testimony).  Guillen provided transportation for Alvarenga, picking him up in the morning and driving him to supply stores or directly to job sites.  (Salvador Alvarenga testimony).  They were paid separately.  (*Id.*).  When Guillen worked with Garcia, he infrequently received paychecks that included Garcia's pay.  (Jesus Guillen testimony, trial day 2; Pl. Ex. 2, at 52).  Guillen complained when this occurred because he did not want to pay taxes on another worker's pay.  (Jesus Guillen testimony, trial day 2).

For each job with Armour, Guillen learned the location of the job site from either Mr. or Mrs. Stouffer.  (*Id.*).  On the first day of a job, he would meet with Mr. Stouffer at the job site to go over the scope of work.  (*Id.*).  Mr. Stouffer's initial instructions were a high-level overview of the project and a timeframe for its completion.  (*Id.*; Robert Stouffer testimony, trial day 3).  For example, if the project was a bathroom renovation, Mr. Stouffer might instruct Guillen on which wall needed to be retiled or whether the toilet needed to be replaced.  (Robert Stouffer testimony, trial day 3; Salvador Alvarenga testimony).  There was conflicting testimony on how closely Mr. Stouffer supervised Guillen.  Mr. Stouffer testified that he would review projects and raise any issues with Guillen at the end.  (Robert Stouffer testimony, trial day 3).  He said he did not monitor the work as it was being done because he did not have time to look over Guillen's shoulder.  (*Id.*). Alvarenga similarly testified that Mr. Stouffer told him and Guillen what needed to be done, not how to do it.  (Salvador Alvarenga testimony).  Guillen testified that Mr. Stouffer occasionally supervised his work on-site, but he did not elaborate or explain what that entailed.  (Jesus Guillen

testimony, trial day 2).  The Court finds that Mr. Stouffer did not provide Guillen with daily or regular supervision on job sites.  He would review projects with Guillen and instruct him on what to do, not how to do it.  He generally did not monitor Guillen's day-to-day activities.

Guillen's last job with Armour was for a customer named Jerry Yu, who was very demanding.  (Robert Stouffer testimony, trial day 3).  Mr. Stouffer did not send Guillen to work on other jobs after the Yu job concluded.  (*Id.*).  Guillen testified that his last work for Armour was around July 18, 2018, but records from Home Depot indicate that someone who identified himself as "jesus" picked up supplies on behalf of Armour in August 2018.  (Def. Ex. 7, pg. 2455).  Guillen testified that when he picked up supplies at Home Depot, he provided his name.  (Jesus Guillen testimony, trial day 3).  Additionally, the name "jesus" does not appear in the records after August 2018.  (*See* Def. Ex. 7).  The Court finds Guillen stopped working on Armour jobs in August 2018.

### C.  Mrs. Stouffer's Role

Mr. and Mrs. Stouffer are married.  (Christina Stouffer testimony, trial day 1).  From 1994 to 2002, Mrs. Stouffer worked as a secretary and assistant to an attorney who was a solo practitioner.  (*Id.*).  She worked as a paralegal at a law firm from 2002 to 2004.  (*Id.*).  The Stouffers' first child was born in 2004 and their second in 2006.  (*Id.*).  Following the birth of their children, Mrs. Stouffer became a stay-at-home parent.  (*Id.*, trial day 2).  She also began assisting Mr. Stouffer with Armour and acted as his "right hand."  (*Id.*, trial day 1).  She had multiple conversations a day with Mr. Stouffer about Armour's work.  (*Id.*).  She communicated with customers and workers on behalf of Mr. Stouffer, collected tax information from workers, filled out 1099 Forms, performed data entry, and signed checks.  (*Id.*).  She also assisted with material orders, advertising, scheduling home estimates, and filing tax forms.  (*Id.*).  Rarely, when Mr.

Stouffer was busy elsewhere, she would deliver tools or materials to job sites. (*Id.*). This happened no more than a handful of times between 2016 and 2018. (*Id.*).

Mrs. Stouffer was an authorized signer for the Armour Home bank account. (*Id.*). She signed checks for the company, including paychecks to Guillen. (*Id.*; Pl. Ex. 2). She wrote and signed these checks at Mr. Stouffer's direction. (Christina Stouffer testimony, trial day 1). She did not know each worker's rate of pay and had to confirm it with Mr. Stouffer. (*Id.*). Of the 55 checks written to Guillen between August 2016 and August 2018, Mrs. Stouffer wrote ten of them. (*See* Def. Ex. 3). She and Mr. Stouffer had separate debit cards for the Armour Home account, and she used hers for business and occasionally for personal expenses. (Christina Stouffer testimony, trial day 1). Bank records for the Armour Home account catalog her purchases, including, for example, a visit to a nail salon. (Pl. Ex. 26, pg. 153). She received Mr. Stouffer's approval to use the debit card for personal expenses. (Christina Stouffer testimony, trial day 1). On the rare occasion when she did not request approval before making a purchase with the company card, she would discuss the purchase with Mr. Stouffer afterwards. (*Id.*).

Mrs. Stouffer's communications with workers included providing the addresses for job sites and information about what supplies to pick up—for example, what paint color a customer wanted or the SKU number of an appliance. (*Id.*, trial days 1 & 2). When she communicated on behalf of the company, she was either relaying information from Mr. Stouffer or acting based on his instructions. (*Id.*). One of the only surviving text message exchanges between Guillen and the Stouffers corroborates Mrs. Stouffer's testimony on this point: On June 8, 2018, Guillen texted Mrs. Stouffer about his paycheck, and she responded, "Rob told me to write you the check so that's what I did." (Def. Ex. 12). Mrs. Stouffer never instructed Guillen on how to do his work. (Jesus Guillen testimony, trial day 2).

Mrs. Stouffer also had access to and used the Armour company email account to communicate with customers, subcontractors, and vendors. (Christina Stouffer testimony, trial day 1). As with her communications to workers, when Mrs. Stouffer communicated over email, she did so as Mr. Stouffer instructed. (*Id.*). Mr. Stouffer often would dictate e-mails for her to type because she was a much faster typist than he was. (*Id.*; Robert Stouffer testimony, trial day 4). In her emails, she regularly uses "we" and expressions like "it's my understanding" and frequently mentions speaking to Mr. Stouffer. (*See* Pl. Ex. 34). She explained that even when she wrote things like "I just heard from the crew[,]" she was relaying information from Mr. Stouffer or doing what he asked her to do. (Christina Stouffer testimony, trial day 1). This explanation is consistent with her admission that she would sometimes use language to make the business seem more professional, like saying she was "in the field" when in fact she was running personal errands and referring to an "installation ledger" that was really a collection of project files ordered by the date they were received. (*Id.*). The Court finds Mrs. Stouffer's testimony that she acted at the direction of Mr. Stouffer to be credible and corroborated by her emails.

Mrs. Stouffer never hired or fired any worker, and she did not have the authority to do so. (*Id.*, trial day 2). She also did not have the authority to set or negotiate a worker's hourly rate or method of payment. (*Id.*). Those decisions required experience and knowledge that she did not have. (Robert Stouffer testimony, trial day 3). And while she did communicate logistical information to workers, such as the addresses of job sites, she did so at the direction of her husband, and she never decided which crews would work which job on what day. (Christina Stouffer testimony, trial days 1 & 2).

Mrs. Stouffer held herself out as an officer of Armour on two occasions. She signed the 2008 articles of revival for Armour Home as the corporation's last acting secretary. (Pl. Ex. 15).

She did so on the advice of Armour's accountant.  (Christina Stouffer testimony, trial day 1).  Separately, she identified herself as Armour Home's vice president in an April 5, 2018 letter that Guillen asked Armour to send.  (Pl. Ex. 14).  Guillen had requested from Mr. Stouffer a letter verifying his employment and income so that he could secure credit.  (Robert Stouffer testimony, trial day 3).  Mr. Stouffer directed Mrs. Stouffer to draft the letter based on what Guillen told her to say.[3]  (*Id.*; Christina Stouffer testimony, trial day 1).  Mrs. Stouffer decided to sign as vice president to make the letter seem more legitimate, even though neither Mr. Stouffer nor Guillen told her to do so.  (Christina Stouffer testimony, trial day 1).  Mrs. Stouffer did not perform the responsibilities of a traditional corporate officer, whether secretary or vice president.[4]

Guillen's trial testimony about Mrs. Stouffer's role was exaggerated and not credible.  He asserted repeatedly that both Mr. and Mrs. Stouffer were his employers.  (Jesus Guillen testimony, trial days 2 & 3).  He stated they both gave him directions about where to go, what to do, what to buy, and how long he should take on projects; that he raised issues regarding his pay with both; and that he contacted both about problems that arose during his work.  (*Id.*).  This testimony contradicts statements he made during his deposition, when, in response to questions about who

---

[3] Guillen had difficulty recalling the letter, which he believed was to secure credit for a car.  (Jesus Guillen testimony, trial day 3).  He could not remember how he requested the letter, but he testified that when he was "asking for a letter or something," he would go directly to Mrs. Stouffer.  (*Id.*).  This testimony is not credible.  Guillen's recollection was spotty, and he did not identify any other time he requested a letter from Armour.

[4] One other document merits discussion.  A credit application for an auto loan identifies Mrs. Stouffer as a "general manager" at Armour with a salary of $147,000.  (Pl. Ex. 17).  Mrs. Stouffer remembered purchasing the vehicle, but she said she did not complete the credit application and did not remember submitting one.  (Christina Stouffer testimony, trial day 1).  She denied that the signature on the application was hers.  (*Id.*).  She thinks Mr. Stouffer provided the information and a bank employee filled out the form and put her name on the application.  (*Id.*).  Whatever the job title of "general manager" might imply in the abstract, it does not alter the Court's findings regarding Mrs. Stouffer's actual activities.

employed him, he referred only to Mr. Stouffer and used masculine pronouns. (*See id.*, trial day 3). When Guillen was confronted with these inconsistencies at trial, he explained that he assumed the questions at his deposition were about both Mr. and Mrs. Stouffer and that his answers always referred to the two of them—even when he expressly referred only to Mr. Stouffer or used masculine pronouns—because they were "the two bosses that he had." (*Id.*). This explanation is not believable and undermines Guillen's credibility. On more than one occasion at Guillen's deposition, he, not the questioner, was the one who specifically referred to Mr. Stouffer in his answer. (*Id.*). Indeed, Guillen admitted at trial that he had no problem during his deposition identifying Mrs. Stouffer separately; he did so at least once, in response to a question about whom he called to authorize purchases at supply stores. (*Id.*). Additionally, Alvarenga never heard Guillen mention that he had communicated with Mrs. Stouffer about instructions, pay, or any aspect of their work. (Salvador Alvarenga testimony).

Other parts of Guillen's testimony about Mrs. Stouffer's role at Armour further undermine his credibility. Guillen testified that he worked on the Stouffers' home on several occasions, performing work on their basement, constructing a two-story addition, and painting the walls and ceiling of the home office. (Jesus Guillen testimony, trial day 2). He stated he saw Mrs. Stouffer "always busy on the phone" and working in the office. (*Id.*). On cross examination, Guillen agreed that the office is on the second story of the home and that he could not observe it from the basement. (*Id.*, trial day 3). He also admitted that his work on the addition was outdoors, digging and laying concrete. (*Id.*). He then switched his story from seeing Mrs. Stouffer to hearing her while he worked on the addition because it was spring or fall and "possibly the window was partially open." (*Id.*). In trying to communicate where the addition was, he mentioned the Stouffers' garage. (*Id.*). Mr. Stouffer later testified that the house does not have a garage and that Guillen never worked on

the office, which has wood-panel walls with thin primer and has not been painted since they moved in.  (Robert Stouffer testimony, trial day 3).  The Court finds that Guillen did not observe Mrs. Stouffer busy on the phone as he described.  His exaggerations and unreliable memory call into question his credibility on several key issues.

### D.  Guillen's Hours and Compensation

Guillen reported the hours he worked to Mr. or Mrs. Stouffer approximately every two weeks.  (Jesus Guillen testimony, trial day 2; Robert Stouffer testimony, trial day 4).  He usually texted his hours to one of the Stouffers; less often, he called one of them or spoke to Mr. Stouffer in person.  (Jesus Guillen testimony, trial day 2).  Most of the time, he communicated his hours to Mr. Stouffer.  (*Id.*).  There are no records of the hours Guillen reported to the Stouffers, apart from a May 11, 2018 text to Mrs. Stouffer requesting payment for 98 hours that happened to be preserved.  (Def. Ex. 12).  Armour did not keep records of Guillen's hours and wages because Mr. Stouffer believed Guillen was an independent contractor and, therefore, that the company was not required to keep such records.  (Robert Stouffer testimony, trial day 3).

There was conflicting testimony about whether Guillen was paid by the hour or by the job. Guillen testified that he was paid by the hour.  (Jesus Guillen testimony, trial day 2).  He stated he never submitted bids or proposals and could not turn down jobs.  (*Id.*).  Mr. Stouffer testified that Guillen was paid by the job and that his "hours worked" communications were simply the way he billed for each job at the price they had agree on during their initial meeting at the job site.  (Robert Stouffer testimony, trial day 3).  He stated that he would show Guillen a job and give a timeframe for its completion and that Guillen then would decide whether to bid on the job.  (*Id.*).  He understood that Guillen calculated his "bids" by estimating the number of hours required for the job.  (*Id.*).  At some point, Guillen stopped requesting payment by submitting the bid price and just

provided the number of hours.  (*Id.*).  Mr. Stouffer did not keep track of Guillen's hours, and he testified that Guillen could earn a profit if he finished the job more quickly than they had agreed because he would still submit the agreed-upon hours and receive payment for that amount.  (*Id.*). Mr. Stouffer recalled Guillen would sometimes submit more hours than Mr. Stouffer expected. (*Id.*).  When that happened, he would talk to Guillen, and they would come to an agreement about how much Guillen would be paid.  (*Id.*).

The Court finds that Guillen was paid by the hour and that he reported the number of hours he worked rather than a predetermined number of hours per job.   Alvarenga's testimony corroborates Guillen's version of events.  Alvarenga testified that he reported the hours he worked and was paid based on those hours.  (Salvador Alvarenga testimony).  Mr. Stouffer never asked Alvarenga for bids or invoices, and Alvarenga never submitted any.  (*Id.*).  Additionally, Mr. Stouffer and Guillen testified that Guillen would report his hours approximately every two weeks, rather than after the completion of one or more jobs.  (Jesus Guillen testimony, trial day 2; Robert Stouffer testimony, trial day 4).  That practice is not consistent with payment by the job.

Guillen requested payment for the time he worked after 8:00 a.m. each day.  (Jesus Guillen testimony, trial day 2).  His schedule was Monday through Friday and usually two Saturdays each month.[5]  (*Id.*).  He did not work holidays or days when he was sick or needed to care for his family. (*Id.*).  After Guillen communicated his hours, one of the Stouffers would calculate his pay based on his hourly rate and write him a check.  (Christina Stouffer testimony, trial day 1).  For example, he reported "98" to Mrs. Stouffer via text on May 11, 2018, and Mrs. Stouffer signed a check on

---

[5] Mr. Stouffer testified he did not work on weekends, he did not ask Guillen to do so, and he did not know that Guillen worked Saturdays.  (Robert Stouffer testimony, trial day 3).  This testimony is contradicted by phone records that show a pattern of calls between Guillen and Mr. Stouffer on Saturdays during the relevant period.  (*See id.*, trial day 4; Def. Ex. 22).

May 11, 2018 for $2,450 (98 hours times $25), which Guillen cashed on May 14.  (Pl. Ex 2, at 50; Def. Ex. 12).  The record includes copies of 54 paychecks Guillen received from Armour between August 12, 2016 and August 12, 2018.[6]  (Pl. Ex. 2).  The first check in this period is dated August 12, 2016 and was preceded by a check dated July 30, 2016, and the last check in this period is dated August 6, 2018, for a total period of 737 days or 105.29 weeks.[7]  Guillen usually received paychecks every two weeks, but his pay periods were irregular.  The number of days between checks ranges from four to 42.  On average, Guillen received a check every 13.65 days (737 days divided by 54 paychecks), but the standard deviation from that average is more than six days.  At least some of this variation is the result of delayed payments and advances, both of which occurred during the relevant period.  (Jesus Guillen testimony, trial days 2 & 3; Robert Stouffer testimony, trial day 3).

Guillen testified about the number of hours he worked each week.  He said he was required to arrive at the job site by 8:00 a.m. and that he worked through 6:30 or 7:00 p.m., sometimes later.  (Jesus Guillen testimony, trial day 2).  When he worked later than 7:00 p.m., he said he did so because he was told that the job had to be finished because another job was already scheduled.  (*Id.*).  He estimated that this happened more than three times per month.  (*Id.*).  He stated he worked between seven and nine hours on Saturdays.  (*Id.*).  He stated his paychecks should reflect the number of hours he worked after 8:00 a.m. each day.  (*Id.*).  However, he also testified Armour

---

[6] Check number 1843, located at page 16 of Pl. Ex. 2, is dated incorrectly.  The date on the check is 2/26/17, but the electronic stamp below shows that the check was cashed on "20160229" or February 29, 2016—the prior year, and outside the limitations period.  Check number 2051, located at page 33 of Def. Ex. 3, was for material reimbursement.  The Court did not consider either check in its analysis, other than to note Mrs. Stouffer wrote check number 2051.

[7] The Court considers the date of the July 30, 2016 check only to determine the number of days in the pay period preceding the August 12, 2016 check, the first check in the limitations period.

sometimes shorted his paychecks and did not pay him for all the hours he reported.  (*Id.*, trial days 2 & 3).  For example, he might have reported 98 hours but received pay for only 90 or 92 hours.  (*Id.*, trial day 2).  He recalled the shorting started as early as his second or third paycheck.  (*Id.*).  When he was shorted, he said he would complain about it, and sometimes the Stouffers would correct the error by adding the missing amount to his next paycheck.  (*Id.*).  He claimed that other times they would forget to do so, but he did not protest the persistent shorting and continued to work for Armour because he needed the money to support his family.  (*Id.*).  He initially said his paychecks were short "several" times, but he later stated "six to eight hours were missing every check" before clarifying that it was only a "majority" of his paychecks.  (*Id.*).  Mr. Stouffer testified that he paid Guillen for the hours he reported unless they seemed excessive for the work they had agreed to, in which case he would reach out to Guillen and work out a solution.  (Robert Stouffer testimony, trial day 3).

The Court finds that Guillen exaggerated in his testimony the number of hours he worked and reported working each week.  First, his claim that he had to be at the job site by 8:00 a.m. conflicts with credible evidence.  The Court credits Mr. Stouffer's testimony that he gave customers a range of time in which crews could arrive and did not keep track of when Guillen arrived at job sites.  (Robert Stouffer testimony, trial day 3).  This testimony is corroborated by an email informing a customer that crews "typically arrive[] between 8am-9am after picking up necessary materials . . . ."  (Pl. Ex. 34, pg. 33).  And, as discussed below, records from Home Depot indicate that when Guillen visited the store to pick up supplies in the morning, he regularly checked out between 8:00 a.m. and 9:00 a.m.  It took Guillen as much as 45 minutes to drive from the store to a job site.  (Jesus Guillen testimony, trial day 2).  So, if Guillen was at Home Depot shortly after 8:00 a.m., then he was not, and did not have to be, at the job site by 8:00 a.m.

Second, Guillen's testimony that he was not paid for the hours he reported was not credible. Guillen had difficulty remembering how often his paychecks were short, and his testimony was inconsistent. Initially, he seemed to suggest the shorting was infrequent. Later, near the end of his testimony on redirect, he stated it was six to eight hours every paycheck. Under questioning by the Court regarding the basis for that claim, he stated it was only a majority of his paychecks. Meanwhile, Alvarenga testified his paychecks were always consistent with the hours he reported. (Salvador Alvarenga testimony). Alvarenga recalled doing the math and the numbers always adding up. (*Id.*). And the only instance of Guillen reporting his hours for which there is documentation, the May 11, 2018 text for "98" hours, was followed by a check reflecting 98 hours' pay. The Court finds the evidence does not support Guillen's claims of shorting.

Third, Guillen's testimony about how many post-8:00 a.m. hours he worked and reported working conflicts with his paychecks. If Guillen had worked and reported working 10.5 to 11 hours each weekday and seven to nine hours every other Saturday, as he claims, then his paychecks should show that he was compensated for approximately 56 to 59.5 hours every week. Over 105.29 weeks, that adds up to 5,896.24 to 6,264.76 total hours. However, Guillen's paychecks show he was paid for 4,318.6 total hours or 41.02 hours on average per week. That means, according to Guillen's recollection of his schedule, he was not compensated for over 1,500 reported hours—about 15 hours per week, on average. Even if one credits Guillen's testimony that he was not paid for every hour he reported, which the Court does not, his largest shorting estimate of eight hours every paycheck (432 total hours) cannot explain the 1,500-hour difference between the number of hours he recalled working and reporting and the number of hours he was paid for. Neither can the difference be explained by assuming some of the 1,500 uncompensated hours were sick days, holidays, or vacation. A generous assumption that Guillen took four weeks

off per year, which is not supported by the evidence, would reduce the 1,500-hour discrepancy by less than one third—56 to 59.5 hours per week times eight weeks, or 448 to 476 total hours.  The Court finds the documentary evidence more credible than Guillen's testimony.  Guillen was paid for the hours he reported.

Guillen's paychecks indicate he worked some amount of overtime during the relevant period, but they do not indicate precisely how many overtime hours he worked.  Some paychecks suggest a plausible amount of overtime for the associated pay period when viewed in isolation— the August 26, 2016 check for $2,200 (88 hours) was issued 14 days after the previous check, suggesting that Guillen worked eight hours of overtime during that period.  But many other checks suggest implausible amounts of straight-time or overtime, whether they are viewed in isolation or in the context of the adjacent checks.  The following checks illustrate some of the problems:

| Date | Days since previous check | Gross pay | Hours reported |
|------|---------------------------|-----------|----------------|
| 1/28/2017 | 16 | $1,700 | 68 |
| 2/3/2017 | 6 | $2,175 | 87 |
| 2/23/2017 | 20 | $2,000 | 80 |
| 3/3/2017 | 8 | $1,700 | 68 |

(*See* Pl. Ex. 2).  During this seven-week period, Guillen's gross pay and the number of days between his paychecks varied significantly, and the quantities do not appear to be correlated.  It is implausible that Guillen worked 87 hours over the five workdays between January 28 and February 3—January 29, 2017 was a Sunday and Guillen does not claim he ever worked on a Sunday—and there is no obvious way to reconcile that check with the surrounding pay periods.  It is plausible that some irregularities are the result of either delayed payments or advances, but there is no way

to determine what caused each irregularity or what date range Guillen worked the hours for which he was paid each pay period.

Guillen suggests his paychecks indicate he worked 538.6 overtime hours during the relevant period, not including any pre-8:00 a.m. time. (*See* Pl. ID Ex. 4).[8]  Guillen's estimate of his damages does not account for the varying time periods between paychecks. (Emily Wilson testimony). His method assigns each paycheck a one- or two-week pay period based on the gross pay, regardless of the actual number of days in the pay period, and calculates the difference between the hours paid and 40 or 80 hours. This results in obvious overestimates. For example, Guillen assumes the check dated September 8, 2016 for $1,500 (60 hours) was for one week of work, even though the preceding paycheck was issued 13 days earlier on August 26, 2016. Similarly, he assumes the check dated November 19, 2016 for $2,550 (102 hours) was for two weeks of work, despite a pay period of 22 days. Additionally, Guillen's method produces an implausible amount of total overtime. Guillen worked 4,318.6 hours. A full-time, 40-hour-per-week schedule over the same 105.29-week period would have been 4,211.6 hours. If more than 500 of the hours for which Guillen was paid were overtime hours, as he asserts, then he would have had to have taken more than ten weeks off work over the two years. 4,318.6 total hours worked, minus 538.6 overtime hours, yields 3,780 straight-time hours; the difference between the expected full-time 4,211.6 hours and 3,780 is 431.6 hours, equal to more than ten full-time weeks

---

[8] Plaintiff's ID Ex. 4 is a spreadsheet estimating Guillen's damages. To discern Guillen's estimate of his post-8:00 a.m. overtime hours, the Court subtracted his "additional hours" estimate (the pre-8:00 a.m. hours, discussed below) from his total "overtime hours" estimate, ignoring any negative values. Guillen did not include check number 1895, dated August 12, 2016, in his spreadsheet; including it does not change the calculation because that check indicated no overtime under Guillen's method. The Court considers the spreadsheet solely to determine Guillen's damages estimate; it is not substantive evidence. The Court's conclusions on the amount of post-8:00 a.m. overtime hours are based on Guillen's paychecks.

off work.  The Court finds it implausible that Guillen took off more than ten weeks over two years

for holidays, vacation, and sick days, and such a finding is not supported by the evidence.  For

these reasons, the Court rejects Guillen's method of calculating his post-8:00 a.m. overtime hours.

To calculate a more reasonable estimation of Guillen's post-8:00 a.m. overtime hours based

on his paychecks, the Court broke the two-year period into eight "seasons" of approximately equal

length, compared the number of hours Guillen worked each season against a full-time schedule for

the same period, and added together each season's overtime:

| Season | First check | Last check | Weeks | Hours worked | Full-time hours | Overtime hours |
|---|---|---|---|---|---|---|
| Fall 2016 | 8/12/2016 | 10/28/2016 | 12.86 | 485 | 514.29 | 0 |
| Winter 2016 | 11/19/2016 | 2/3/2017 | 14 | 525 | 560 | 0 |
| Spring 2017 | 2/23/2017 | 5/4/2017 | 12.86 | 461 | 514.29 | 0 |
| Summer 2017 | 5/17/2017 | 8/11/2017 | 14.14 | 612 | 565.71 | 46.29 |
| Fall 2017 | 8/29/2017 | 11/8/2017 | 12.71 | 522 | 508.57 | 13.43 |
| Winter 2017 | 11/15/2017 | 2/7/2018 | 12.86 | 595 | 514.29 | 80.71 |
| Spring 2018 | 2/19/2018 | 5/11/2018 | 13.43 | 563.6 | 537.14 | 26.46 |
| Summer 2018 | 5/28/2018 | 8/6/2018 | 12.43 | 555 | 497.14 | 57.86 |
| | | | | | | **224.75** |

In the above chart, the "weeks" column represents the number of weeks between the first and last

check; the "hours worked" column represents the sum of Guillen's gross pay during the season,

divided by his hourly rate; the "full-time hours" column represents the number of weeks times 40

hours per week; and the "overtime hours" column represents the difference between "hours

worked" and "full-time hours," ignoring negative values.  This method accounts for the varying

lengths of Guillen's pay periods and the possibility that a paycheck includes an advance or a late

payment by viewing the paychecks in batches.  A seasonal approach is midway between a

paycheck-by-paycheck approach, which would be fraught with speculation, and an aggregate or

whole-period approach, which runs a greater risk of cancelling out likely overtime with periods

during which Guillen worked less than a full-time schedule.  Seasons of roughly 13.16 weeks

(105.29 divided by eight) are sufficiently granular—the longer the time between any two paychecks, the less likely the pay in one is connected to the pay period in the other—and they fit Guillen's irregular pay schedule.[9]  Overall, the Court finds that Guillen worked 224.75 overtime hours after 8:00 a.m. during the relevant period.

In addition to his post-8:00 a.m. work, Guillen testified that he routinely visited construction supply stores before 8:00 a.m. to pick up materials.  (Jesus Guillen testimony, trial day 2).  He was not paid for these pre-8:00 a.m. hours because he did not report them.  (*Id.*).  The stores he visited included Home Depot, Lowe's, Sherwin Williams, Floor & Decor, and Roof Center, among others.  (*Id.*).  Guillen claims he went on pre-8:00 a.m. supply runs three or more times per week and that it typically took between one and two hours from the time he arrived at the store to the time he arrived at the job site.  (*Id.*).  He said he typically spent 45 minutes at the store, depending on the length of the line and whether the items he needed already had been collected by employees.  (*Id.*).

Here too, the Court does not find Guillen's testimony entirely credible.  Alvarenga testified that he and Guillen visited supply stores before 8:00 a.m. only when they started a new job, which was one to three times every two weeks.  (Salvador Alvarenga testimony).  This makes sense.  They had an incentive to minimize this time since they were not being compensated for it.  Alvarenga's recollection is consistent with records from Home Depot compiling all Armour's

---

[9] This seasonal length captures in a single season the series of checks between April 2, 2018 and April 28, 2018, which likely include related late payments.  The April 2, 2018 check came 42 days after the preceding check.  The next four checks, through April 28, 2018, followed approximately every week with implausibly high pay amounts for the short pay periods.  This strongly suggests the latter four checks included late payments for the 42-day period.

transactions in 2016, 2017, and 2018.[10]  (*See* Def. Ex. 7).  Those records reveal that pre-8:00 a.m. supply trips were infrequent.   (*Id.*).   The records, which include each buyer's "contact name," show only three times when a person whose name was recorded as "jesus" or some variation of that name checked out before 8:00 a.m.  (*See* ECF 100-2).  Even if one considers checkouts by someone who might have been Guillen—checkouts for which no name or some variation of "armour," "robert," or a generic description like "checkout" was recorded—there are only ten such pre-8:00 a.m. checkouts over the two-year period.  (*See* ECF 102-3).  Expanding the checkout cutoff time to 8:45 a.m. to reflect the typical amount of time Guillen remembered spending in the stores before checking out yields 35 checkouts for some spelling of "jesus" and 54 checkouts by someone who might have been Guillen, for a total of 89.  (*See* ECF 100-2; ECF 102-3).  These records account only for Home Depot, but Home Depot was Armour's primary supply store.  Both Alvarenga and Guillen used Home Depot as shorthand for construction supply stores generally, and Armour's bank records show that the number of purchases at Home Depot (877) is almost double the number of purchases at all other supply stores combined (454) over the relevant period. (*See* Pl. Ex. 26; *compare* Def. Ex. 7 *with* ECF 102-4).  The fact that pre-8:00 a.m. checkouts are so rare among the checkouts at Home Depot casts significant doubt on Guillen's testimony that he

---

[10] Guillen does not challenge the authenticity of the Home Depot records of Armour transactions. The transaction records include times, but they do not indicate whether the times signify the checkout times or other events.  Separately, receipts from Home Depot for Armour purchases post-dating August 2018 show the checkout times in local time.  (Pl. Ex. 62).  When the time on the Home Depot transaction records is compared with the checkout time on the associated receipt, the former is consistently four or five hours later than the latter, depending on daylight savings time. The Court finds that the Home Depot records use Coordinated Universal Time, that the time on the records is the checkout time, and that to determine the checkout time from the records, four hours must be subtracted if the purchase was made during standard time or five hours if the purchase was made during daylight savings time.  Guillen concedes that the records that feature his name establish his presence at Home Depot at the time the store "charged the card" used for the purchase at the point of sale.  (Post-trial argument).

went on pre-8:00 a.m. supply runs three or more times each week.  The Court finds Alvarenga more credible than Guillen, and Alvarenga's testimony is consistent with the records.

Overall, the Court finds Guillen went on morning supply runs 97 times during the relevant period.[11]  That figure is square in the middle of Alvarenga's recollection of one to three times every two weeks.  From this figure, the Court finds Guillen worked 42.11 unpaid hours on pre-8:00 a.m. supply runs during the relevant period.[12]

### E.  Mr. Stouffer's Knowledge and Understanding of the Law

Mr. Stouffer is familiar with the FLSA's overtime compensation requirement and how the law distinguishes between employees and independent contractors.  (Robert Stouffer testimony, trial day 3).  He learned about the overtime compensation requirement during his time working as an employee before starting Armour Home.  (*Id.*).  He learned how independent contractors are classified when he became an independent contractor.  (*Id.*).  He acquired this knowledge by 2004 at the latest, when he took the Maryland contractor's exam, which covers the FLSA.  (*Id.*).  When Mr. Stouffer hired Guillen in 2012, he was familiar with several of the criteria relevant to the

---

[11] To reach this finding, the Court took the number of times Guillen (some variation of "jesus") checked out before 8:45 a.m. (35), plus one-fourth the number of times someone who *may* have been Guillen checked out before 8:45 a.m. (54 divided by 4, or 13.5).  This ratio accounts for the possibility that the person checking out was not Guillen by dividing the total number of possible checkouts equally among four groups—three crews of two workers, plus Mr. Stouffer.  The Court doubled this figure to account for trips to stores other than Home Depot (48.5 times 2, or 97).

[12] To calculate this figure, the Court reviewed all 89 pre-8:45 a.m. Home Depot checkouts that either were or may have been Guillen.  Based on Guillen's testimony, the Court assumed in each instance that the individual spent 45 minutes at the store.  It then turned back the clock 45 minutes from the recorded checkout time to determine the arrival time.  For the 35 checkouts by some variation of "jesus," the Court added up the number of minutes between each arrival time and 8:00 a.m. (834 minutes).  For the remaining 62 trips to Home Depot and other supply stores (97 minus 35), the Court used the average number of minutes spent at Home Depot before 8:00 a.m. for all 89 pre-8:45 a.m. checkouts (27.3 minutes times 62, or 1,692.6 minutes). An average accounts for uncertainty about which checkouts were Guillen and for visits to supply stores other than Home Depot for which no records are available.  2,526.6 minutes is 42.11 hours.

classification of independent contractors: the ability to set one's own hours, compensation based on job or project rather than hours worked, and the opportunity for profit and loss based on managerial skill.  (*Id.*).  These criteria and others were covered in a manual that Mr. Stouffer reviewed when he was setting up Armour Home, but he did not review the manual to determine whether his workers were independent contractors or employees.  (*Id.*; *see* Pl. Ex. 4).  He never consulted with an attorney about how to classify Armour's workers.  (Robert Stouffer testimony, trial day 3).

Mr. Stouffer believed that Guillen was an independent contractor because Guillen provided his own tools, had his own insurance, and—in Mr. Stouffer's view—was paid by the job and could turn down jobs from Armour and take other work.  (*Id.*).  He believed that independent contractors set their own hours and determined how to accomplish their work within the time limit, and in his view, Guillen did those things.  (*Id.*).  Additionally, as stated above, he believed that Guillen had the opportunity for profit or loss because he believed Guillen could finish a job faster or slower than they had agreed to.  (*Id.*).

## II.   Conclusions of Law

The FLSA and MWHL require covered employers to pay their employees a minimum hourly wage for all hours worked.  29 U.S.C. § 206(a)(1); Md. Code Ann., Lab. & Empl. § 3-413(b).  The statutes further require employers to pay their employees at a rate of one and one-half times their regular rate for hours worked over 40 hours per week.  29 U.S.C. § 207(a)(1); Md. Code Ann., Lab. & Empl. § 3-415(a).  The MWHL is Maryland's statutory equivalent of the FLSA, and its requirements "are so closely linked to the FLSA" that the claims stand or fall together. *McFeeley v. Jackson Street Entm't, LLC*, 47 F. Supp. 3d 260, 267 n.6 (D. Md. 2014) (citing *Turner v. Human Genome Sci., Inc.*, 292 F. Supp. 2d 738, 744 (D. Md. 2003)), *aff'd*, 825 F.3d 235 (4th

Cir. 2016).  The MWPCL, meanwhile, requires employers to pay "all wages due for work that the employee performed before the termination of employment," including overtime pay.  Md. Code Ann., Lab. & Empl. § 3-505(a); *Peters v. Early Healthcare Giver, Inc.*, 97 A.3d 621, 625–26 (Md. 2014).

### A.  Guillen Was an "Employee"

The defendants argue Guillen was an independent contractor and not an employee as defined by the wage statutes.  For purposes of all three wage statutes, the same test determines whether a worker was an independent contractor or an employee.  *See McCoy v. Transdev Servs., Inc.*, No. DKC-19-3137, 2022 WL 951996, at *11 (D. Md. Mar. 30, 2022) (applying the same test to claims under the three statutes).  The test, set forth in *Schultz v. Capital International Security, Inc.*, 466 F.3d 298 (4th Cir. 2006), asks whether the worker was economically dependent on the purported employer or in business for himself.  *Id.* at 304.  The Fourth Circuit has identified six relevant factors:

1. The degree of control that the putative employer has over the manner in which the work is performed;

2. The worker's opportunities for profit or loss dependent on his managerial skill;

3. The worker's investment in equipment or material, or his employment of other workers;

4. The degree of skill required for the work;

5. The permanence of the working relationship;

6. The degree to which the services rendered are an integral part of the putative employer's business.

*Id.* at 304–05.  No single factor is dispositive, and courts consider the totality of the circumstances to determine the economic reality of the working relationship.  *Id.*  Guillen bears the burden of proving he was an employee.  *See Steelman v. Hirsch*, 473 F.3d 124, 128 (4th Cir. 2007).

### 1.  Control Over Manner of Work

Mr. Stouffer exercised high-level control over the manner of Guillen's work.  He negotiated the scope of the work with the customers and told Guillen which jobs he would work and where to go and when, providing windows in which Guillen was expected to arrive at the job site.  Guillen could not deviate from the scope of work Mr. Stouffer negotiated with Armour's customers.  When customers had questions or issues about the work, they communicated with Armour and Mr. Stouffer, not Guillen.

While Mr. Stouffer did not keep track of Guillen's time on job sites, he monitored the hours Guillen reported working and would communicate with Guillen and reduce the hours if he thought the number was excessive for the pay period.  And, while Mr. Stouffer did not directly supervise Guillen's work or tell him how to accomplish his tasks, such a fine degree of control is not required for employer status.  *See Montoya v. S.C.C.P. Painting Cont., Inc.*, 589 F. Supp. 2d 569, 578–79 (D. Md. 2008) (holding first factor favored workers when the putative employer directed them to job sites, rotated between job sites providing instructions about which rooms should be painted, which paint to use, and how many coats to apply, and "set worker schedules according to project deadlines").  The first factor favors Guillen.

### 2.  Opportunities for Profit or Loss

Guillen did not have any opportunity for profit or loss based on his managerial skill.  While Guillen's work was project-based, his pay was based on the number of hours he worked and reported to Armour.  When he finished one job, Armour sent him to the next one.  He did not benefit by finishing ahead of schedule.  *See Schultz*, 466 F.3d at 307 (holding the second factor favored the worker when there "was no way an agent could finish a shift more efficiently or quickly in order to perform additional paid work").  The second factor favors Guillen.

24

### 3.  Investment in Equipment or Material and Employment of Others

Guillen invested in his own small tools, but Armour supplied larger tools.  This arrangement is consistent with employee status.  *See Guerra v. Teixeira*, No. TDC-16-618, 2019 WL 330871, at *9 (D. Md. Jan. 25, 2019) (holding this factor favored the worker when "he owned only the most basic tools, such as a screwdriver and pliers[,]" and the employer provided "[a]ll the more advanced tools").  Armour also provided all the materials for its jobs.  Guillen regularly used the Armour account to pay for materials at supply stores.

Guillen did not employ other workers.  Guillen worked with Garcia and Alvarenga, but Mr. Stouffer set their rate of pay, and Armour paid them directly.  On the few occasions that Guillen received Garcia's pay in his paycheck, he protested and demanded Armour provide separate checks.  The third factor favors Guillen.

### 4.  Skill

Guillen's work for Armour required different degrees of skill.  Some aspects of his work, like demolition and painting, required little skill.  *See Montoya*, 589 F. Supp. 2d at 581 (agreeing that painting "is not a high-skilled job").  Other aspects of his work, like electrical work, plumbing, and tile work, required more skill and specialized knowledge.  "Traditionally, carpenters, construction workers, electricians and similarly skilled tradesmen are considered independent contractors." *Herman v. Mid-Atl. Installation Servs., Inc.*, 164 F. Supp. 2d 667, 675 (D. Md. 2000).  But even if construction work generally is a skilled trade indicative of independent contractor status, Guillen holds no licenses or certificates, and he never received any formal training.  Everything he knows how to do, he learned on the job, and much of his training occurred during his time with Armour.  The fourth factor slightly favors Guillen.

### 5.   Permanence of the Relationship

Guillen had a long-lasting and consistent working relationship with Armour.  He worked exclusively, or almost exclusively, for Armour from 2011 or 2012 through August 2018.  "The more permanent the relationship, the more likely the worker is to be an employee."  *Schultz*, 466 F.3d at 308.  Guillen worked for Armour nearly every weekday and a fair number of Saturdays.  While he was free to stop working on Armour jobs at any time, the same is true for most traditional employees.  *See McFeeley*, 825 F.3d at 244 (stating "an at-will arrangement that could be terminated by either party at any time . . . could characterize either an employee or an independent contractor depending on the other circumstances of the working relationship").  The fifth factor favors Guillen.

### 6.   Integral to the Business

Guillen's work was integral to Armour's business.  Armour is a home improvement and construction business, and Guillen performed the home improvement and construction work that provided Armour's source of income.  The sixth factor favors Guillen.

### 7.   Balancing the Totality of the Circumstances

All six *Schultz* factors weigh in favor of finding that Guillen was an employee of Armour and not an independent contractor.  These indicia of functional control override any formalistic indicia of independence, such as the use of 1099 Forms.  *See Guerra*, 2019 WL 330871, at *10 (holding independent contractor agreement and worker's receipt of 1099 Forms did not outweigh the *Schultz* factors that uniformly supported classification as an employee).

As an employee, Guillen was entitled to a minimum hourly wage for all hours worked and time-and-a-half for hours worked over 40 hours per week.

**B.  Mrs. Stouffer Was Not Guillen's "Employer"**

Mr. Stouffer and the Armour entities were Guillen's employers and are liable for the wage violations.  The parties vigorously dispute whether Mrs. Stouffer, too, was Guillen's statutory "employer" and, therefore, liable for the wage violations.  An individual is a covered "employer" if the "economic reality" of the workplace suggests that an employer-employee relationship exists. *Gionfriddo v. Jason Zink, LLC*, 769 F. Supp. 2d 880, 890 (D. Md. 2011); *Pinnacle Grp., LLC v. Kelly*, 178 A.3d 581, 603 (Md. Ct. Spec. App. 2018) (applying economic reality test to claims under the state wage statutes).[13]  While the "economic realities" test considers the totality of the circumstances of the working relationship, courts typically focus on the four *Bonnette* factors: whether the putative individual employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.  *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 83 (4th Cir. 2016) (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (quoting *Bonnette v. Calif. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983))); *see also Ramirez v. 316 Charles, LLC*, No. SAG-19-3252, 2020 WL 7398807, at *5 (D. Md. Dec. 16, 2020) (applying *Bonnette* factors).  These factors are not exclusive, and no one is dispositive.  *Kerr*, 824 F.3d at 83.

Other courts have considered whether a business owner's spouse who is involved in the business is individually liable as an "employer" under the FLSA.  Naturally, the liability of the spouse "turns on the nature of the spouse's involvement in the business."  *Morataya v. Nancy's Kitchen of Silver Spring, Inc.*, No. GJH-13-1888, 2015 WL 165305, at *4–5 (D. Md. Jan. 12, 2015)

---

[13] The test is the same under the FLSA, MWHL, and MWPCL.  *Campusano v. Lusitano Constr. LLC*, 56 A.3d 303, 308 (Md. Ct. Spec. App. 2012).

(holding spouse was not an employer when she "assist[ed] her husband with the business, [was] involved with writing and distributing paychecks, but otherwise ha[d] minimal involvement with employees"); *see also Messmer v. Colors In Bloom, Inc.*, 67 F. App'x. 719, 721–22 (3d Cir. 2003) (holding spouse was not an employer because he was not an owner, officer, or director, and he would only "visit[] the shop to collect receipts and assist[] his wife with operations during her illness"); *Reich v. Circle C. Invs., Inc.*, 998 F.2d 324, 329 (5th Cir. 1993) (holding spouse was an employer because he could hire/fire, supervised employees, signed payroll checks, and spoke for the business during the investigation of FLSA violations); *Solis v. Best Miracle Corp.*, 709 F. Supp. 2d 843, 849–50 (C.D. Cal. 2010) (holding spouse was an employer because he could hire/fire, controlled schedules, signed paychecks, and maintained employment records); *Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 265 (S.D.N.Y. 2008) (holding spouse was an employer because she could hire/fire, set schedules, monitored performance, paid wages, and was an owner); *Marroquin v. Canales*, 505 F. Supp. 2d 283, 299 (D. Md. 2007) (holding spouse was not an employer because she had no decision-making responsibilities and did not hire/fire, decide wages, or direct employees).

### 1.  Power to Hire or Fire

Mrs. Stouffer did not have the power to hire or fire Armour's workers, including Guillen. Mr. Stouffer hired Guillen, and he alone had the power to terminate Guillen's working relationship with Armour.  The first factor favors Mrs. Stouffer.

### 2.  Supervision and Control of Schedule or Conditions of Employment

Mrs. Stouffer did not supervise Guillen's work.  On the rare occasions she visited job sites, she did so to deliver tools because her husband was unavailable and asked her to do so.  Mr. Stouffer solely was responsible for instructing Guillen on the scope of work.

Mrs. Stouffer did not decide which jobs Guillen would work or which tools or materials were necessary for the jobs, and she could not change the scope of work for Armour's jobs.  Those decisions were made by Mr. Stouffer.  She did, on occasion, tell Guillen the addresses of job sites and what supplies to buy, but she did so at the direction of her husband.   Whenever she communicated with Guillen about his work, it was at Mr. Stouffer's direction.  She could not, and never did, hold Guillen accountable for following through on the instructions she relayed to him. She never addressed any issues Guillen raised about his work beyond relaying his concerns to Mr. Stouffer.  When Guillen wanted an employment verification letter to secure credit, he asked Mr. Stouffer, who instructed Mrs. Stouffer to provide one.  The second factor favors Mrs. Stouffer.

### 3.   Determination of Rate or Method of Payment

Mrs. Stouffer had no control over Guillen's rate or method of payment.  It was Mr. Stouffer who negotiated Guillen's pay, approved his raises, and resolved any disputes about his hours. While Guillen sometimes communicated his hours to Mrs. Stouffer and she wrote and signed nine of his 54 paychecks, she did so at Mr. Stouffer's direction and after confirming Guillen's hourly rate with her husband.  The third factor favors Mrs. Stouffer.

### 4.   Maintenance of Records

Mrs. Stouffer did not prepare or maintain records related to Guillen's job performance, schedule, or any other aspect of his work.  She did, however, collect information from workers and assist in the preparation of tax forms.  She also helped Mr. Stouffer maintain Armour's accounting records.   The fourth factor slightly favors Guillen only because Mrs. Stouffer maintained some company records.

### 5.   Balancing the Totality of the Circumstances

Three of the four *Bonnette* factors cut decidedly against a finding that Mrs. Stouffer was Guillen's employer.  The fourth factor does not weigh strongly in the other direction.

Guillen attempts to tip the balance in his favor by focusing on Mrs. Stouffer's representations that she was an officer of Armour and her use of the Armour Home bank account for personal expenses.  He cites to a line of precedent that views "an individual's operational control over significant aspects of the business and an individual's ownership interest in the business" as supporting "employer" liability.  *See Campusano*, 56 A.3d at 310; ECF 97 (citing cases).  These cases reason that operational control and an interest in the corporation's finances "suggest that an individual controls a corporation's financial affairs and can cause the corporation to compensate (or not to compensate) employees in accordance with the FLSA."  *Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 678 (1st Cir. 1998).  Guillen leaps from this principle to the conclusion that because Mrs. Stouffer had access to the corporate bank account and technically may have been an officer, she is a statutory employer despite her minimal control over him and his work.  Not so.

The Court is not convinced Mrs. Stouffer was an officer of Armour.  Mrs. Stouffer did not perform any of the responsibilities of a corporate officer.  She only identified herself as one— notably, in different roles—on two occasions.  For each, she had a credible explanation for why she held herself out as an officer even though she did not perform the associated responsibilities.

As for ownership, Mr. Stouffer is the sole owner of the Armour entities.  Guillen suggests that Maryland law would treat Armour Home as a *de facto* partnership and Mrs. Stouffer as a *de facto* partner because she signed checks from the corporate account after the forfeiture of the Armour Home corporate charter.  He points to Md. Code Ann., Corps. & Ass'ns § 9A-202, which

provides that "the unincorporated association of two or more persons to carry on as co-owners a business for profit forms a partnership" regardless of the individuals' intent or how they refer to the association.  But Mr. and Mrs. Stouffer did not "carry on as co-owners" of Armour, and Guillen has not identified any precedent for finding a *de facto* partnership in a similar situation.  He principally relies on *In re Hare*, 205 F. Supp. 881 (D. Md. 1962), a 60-year-old bankruptcy case that found a *de facto* partnership between a husband and wife who continued to operate their business after the corporation's charter was forfeited.  *Id.* at 884.  The court stated that partnership "may be inferred from the acts of the parties" and "is to be determined from all the circumstances." *Id.* at 885.  Critically, there was no dispute in that case that the wife was a director of the corporation and owned two percent of its stock.  *Id.* at 884.  The same is not true here.

Even if Mrs. Stouffer was an officer and/or owner of Armour, it would not change the Court's conclusion.  The cases Guillen cites suggest an owner or officer may be liable as an employer based on significant control over day-to-day business or financial decisions, even if he or she had little direct control over a worker.  *See Baystate Alt. Staffing*, 163 F.3d at 678.  But both kinds of control are minimal in Mrs. Stouffer's case.  No evidence suggests she had control over day-to-day business operations or financial decision-making; rather, she provided administrative assistance to her husband and relayed information to clients, employees, and vendors on his behalf. Mrs. Stouffer did not have control over Guillen or the decisions that led to the wage violations in his case.

Examining a few of the cases Guillen cites illustrates the kinds of control that are missing in this case.  In *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299 (11th Cir. 2013), hurricane shutter installers sued their corporate employer, its president and CEO, and two of its directors.  The Eleventh Circuit reaffirmed that employer status "does not depend on technical or

isolated factors but rather on the circumstances of the whole activity" and that directors, like corporate officers, can be personally liable under the FLSA if they exercise the requisite degree of operational control over the business. *Id.* at 1310. It held the directors were employers because they each owned a 22.5 percent stake in the corporation, were on-site at least one week per month to observe installation progress, distributed work orders that described the work to be finished each day, met with the installers to inform them they could not pay them, promised to pay them, and used personal money to satisfy the company's payroll obligations. *Id.* at 1314. This evidence proved their "role in causing the violation." *Id.* at 1313. The court concluded that "control need not be continuous, [but] it must be both substantial and related to the company's FLSA obligations." *Id.* at 1314. Unlike the directors in that case, Mrs. Stouffer did not exercise substantial control over any aspect of Armour's business. Similarly, in *Reich v. Harmelech*, No. 93C3458, 1996 WL 308272 (N.D. Ill. June 5, 1996), the court held that a husband and wife were statutory employers. *Id.* at *4. The husband was more involved in the business, but the wife was an officer and director who had knowledge that employees received NSF (insufficient funds) payroll checks but nonetheless wrote and deposited payroll checks made out to her husband from accounts at other banks and wrote other checks for expenses on behalf of the business. *Id.* In other words, she played a direct role in the wage violations. Even though Mrs. Stouffer, like the wife in *Reich*, had access to the corporate account, she did not play any role in the wage violations in this case. She did not hire or fire Guillen, was not involved in the decision to classify him as an independent contractor, and did not make decisions about when or how much he would be paid. While she did write nine of Guillen's paychecks during the relevant period, she did so only after

her husband authorized it.  Mrs. Stouffer's access to the Armour account and her check-writing authority are not the same as control over Armour's finances or compensation decisions.[14]

This case is analogous to *Morataya* and *Marroquin*, two cases in which this court found that business owners' spouses were not statutory employers.  In *Morataya*, the court concluded that the owner's spouse "did not have any control over the employees, including Plaintiff, or the day-to-day operations of [the business].  In fact, according to Plaintiff, it was [the business owner] who hired her, set her pay rate, set her hours, promoted her, and supervised her."  2015 WL 165305, at *4.  Substitute the names and pronouns, and this summary describes the record in this case.  In *Marroquin*, the court similarly concluded that an individual who "did not hire the plaintiffs, did not decide their wages, did not direct the plaintiffs in any of their work," and had no decision-making responsibilities was not an employer.  505 F. Supp. 2d at 299.  This was so despite the business observing "almost no corporate formalities" and co-mingling "corporate and family" funds; the individual's access to the corporate checking account; and her practice of writing checks to workers on behalf of her husband and sons, the owners of the company.  *Id.*  The court expressly rejected the argument that the corporation's disregard for corporate formalities gave rise to liability for the wife as a *de facto* corporate officer when there was no evidence that she "exercised control over the corporation."  *Id.*  Like the individuals in these cases, Mrs. Stouffer was involved in her spouse's business, but she did not exercise control over workers, business operations, or financial

---

[14] At trial, Guillen argued *Steelman v. Hirsh*, 473 F.3d 124 (4th Cir. 2007), also supports his argument.  *Steelman* involved romantic partners who previously co-operated a dog-grooming business.  *Id.* at 125.  The relationship broke down, and one of the women sued under the FLSA. The issue in *Steelman* was whether the plaintiff, who exhibited many of the characteristics of a general partner in the business, was an employee under the FLSA who could sue her former partner for wage violations.  *Id.* at 130–31.  That question is quite distinct from whether a person is a statutory employer.

decisions.  Rather, she signed checks, relayed information, handled paperwork, and ran errands—all at her husband's direction.

Mrs. Stouffer was not Guillen's employer, and she is not liable for the wage violations.

## C.  Damages

Guillen seeks damages for his unpaid wages under the FLSA, MWHL, and MWPCL.  He also seeks an equivalent amount as liquidated damages under the FLSA and MWHL and "a sum equal to double liquidated damages under the MWPCL."  ECF 33, at 8.  Under the "'one wrong, one recovery rule,' a party may not recover twice for one injury, even if the party asserts multiple, consistent theories of recovery."  *Clancy v. Skyline Grill, LLC*, No. ELH-12-1598, 2012 WL 5409733, at *5 (D. Md. Nov. 5, 2012).  Accordingly, Guillen may "recover only once for all damages resulting" from the established wage violations.  *See id.*

### 1.  Statutes of Limitations

The FLSA and Maryland wage statutes have different limitations periods.  Guillen filed suit on August 12, 2019.  ECF 1.  The MWHL and MWPCL use Maryland's general three-year statute of limitations, Md. Code Ann., Cts. & Jud. Proc. § 5-101, with the quirk that MWPCL claims do not accrue until two weeks after a missed wage payment, Md. Code Ann., Lab. & Empl. § 3-507.2(a).  The relevant period for the MWHL, therefore, extends to August 12, 2016, while the MWPCL effectively extends to July 29, 2016.  Guillen received his final paycheck from Armour on August 6, 2018.

The statute of limitations for FLSA claims is two years, extended to three years in cases arising out of a "willful violation."  29 U.S.C. § 255(a); *see Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 357 (4th Cir. 2011).  Because the limitations periods for the MWHL and the MWPCL are three years regardless of whether the violations were willful and the statutes

generally allow the same relief, the Court need not determine whether the violations were willful. *See Guerra*, 2019 WL 330871, at *14 (declining "to determine whether [wage] violations were 'willful' and merit an extension of the statute of limitations under the FLSA" because the state statutes "all have three-year statutes of limitations").

### 2. Wages Owed

Guillen, as the employee, has the burden of proving that he performed work for which he was not properly compensated. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). At the same time, the statutes require employers to keep records of an employee's hours and pay. 29 U.S.C. § 211(c); Md. Code Ann., Lab. & Empl. § 3-424. If an employer's records are inaccurate or inadequate, a relaxed burden-shifting scheme applies. *Anderson*, 328 U.S. at 687. The employee is required to provide only "sufficient evidence" of the hours he worked "as a matter of just and reasonable inference." *Id.* The burden then shifts to the employer to produce "evidence of the precise amount of work performed" or to negate "the reasonableness of the inference to be drawn from the employee's evidence." *Id.* If the employer fails to do so, then the Court may award damages even if they are approximate. *Id.*

Mr. Stouffer and Armour did not keep records of Guillen's hours. Guillen provided evidence of his pre-8:00 a.m. and overtime hours through his testimony, which the Court largely discredits, and the testimony of Alvarenga, which the Court credits. Guillen also produced paychecks from the relevant period that show the amount and date of each payment and allow the Court to determine how many hours he was paid for (at $25 per hour) in each check. From the checks and the testimony of Alvarenga, the Court can draw a "just and reasonable inference" of the overtime hours Guillen worked. Armour, in turn, produced Home Depot records showing when Guillen made purchases there, and Mr. Stouffer testified about Guillen's hours. The Home

Depot records negate some, but not all, inferences drawn from Guillen's evidence of his pre-8:00 a.m. hours.

Applying the relaxed burden-shifting standard, the Court has found that Guillen spent 42.11 hours between August 2016 and August 2018 picking up supplies at construction supply stores before 8:00 a.m. and that he was not compensated for this time.  On average, Guillen worked more than 40 hours per week after 8:00 a.m. during the same period, so the 42.11 hours should have been compensated at his overtime rate of $37.50 per hour—$1,579.13 total.  The Court also has found that Guillen worked a total of 224.75 overtime hours for which he was compensated at his straight-time rate.  Accounting for the $12.50 difference between his straight-time rate and overtime rate for these hours yields $2,809.38 due for unpaid overtime wages.

The Court concludes that Mr. Stouffer and the Armour entities violated the FLSA, MWHL, and MWPCL by failing to pay Guillen for his pre-8:00 a.m. hours and by failing to pay him overtime.  For the three-year period covered by the MWHL and the MWPCL, Guillen is owed $4,388.51 in unpaid wages.

### 3.  Enhanced Damages

The FLSA provides that an employer who violates the statutes shall be liable to the employee for the unpaid wages plus "an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  The MWHL provides similarly.  Md. Code Ann., Lab. & Empl. § 3-427(d)(1)(ii). Under both statutes, courts have discretion to reduce or eliminate an award of liquidated damages if the employer shows that it acted in "good faith."  29 U.S.C. § 260; Md. Code Ann., Lab. & Empl. § 3-427(d)(2).  The employer has the "plain and substantial burden" of persuading the court that its "failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon [it] more than a compensatory verdict."  *Mayhew*

*v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997).  Good faith "requires than an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them."  *Braxton v. Jackson*, 782 F. App'x 240, 245 (4th Cir. 2019) (unpublished) (quoting *Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997)).  "This burden is a difficult one to meet . . . and [d]ouble damages are the norm[.]"  *Rogers v. Sav. First Mortg., LLC*, 362 F. Supp. 2d 624, 637 (D. Md. 2005).

Mr. Stouffer and Armour have not met their burden of establishing they acted in good faith. By 2004 at the latest, Mr. Stouffer was aware of the distinction between employees and independent contractors, the criteria used to distinguish them, and the FLSA's overtime requirements.  Yet, he did not take steps to stay up to date with the law or to ascertain whether his belief that Guillen was an independent contractor was correct.  He sought no guidance regarding compliance with the law.  He either chose to remain ignorant of the legal requirements by not confirming whether Guillen was an employee or independent contractor or knew about them and disobeyed them.  He did this despite knowing Guillen regularly worked more than 40 hours per week, consistently worked for Armour for more than six years, regularly moved from one Armour job to the next, and was paid by the hour rather than by the job.  Similarly, while Mr. Stouffer was aware that Guillen went on morning supply runs—Guillen had to contact Mr. or Mrs. Stouffer to approve purchases, and Mr. Stouffer himself sometimes visited the stores in the morning—he made no effort to ascertain whether Guillen was being compensated for his time at supply stores before 8:00 a.m.  His failure to do so is notable in light of his practice of regularly reviewing Guillen's paychecks to make sure the hours were not too high.  The Armour entities and Mr. Stouffer have not met the high bar to establish they acted in good faith.

Separately, the MWPCL provides for up to treble damages if wages were not withheld "as a result of a bona fide dispute."  Md. Code Ann., Lab. & Empl. § 3-507.2(b); *Programmers' Consortium, Inc. v. Clark*, 976 A.2d 290, 299 (Md. 2009).  A bona fide dispute is one where "the party making or resisting the claim has a good faith basis for doing so" or "there is a legitimate dispute over the validity of the claim or the amount that is owing."  *Admiral Mortg., Inc. v. Cooper*, 745 A.2d 1026, 1031 (Md. 2000).  The employer bears the burden of establishing a bona fide dispute.  *Peters*, 97 A.3d at 628.  For the reasons the Court concluded the Armour entities and Mr. Stouffer did not act in good faith, it finds the wage violations were not the result of a bona fide dispute.  Even so, "[i]t has become customary in this district to award double damages under the FLSA, but not treble damages under the MWPCL[,]" if there is no evidence that the employee suffered consequential damages as the result of the underpayments.[15] *Ramirez*, 2020 WL 7398807, at *9 (quoting *Sanabria v. Cocody, Inc.*, No. DKC-16-365, 2017 WL 3022990, at *4 (D. Md. July 17, 2017)); *see also Fiallos v. Hamzah Slaughter House, LLC*, No. JMC-20-3577, 2022 WL 16540001, at *7 (D. Md. Oct. 28, 2022) (citing *Clancy*, 2012 WL 5409733, at *8).  The Court follows this lawful custom here.  Guillen has not offered evidence of consequential damages he suffered because of Armour's underpayments.

The Court awards Guillen liquidated damages under the MWHL in an amount equal to his unpaid wages.

### 4.  Attorneys' Fees and Costs

Finally, Guillen seeks reasonable attorneys' fees and costs.  Reasonable attorneys' fees and costs are mandatory under the FLSA and MWHL, and the MWPCL permits an award of attorneys'

---

[15]  It makes no difference that the damages are awarded under the MWHL rather than the FLSA.  *See Guerra*, 2019 WL 330871, at *18.

fees and costs when wage violations are not the result of a bona fide dispute.  *See* 29 U.S.C. § 216(b); Md. Code Ann., Lab. & Empl. §§ 3-427(d)(1)(iii) & 3-507(b)(1).  Guillen may move for reasonable attorneys' fees and costs pursuant to Local Rule 109.

### III.   Conclusion

Judgment in favor of Guillen and against Robert Stouffer, Armour Home, and Armour Construction is entered in the amount of $8,777.02.  The Court will defer its award of attorneys' fees and costs until it has received Guillen's fee petition and the defendants' response thereto. Judgment is entered in favor of Christina Stouffer and against Guillen on the claims against her. A separate Order follows.

Date:_ June 5, 2023 _____                        _____
                                                   Deborah L. Boardman
                                                   United States District Judge