**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| **JESUS NEHEMIAS MONTANO GUILLEN** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | |
| **v.** ) | **Civil Action No. 1:19-cv-02317-DLB** |
| ) | |
| **ARMOUR HOME** ) | |
| **IMPROVEMENT, INC.,** *et al.* ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
<u>**PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS**</u>

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

II. RELEVANT ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    A.    Plaintiff's Exaggerated Claims Led Directly to Excessive
           Legal Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

           i.    The Inclusion of Mrs. Stouffer as a Defendant. . . . . . . . . .  8

           ii.    Plaintiff's Exaggerated and Embellished Wage
                Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

    B.    Questionable Litigation Tactics and Misrepresentations.. . . . . . . . . . . . .  14

           i.    Alvarenga Deposition. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

           ii.    Stipulation Regarding a Covered Enterprise. . . . . . . . . . .  19

    C.    Dubious and Disputed Billing Practices. . . . . . . . . . . . . . . . . . . . . . . . . .  20

           i.    Billing Nearly Twenty-Four Hours in a Single Day. . . . . .  21

           ii.    Inflated, Erroneous and Dubious Billing.. . . . . . . . . . . . . .  22

           iii.    Trial Preparation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

           iv.    Feeding the Staff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

           v.    The Need for Two Attorney's, a Paralegal and Two
               Interpreters at Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

           vi.    Billing Clerical Tasks at Paralegal Rates. . . . . . . . . . . . .  28

           vii.    Other Excessive Costs Incurred.. . . . . . . . . . . . . . . . . . . . .  29

    D.    Plaintiff's Outrageous Settlement Demands. . . . . . . . . . . . . . . . . . . . . . .  31

III. ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

    A.    Initial Calculation of Attorney's Fees and Costs. . . . . . . . . . . . . . . . . . . . 33

    B.    Reduction for Unsuccessful Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    C.    Reduction for Unreasonable Settlement Demands. . . . . . . . . . . . . . . . . . 39

    D.    Plaintiff's  Excessive Legal Fees.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

IV. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

# **CASE CITATIONS**

*Carrera v. EMD Sales, Inc., No. JKB-17-3066*, 2021 WL 3856287,

    (D. Md. Aug. 27,2021) . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22, 33-35


*EEOC v. Nutri/System, Inc. 685 F. Supp. 568, 77 (E.D. Va. 1988)* . .. . . . . . . . . . . . . 39


*Fair Housing Council of Greater Washington v. Landow,*999 F.2d 92

    (4th Cir. 1993) . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-27, 40


*Friolo v. Frankel,* 91 A.3d 1156 (D.Md. 2014) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39


*Gorrell v. Wake Cty.,* No. 5:21-CV-00129-M, 2022 U.S. Dist. LEXIS

    141068, at \*28 n.4 (E.D.N.C. Aug. 8, 2022) . .. . . . . . . . . . . . . . . . . . . . . . . . . . 37


*Guillen v. Pro Services*, No. 1:20-cv-00055-RDB, ECF 36, p.5

    (D. Md. February 2, 2021) . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36


*Hart v. Bourque, 798 F.2d 519 (1st Cir. 1986)* . .. . . . . . . . . . . . . . . . . . . . . . . . . . . 27


*Hensley v. Eckerhart, 461 U.S. 424* (1983) . .. . . . . . . . . . . . . . . . . . . . . 33, 36-38, 40


*Johnson v. Georgia Highway Express Inc.,488 F.2d* 714

    (5th Cir. 1974) . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34-35, 37-38


*Lipsett v. Blanco, 975 F.2d* 934 (1st Cir. 1992) . .. . . . . . . . . . . . . . . . . . . . . . . . . . 27


*Lohman v. Duryea Borough,* 574 F. 3d 163 (3rd Cir. 2009) . .. . . . . . . . . . . . . . . . . 37-38


*Macsherry v. Sparrows Point, LLC 973* F. 3d 212 . .. . . . . . . . . . . . . . . . . . . . . . . . . 38

*Molina v. KP Stoneymill, Inc.,* No. 19-3123, 2021 WL
2805838 (D. Md. Jul. 6, 2021) . ... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-29, 35

*Mullen v. United States Army Criminal Investigation Command,* 2012
U.S. Dist. LEXIS 93977 (E.D. Va. 2012) (1st Cir. 1992) . .. . . . . . . . . . . . . . . . 37

*Nelson v. Cowles Ford, Inc.,* 77 F. App'x 637 (4th Circ. 2003) . .. . . . . . . . . . . . . . . 37

*Pacheco v. Mezeh-St. Mary's,* No. 8:21-cv-02521-TDC (D. Md. Aug. 22, 2023) . .. 35-36

*Paredes v. Zen Nails Studio,* No. 8:20-cv-02432-TDC, ECF 112-2, pp. 13 . ... . . . . . . . 21

*Thomas v. National Football League Players Ass'n,* 273 F. 3d 1124,
(D.C. Cir. 2001) . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United Nuclear Corp v. Cannon*, 564 F. Supp. 581 (D.R.I. 1983). . . . . . . . . . . . . . . . . 27

*Vocca v. Playboy Hotel of Chicago, Inc.,* 686 F. 2d 605 (1982) ... . . . . . . . . . . . . . . . . 39

*Wagenmann v. Adams, 829 F.2d 196* (1st Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

# List of Exhibits

| Ex. No. | Description |
|---|---|
| 1 | Jesus Guillen Demand Letter |
| 2 | Howard Hoffman's Declaration |
| 3 | Judge Copperthite Order |
| 4 | Jeffrey D. Goldstein Declaration |
| 5 | Plaintiff's Answers to Interrogatories |
| 6 | Plaintiff's Supplemental Answers to Interrogatories |
| 7 | Deposition of Salvador Alvarenga Quintanilla |
| 8 | Email Exchange regarding Alvarenga Deposition |
| 9 | Alvarenga Check dated June 2nd, 2014 |
| 10 | Email – Stipulation |
| 11 | Portions of DRAFT Joint Pre-Trial Statement (regarding enterprise stipulation) |
| 12 | *Paredes v. Zen Nails Studios* Time Entries Excerpt |
| 13 | *Carrera v. EMD Sales* – Suvita time Highlighted |
| 14 | Email regarding Postponement of Deposition in light of the uncertainty of the Pandemic |
| 15 | Email - Full Measure of Damages |
| 16 | Email - Armour Settlement Offer |
| 17 | Email – Request of 215k Demand |
| 18 | Spreadsheet and Quarterly Statement Letters |
| 19 | Declaration of Kimberly Paz |

COME NOW the Defendants, Armour Home Improvement, Inc., Armour Construction, LLC (Armour Home Improvement, Inc. and Armour Construction, LLC are collectively referred to as the "Armour Entities") and Robert Stouffer ("Mr. Stouffer") (the Armour Entities and Mr. Stouffer may be collectively referred to as the "Defendants"), by and through undersigned counsel, and hereby file this memorandum in opposition to Plaintiff's Motion for Attorney's Fees and Costs (the "Motion"), and in support thereof, state as follows:

## I.  PRELIMINARY STATEMENT

From the outset, this case was driven by Plaintiff's embellished and exaggerated wage claims, which the Court repeatedly called out in its Memorandum Opinion, and by his counsel's lack of billing discretion which resulted in exorbitant legal fees and costs.  This was a relatively simple and uncomplicated case, which was made more involved by Plaintiff's unsuccessful efforts to hold Christina Stouffer liable as a statutory employer.  Plaintiff's Motion seeking fees and costs should "shock the conscience" and, if anything, it is Defendants who should be awarded fees for having to defend against the inflated and unsuccessful claims.

Almost a full year after he last worked for the Armour Entities, Plaintiff Jesus Nehemias Montano Guillen ("Plaintiff" or "Guillen") filed suit against Defendants in August 2019 seeking uncompensated (and/or undercompensated) hours alleging Guillen worked "*no less* than 50 hours per week" during the statutory period, and that "*each morning* he would begin his day at Home Depot" picking up supplies for work.  ECF 1, ¶ 9 (emphasis added). Plaintiff claimed to have spent "between 30 and 60 minutes at Home Depot" each day before traveling to the job site, time for which he claimed he had not been compensated.

Defendants firmly rejected the allegation that Plaintiff was required to go to Home Depot *each morning*, but after having examined the checks issued to Guillen during the statutory

2

period, Defendants recognized the potential liability if Plaintiff could prove that he was an employee rather than an independent contractor.  As a result, during the initial call with Judge Hollander on October 24, 2019, the parties agreed to submit the matter to early mediation.  The following day, the Court issued an Order referring the matter to Judge Gesner, and on October 31, 2019, a settlement conference was soon confirmed for March 5, 2020.  ECF 11, 12.

Although settlement discussions are normally confidential, Plaintiff's counsel *waived* any such confidentiality by including settlement offers and demand in their billing records.  ECF 114-2, pp. 38-39.  In fairness, Defendants submit they are entitled to respond and provide additional context to the settlement amounts specifically referenced by Plaintiff.  Notably, while the case was still in its infancy, Plaintiff's counsel demanded $94,015, which was comprised of $60,000 for the wage claim plus $34,015 in fees and costs. See 2/20/20 demand letter attached as Exhibit 1.  Even though Defendants were certain the claimed wages were vastly overstated, Plaintiff's counsel was adamant that Guillen receive his "full measure of damages," regardless of whether those damages were supported by the evidence.  When Defendants' reasonable offer of $25,000 was rejected at the March 2020 settlement conference, it became clear that Defendants' options were to pay the grossly inflated wages plus an exorbitant amount of legal fees, or defend the action and prove the allegations were not credible and the damages overstated.  Refusing to bow to Plaintiff's demands, Defendants opted to defend against the exaggerated wage claims and the allegations as to Mrs. Stouffer.  From the outset, this case was driven by Plaintiff's legal fees and Defendants' efforts to push back against the embellished and unsuccessful claims.

In February 2023, the Court conducted a four (4) witness bench trial, which resulted in a judgment in Plaintiff's favor against some, but not all, of the Defendants, and awarded Plaintiff $4,388.51 in unpaid wages, plus enhanced damages in a like amount, which resulted in a total judgment in the amount of $8,777.02.  Significantly, the Court entered judgment in favor of

3

Defendant Christina Stouffer and against Plaintiff, entered judgment against the remaining Defendants and awarded Plaintiff approximately 17% of the total damages claimed at trial.[1] Defendants proceeded to satisfy the judgment in full with a check issued on August 21, 2023, which included the judgment principal and an estimate as to accrued interest.

As explained *infra*, the vast majority of Plaintiff's claimed legal fees and costs were incurred in pursuit of his inflated and embellished damages claims and his exaggerated claims regarding the extent of Christina Stouffer's ("Mrs. Stouffer") involvement with and control over the Armour Entities. Moreover, as detailed in Memorandum Opinion discussing the judgment, the Court *repeatedly* found that Guillen's sworn testimony was "not credible" and was "exaggerated":

- "Guillen's trial testimony about Mrs. Stouffer's role was exaggerated and not credible." ECF 107, p. 9.

- "This testimony contradicts statements [Plaintiff] made during his deposition . . ." *Id.*

- "[Plaintiff] could not remember how he requested the letter, but he testified that when he was 'asking for a letter or something,' he would go directly to Mrs. Stouffer.  This testimony is not credible." *Id*. at fn. 3.

- "This explanation is not believable and undermines Guillen's credibility." *Id.*, p. 10.

- "Other parts of Guillen's testimony about Mrs. Stouffer's role at Armour further undermine his credibility." *Id*.

- "[Plaintiff's] exaggerations and unreliable memory call into question his credibility on several key issues.  *Id*., p. 11.

- "The Court finds that Guillen exaggerated in his testimony the number of hours he worked and reported working each week.  First, his claim that he had to be at the job site by 8:00 a.m. conflicts with credible evidence." *Id*., p. 14.

---

[1] Plaintiff offered multiple, shifting damage calculations in the weeks prior to trial.  At trial, Plaintiff requested a total amount of $51,320.62.  When compared to the demand of $60,000, the success rate drops to just over thirteen percent (13%).  Regardless, having one of the Defendants dismissed at trial and then receiving an award of between 13-17% of the amounts claimed was not, by any measure, a successful outcome for Plaintiff.

- "Second, Guillen's testimony that he was not paid for the hours he reported was not credible." *Id.*, p. 15.

- "The Court finds the evidence does not support Guillen's claims of shorting." *Id.*

- "Third, Guillen's testimony about how many post-8:00 a.m. hours he worked and reported working conflicts with his paychecks." *Id.*

- "The Court finds the documentary evidence more credible than Guillen's testimony. Guillen was paid for the hours he reported." *Id.*, p. 16.

- "Here too, the Court does not find Guillen's testimony entirely credible." *Id.*, p. 19.

- "The fact that pre-8:00 a.m. checkouts are so rare among the checkouts at Home Depot casts significant doubts on Guillen's testimony that he went on pre-8:00 a.m. supply runs three or more times each week." *Id.*, p. 21.[2]

Not only did Plaintiff's exaggerated claims unnecessarily add to the time, effort and expense incurred by all parties, it also made settlement of the lawsuit virtually impossible unless Defendants were willing to pay a ransom to Plaintiff based on his inflated wages claims. In addition, a host of other issues, discussed *infra*, call into question the reasonableness of the fees sought by Plaintiff. See ¶¶ 15-25 from the Declaration of Howard Hoffman, attached as Exhibit 2. As noted by Hoffman, an experienced employment litigator, there was nothing novel or complex about this case which warrants a departure from Appendix B rates nor that necessitates the amount of time expended pursuing it, and certainly no reason to bill 23.7 hours in a single day. *Id.* at ¶¶ 35-40.

Similar to their trial strategy where Guillen's counsel presented embellished testimony and submitted exaggerated damage calculations, and then left it to Defendants and the Court to sift through and analyze, counsel employs a similar tactic here by throwing hundreds of

---

[2] As discussed *infra*, up until trial, Guillen had repeatedly claimed that he went on these early morning supply runs each and every day of his work week. See ECF 1, p. 4, ¶ 9; ECF 30-1, p. 5, ¶ 11. These embellished claims were repeated in Plaintiff's sworn Answers to Interrogatories and deposition testimony.

thousands of dollars in legal fees and costs "against the wall," thereby leaving Defendants and the Court to sort through to see what "sticks."  A careful (albeit not completely thorough) examination of the hundreds of pages of billing records, receipts and other supporting documents reveals numerous instances of overbilling (e.g., nearly twenty-four billable hours claimed by an attorney in a single day between this case and another case), inexplicable discrepancies between the legal fees claimed in the Motion and the legal fees claimed in the quarterly statements provided to counsel,  overstaffing at trial and beforehand, unreasonable and excessive "paralegal" costs claimed for routine "clerical" tasks, and other outrageous costs, including the apparent claim that Defendants should feed Guillen, his counsel and their staff during the days and weeks before and during trial. ECF 115, pp. 5, 144-159.

As further detailed in Mr. Hoffman's Declaration, the unusual fee arrangements, the outrageous settlement demands, the overstaffing and overbilling, and the inclusion of improper parties all contributed to the excessive fees sought in this case. Ex. 2, ¶¶ 15-60.   As Hoffman notes, among other things, the fee arrangement between Plaintiff and his counsel likely contributed to the inability to settle the case.  Id. at ¶¶ 42-43.

In this Opposition, counsel for Defendants attempts to separate the wheat from the chaff by pointing out many examples of the improper billing, but a full and complete analysis requires far more time, effort and expense than is reasonable here.  It should not be up to Defendants to put Plaintiff's inflated billing and cost documentation under a microscope to locate errors and instances of improper billing, but rather it should be incumbent on Plaintiff's counsel to submit an uninflated, accurate request for *reasonable* attorneys' fees and costs.

In weighing their options throughout the litigation, Defendants were faced with a "no win" proposition – either pay two times the amount of Plaintiff's exaggerated wage claims plus their ever-increasing legal fees to settle, or stand up against Plaintiff's inflated wage claims and

incur legal fees of their own defending against those claims through a trial.  Ultimately, Defendants chose to defend against Plaintiff's claims and permit a finder of fact to assess the parties' credibility, weigh the evidence, and determine the outcome.  Now that the Court has largely rejected Plaintiff's claims and called them out as exaggerated, inflated and not credible, Defendants ask this Honorable Court to carefully review the claim for "reasonable" attorneys' fees and costs, and determine whether a similar pattern of exaggeration and inflation persists.

## II. RELEVANT ISSUES

### A.    Plaintiff's Exaggerated Claims Led Directly to Excessive Legal Fees

Plaintiff began working for the Armour Entities and its sole owner, Robert Stouffer, in or about 2012, and continued in such capacity until approximately August 2018.  Although the Court determined that Defendants had misclassified Plaintiff as an independent contractor when, in fact, he was an employee, Defendants contended at trial (and still contend) it was an honest, although perhaps misinformed, mistake.  Defendants harbored no ill-will or malice towards Plaintiff, and did not intentionally underpay him during the statutory period.  Instead, it is undisputed that Defendants paid Plaintiff the agreed rate for every minute that Plaintiff reported to the Armour Entities as having worked. It is undisputed that, by agreement of the parties, Plaintiff would text his hours to Defendants, whereupon he would be compensated for the hours reported.

Further, Mr. Stouffer testified at trial that, whenever Plaintiff brought a wage or payment issue to his attention, he and Plaintiff discussed the issue and ultimately came to an agreement regarding payment.  In this instance however, Defendants were wholly unaware of the existence of some lingering wage dispute between the parties or claims of underpayment for more than a year after Plaintiff last worked for the Armour Entities.  Unfortunately for Defendants, due to the delay and the lack of notice prior to the filing of the lawsuit, all text messages from Plaintiff

7

which had been sent more than a year prior had been automatically deleted from Mr. Stouffer's phone.  As a result, Defendants were unable to refute some of Plaintiff's claims as Guillen did not retain his text messages either.[3]

Accordingly, it came as a tremendous surprise when, more than a full year after he last worked for them, Defendants, along with Mrs. Stouffer, were served with a lawsuit alleging, *inter alia*, that Plaintiff was (a) required to travel to Home Depot "each morning" before work, where he would spend "30-60 minutes" picking up supplies and materials, and would then drive to the job site by the mandatory start time of 8:00 a.m. (ECF 1, p. 4, ¶ 9); (b) contending that he worked "no less than 50 hours per week" (*Id*.); and (c) claiming he was owed back wages for the time spent at Home Depot and for unpaid overtime premiums (*Id*., p. 5, ¶ 11).

### i. The Inclusion of Mrs. Stouffer as a Defendant

In addition to suing his Mr. Stouffer, whom Plaintiff repeatedly referred to at deposition as his "boss," Plaintiff also sued Mrs. Stouffer, claiming she, too, was his statutory employer.  As discussed *infra*, while there is no doubt Mrs. Stouffer performed a number of administrative tasks for the Armour Entities and functioned as Mr. Stouffer's "right hand," there was an absolute dearth of evidence (other than Guillen's testimony) to support his claim that Christina Stouffer was his statutory employer under the "economic reality" test.  Significantly, there was no credible evidence that Mrs. Stouffer had the power to hire and fire, set wages, control schedules, or determine how and when persons were paid, nor was there any credible evidence that Mrs. Stouffer instructed anyone on how to do their work for the Armour Entities.

---

[3] Defendants recognize that, in light of the Court's finding that Plaintiff was their employee, there was an obligation to maintain time records.  Because of the settings on Mr. Stouffer's phone, all such text messages were automatically deleted one year after receipt of the message. This was not done intentionally, and it clearly would have behooved Defendants to have maintained such records.

Despite the utter lack of evidence suggesting otherwise, Plaintiff engaged in an aggressive and far-reaching quest to turn up *some* evidence supporting that Mrs. Stouffer was a statutory employer.  This included subpoenas issued for personal and business records from PNC Bank, wireless phone records for Mr. and Mrs. Stouffer and their teenage children from Verizon, credit applications from finance companies and others, and a motion to compel, which, after being granted in part, required the production of 30,000 pages of emails based on the exceedingly broad search terms requested by Plaintiff, including Mrs. Stouffer's first name, Christina.[4]  These unrelenting efforts failed to uncover any evidence supporting Plaintiff's allegations regarding Mrs. Stouffer and, instead, provided evidence that Mrs. Stouffer consistently sought direction and instruction from her husband regarding the business and business-related decisions.

Notwithstanding this lack of evidence, when faced with a Motion for Summary Judgment on the issue of whether Mrs. Stouffer was a statutory employer, Plaintiff submitted an exaggerated, embellished and self-serving affidavit (the "Affidavit") arguing that, based exclusively on his say so, Christina Stouffer controlled his schedule, instructed him in his work, was involved with calculating his wages, was an owner of the business, and "believed that Ms. Stouffer had the ability to terminate [his] employment or to discipline [him] because she was a manager at Armour, she spent time in the field visiting my job sites, was involved in scheduling, and, as [he] later learned, was also Armour's Vice President."  ECF 53-5, ¶¶ 2-7.  Moreover, the allegations contained in the Affidavit repeatedly contradicted Plaintiff's sworn Answers to

---

[4]  In connection with a discovery dispute over a variety of documents, the matter was referred to Judge Copperthite.  Following the submission of correspondence and participation in a telephonic hearing, Judge Copperthite ordered emails to be produced, along with a ledger showing payments from 2014 to Salvador Alvarenga, but the remaining relief sought by Plaintiff was denied.  A copy of Judge Copperthite's Order is attached as Exhibit 3.

Interrogatories and his sworn deposition testimony.  Whereas before, Plaintiff was clear in attributing virtually every aspect of operational control to Mr. Stouffer, the Affidavit (intended to defeat summary judgment) sought to attribute certain aspects of control to Mrs. Stouffer.  For instance, Plaintiff previously provided sworn testimony that it was Mr. Stouffer who texted him the addresses of the jobsites (ECF 53-4 at 8 (77:17-78:12), ECF 53-4 at 8 (79:13-16) and ECF 63-6 at 22)), but in the Affidavit, Plaintiff claimed that "both Mr. and Mrs. Stouffer would send [him] text messages containing the address of the job that [he] was supposed to work on for a particular day."  ECF 53-5 at 1.

Further, although his discovery responses and his prior sworn testimony (and that of Mr. Alvarenga) were replete with answers making it clear that Mr. Stouffer controlled all aspects of how to do a particular job (ECF 53-4 at 8-9 (80:8-81:18), ECF 63-7 at 10 (177:13-180:13); ECF 63-7 at 11 (185:10-188:1); ECF 48-19 at 5 (75:7-21); and, ECF 48-19 at 5 (77:7-20)), Guillen's Affidavit stated that "[i]f Mr. Stouffer was busy, and I needed instructions about the work I was doing, he would tell me to call or text Mrs. Stouffer and she would convey the directions to me." 53-5 at 2 (¶ 4).  It is difficult to reconcile this sworn statement from the Affidavit with the unambiguous statement (also under oath) in his Answers to Interrogatories that, when it came to providing instructions and decisions about a given job, "**Robert Stouffer was the only one who could make such decisions and I needed his permission, approval and guidance before proceeding**."  ECF 63-6 at 12 (emphasis added).

After the Court issued a well-reasoned and thorough Memorandum Opinion finding that Mrs. Stouffer was *not* Plaintiff's statutory employer (ECF 66), Plaintiff filed a Motion to Alter or Amend (ECF 70) arguing that the facts alleged in the Affidavit created a question of material fact upon which reasonable persons could differ, which could not be resolved at the summary

judgment stage. Nearly ten (10) months after the Motion to Alter or Amend was filed, and approximately five (5) weeks prior to trial, the Court relented and granted the motion (ECF 80).

Following trial, the Court, relying on essentially the same evidentiary and legal bases as the Memorandum Opinion (ECF 66), explicitly found that "Guillen's trial testimony about Mrs. Stouffer's role was exaggerated and not credible."  ECF 107, p. 9.  The Court then proceeded to enter judgment in favor of Mrs. Stouffer and against Plaintiff. ECF 107, pp. 27-34, 39.  Needless to say, it was Plaintiff's unrelenting efforts to find some modicum of evidentiary support for his unreliable and incredible testimony which dramatically increased the legal fees and prolonged the case as to Mrs. Stouffer.  Guillen's counsel should not be entitled to any fees incurred in connection with his efforts to allege or prove that Mrs. Stouffer was his statutory employer – whether in the pleadings or amended pleadings, discovery requests or responses, subpoenas and/or at trial.

### ii.  Plaintiff's Exaggerated and Embellished Wage Claims

Notwithstanding the many staff members involved in this case from Plaintiff's counsel's firm and the outrageous number of hours purportedly expended on the case, this was not a complex or involved case. Ex. 2, ¶¶ 26-28. Nonetheless, Plaintiff's counsel handled the case "as if they are a large commercial litigation law firm," similar to the manner in which they have handled other wage cases pending before this Court.  See ¶ 8, Statement of Jeffrey D. Goldstein, attached as Exhibit 4, and ¶ 18 of the attachment thereto.

In total, there were only four (4) depositions conducted, and the same four (4) deponents were the only witnesses who testified at trial.  Plaintiff's claims were straightforward and uncomplicated, and did not require the involvement of more than one attorney and one paralegal. Ex. 2, ¶¶ 28, 33 and 36.  Specifically, Plaintiff alleged he had worked and been paid for all post-8:00 a.m. hours worked for the Armour Entities and reported to Defendants, but that he did not

receive a full overtime rate of pay for all hours worked over eighty (80) during any given two-week period, and he did not receive compensation for the pre-8:00 a.m. hours spent at Home Depot and other supply stores.  Regarding the former allegation, Defendants acted quickly to gather copies of all checks paid to Plaintiff during the statutory period, and produced those checks prior to an early mediation between the parties in early March 2020.  In fact, all such checks were provided *prior to* Defendants' initial discovery responses later in March 2020, and were produced in good faith and in hopes of demonstrating to Plaintiff that his specific allegation of having worked "on average . . . no less than 50 hours each week," was wildly inflated and exaggerated.  Indeed, these same checks, when produced at trial (see Def. Trial Ex. Nos. 2-3), enabled the Court to calculate Plaintiff's overtime hours and ultimately determine that Plaintiff was due a total of $2,809.38 in unpaid overtime wages.  Although Plaintiff's counsel had this precise information as of late February 2020, they ignored this indisputable evidence, and instead, persisted with their claims, which, in turn, led to counsel's prolific billing throughout.

The "early morning hour" issue was a bit more complicated due to the lapse of time and the lack of records maintained.  Again, although it was Defendants' statutory duty to maintain time records, the hours Plaintiff allegedly spent at Home Depot and other supply stores were never reported to Defendants and were not tracked by anyone, including Plaintiff.  The lack of clear records allowed Plaintiff to wildly exaggerate the time allegedly spent on these early-morning supply runs.  In fact, knowing that it would be difficult for Defendants to prove otherwise, Plaintiff maintained in his Complaint (ECF 1), Amended Complaint (ECF 33), Answers to Interrogatories and Supplemental Answers to Interrogatories, that he made these early-morning supply runs *every day*.  Relevant portions of Plaintiff's Answers to Interrogatories and Supplemental Answers to Interrogatories are attached hereto as Exhibits 5 and 6 respectively.   At deposition, after initially testifying that he made the early-morning supply runs

12

every morning, Plaintiff eventually conceded that he went straight to the job site 1-2 times per month.  ECF 53-4, pp. 109-110, 122-123.

It was not until trial, when confronted with the deposition and trial testimony of Plaintiff's friend, Salvador Quintanilla, which squarely refuted Plaintiff's claims, Plaintiff testified that he made the early-morning trips "three or more" times per week, rather than "every day."  See pp. 45-46 from Deposition of Salvador Quintanilla, attached as Exhibit 7.  Even if true (which the Court determined it was not), Plaintiff's trial testimony was squarely at odds with his allegations and sworn testimony throughout the litigation, and it served to significantly reduce the exaggerated damages Plaintiff had been claiming throughout the case.  By Plaintiff clinging to the notion that he made daily, early-morning supply runs up until trial, this issue prevented Plaintiff's counsel from presenting a true and correct damage claim, it prevented the parties from engaging in reasonable and fact-based settlement discussions, and it caused both parties to incur excessive legal fees in connection with these outlandish claims.

Plaintiff's credibility regarding the supply runs was further eroded by the Home Depot records introduced at trial.  See Def. Trial Ex. No.  7.  Not only did the records establish that Plaintiff did not make the early-morning supply runs nearly as often as he claimed, but, once Defendants' counsel realized that the time stamp on the records was based on Universal Coordinated Time, Defendants were able to establish that Plaintiff's pre-8:00 a.m. hours at Home Depot were the exception, and not the norm.  See ECF 100.  This evidence, along with bank records, led the Court to conclude that "Guillen exaggerated in his testimony the number of hours he worked and reported each week," and that his "claim he had to be at the job site by 8:00 a.m. conflicts with credible evidence."  ECF 107, p. 14.  Ultimately, the Court concluded that Plaintiff expended only 42.11 uncompensated hours during these early-morning supply runs throughout the entirety of the statutory period, and was entitled to $1,579.13 as a result.

13

Yet again, this was an example of a vigorously contested issue which, because of Plaintiff's shifting testimony and wildly exaggerated damages claims, forced Plaintiff's counsel to expend excessive legal fees attempting to substantiate these inflated claims, and forced Defendants' counsel to expend significant time, efforts and expense defending against and exposing Plaintiff's claims as exaggerated and not credible.  Plaintiff's counsel should not be rewarded for perpetuating and maintaining these false and intentionally inflated claims, which directly contributed to the excessive fees and costs now being sought.

**B.  Questionable Litigation Tactics and Misrepresentations**

**i.        Alvarenga Deposition**

In considering the reasonableness of the attorneys' fees sought by Plaintiff's counsel, several matters which arose during the course of litigation merit mention.  One issue dealt with the scheduling of a deposition for Mr. Alvarenga, which was conducted on Tuesday, July 28, 2020.  Notably, in the initial Answers to Interrogatories provided by Plaintiff, in response to a question about persons with personal knowledge of the facts and allegations set forth in the Complaint, Plaintiff failed to identify Mr. Alvarenga, despite the fact that they worked together for the Armour Entities and had remained in touch.  Ex. 5, pp. 3-8.  In early July 2020, Plaintiff's counsel scheduled a number of fact witnesses for deposition, including an individual named David Hernandez, who also was not identified in Plaintiff's discovery responses.  *Id.* Mr. Hernandez's deposition was scheduled for July 28, 2020.  On Friday afternoon, July 24, 2020, Plaintiff's counsel notified Defendants that they needed to reschedule the upcoming deposition from 9 a.m. to 11 a.m.  See p. 7 from email exchange between counsel, attached as Exhibit 8.  In response, Defendants' counsel indicated the time change would not be an issue, but then sought to confirm the deponent would be Mr. Hernandez, whereupon Plaintiff's counsel advised that the deponent would be the as-yet-undisclosed Salvador Alvarenga.  *Id.* at pp. 5-7.  The following

14

day, because the identify and knowledge of Mr. Alvarenga had not been previously disclosed in

Answers to Interrogatories or otherwise, and because the name was not familiar to Defendants,

Defendants' counsel objected to the "substitution" of Mr. Alvarenga, but proposed rescheduling

the deposition until further information about his identify and knowledge were disclosed. *Id*. at

p. 4.

Shortly thereafter, Plaintiff's counsel responded and indicated that the deposition would

go forward despite the objection.  Notably, Mrs. Melehy responded as follows:

> Mr. Alverenga is not a party to this case *and has already taken the whole day
> off on Tuesday in order to attend his deposition*. It would be a great imposition
> to ask him to lose another day's worth of pay by rescheduling. In addition, we
> have already arranged for the Spanish Language Interpreter and Mr. Guillen
> will have to incur her fee if we have to reschedule as we are now outside her
> cancellation period. As such the deposition will proceed as noted and
> scheduled.
>
> Mr. Alverenga previously worked for Armour Home Improvement Inc. *and is
> well known to both Mr. and Mrs. Stouffer*. I understand that Mr. Alverenga
> started working for the Stouffers in 2014 or 2015 and knows about Mr.
> Guillen's work schedule/hours and the Defendants' pay practices and other
> related matters. He is expected to refute a majority of the testimony of both
> Mr. and Mrs. Stouffer. *After listening to the testimony of both Defendants and
> after finding out that we have not been successful in securing the cooperation
> of any of the witnesses identified by the Defendants, Mr. Guillen asked me to
> depose Mr. Alverenga instead.*
>
> *Id*. at pp. 2-3 (emphasis added).

This response was concerning in several respects.  The first was that, despite Mrs.

Melehy's certainty that Mr. Alvarenga was "well known to Mr. and Mrs. Stouffer," neither were

familiar with this individual.  In searching their records that weekend, they managed to identify

an individual named, "Juan Carlos Alvarenga," who had worked for the Armour Entities

approximately six (6) years prior, but they were uncertain whether this was the same person

sought to be deposed.  See 2014 check payable to Juan Carlos Alvarenga, attached as Exhibit 9.

Due to Mrs. Melehy's comment that this previously unknown and undisclosed individual would

be refuting "a majority of the testimony of both Mr. and Mrs. Stouffer," this was further evidence of a need to delay the deposition (which had not been properly noticed) until more information could be obtained.

It was also alarming to learn that Plaintiff knew this witness had discoverable information about the case, yet intentionally chose not to disclose his identity.  From Mrs. Melehy's comment, it seemed as though Plaintiff had been withholding this individual's identity and information until it could be sprung on Defendants to "refute" their testimony.  Finally, in an effort to increase the pressure on Defendants to go forward with the deposition, Mrs. Melehy advised that Mr. Alvarenga had taken the entire day off from work, and it would be unfair for him to lose "another day's worth of pay by rescheduling." Ex. 8, pp. 2-3.

In response, Defendants' counsel recounted the history of the deposition discussions, and again requested that the deposition be postponed until further information had been disclosed. With the deposition set for the upcoming Tuesday, counsel wrote as follows:

> Based upon your below email, it appears as though Plaintiff is unwilling to withdraw the improper, inaccurate and untimely deposition notice of Mr. Alvarenga. Therefore, I suggest we contact the judge on Monday, July 27, 2020, in an effort to resolve this dispute. If we are forced to seek a protective order, any such filing will seek the recovery of attorneys' fees and costs.
>
> *As previously expressed, we are amenable to postponing Mr. Alvarenga's deposition to a later date once Plaintiff properly supplements his discovery responses*; however, Defendants will not accept your below proffer as to what Mr. Alvarenga's testimony will be—it is not appropriate. Any such proffer must be included in Plaintiff's Supplemental Discovery Responses.

*Id*. at pp. 1-2 (emphasis added).

When Plaintiff's counsel refused to postpone the deposition and refused to make a proper disclosure as to Mr. Alvarenga's personal knowledge, Defendants sought court intervention and contacted Judge Hollander's chambers to bring the issue to the Court's attention.  During a call with Judge Hollander and counsel, Mrs. Melehy again reiterated that Mr. Alvarenga had taken an

16

entire day off from work, and that postponing his deposition would create a tremendous hardship

for him.  Although the Court expressed reservations about the improper disclosure of this

witness, Judge Hollander seemed persuaded by the inconvenience and loss of income to Mr.

Alvarenga and ordered that the deposition could proceed.

The following day, Mr. Alvarenga was deposed.  Not only did he not "refute a majority

of the testimony of Mr. and Mrs. Stouffer," but he undercut Plaintiff's testimony about going to a

supply store "each morning before work," and indicated that "[t]here was some weeks that we

would not go at all, and there were some weeks that we would go, like, two times a week."  Ex.

7, p. 45.  This testimony was consistent with Mr. Alvarenga's trial testimony of "one to three

times every two weeks," and contradicted Plaintiff's exaggerations.  ECF 107, p. 19.  Mr.

Alvarenga repeatedly referred to Mr. Stouffer as "Boss Rob," and barely made mentioned of

Mrs. Stouffer except to indicate she would authorize charges to the Armour account at Home

Depot.  Again, this testimony which was consistent with Defendants' sworn testimony and

completely at odds with Plaintiff's sworn testimony.

More disturbingly, when Defendants' counsel apologized to Mr. Alvarenga for having to

miss work and asked where he was employed, the following exchange ensued:

> Mr. Futrovsky:  I apologize that you're missing work today to sit for this
> deposition. Where is your current place of employment?
>
> Mr. Alvarenga:  I am working with a lady and I was supposed to go actually,
> today, to cut her grass, but I couldn't go because of this situation.
>
> Mr. Futrovsky:  I'm sorry. When did you notify her that you were unable to go
> because of this deposition?
>
> Mr. Alvarenga:  I didn't really give her much explanation.  I just told her I
> would go the next day.
>
> Mr. Futrovsky:  Okay. If you had called her -- strike that. When did you tell
> her that?

17

Mr. Alvarenga:  Yesterday.

Ex. 7, pp. 82-83.

Based on the foregoing, it is clear that not only did Mr. Alvarenga not have to take an entire day off from work as Mrs. Melehy advised Defendants' counsel and Judge Hollander, but he was easily able to reschedule the single lawn cutting for the following day.  It is also troubling that, on Saturday, July 25th, three (3) days prior to the deposition, Mrs. Melehy stated that Mr. Alvarenga had "already taken the whole day off on Tuesday in order to attend his deposition," and "[i]t would be a great imposition to ask him to lose another day's worth of pay by rescheduling."  Ex. 8, p. 3.  According to Mr. Alvarenga's sworn testimony however, he did not have to miss a "whole day" of work, nor would he lose "another day's worth of pay by rescheduling" (he re scheduled the grass cutting for the following day), nor had he "already taken" the day off as of Saturday the 25th (he had only informed the lady "yesterday" (i.e., Monday, July 27th).

In sum, in order to depose a previously undisclosed and largely unfamiliar deponent on less than five (5) days' notice, despite multiple, reasonable requests to postpone the deposition, Plaintiff's counsel made intentional or negligent misrepresentations concerning Mr. Alvargena's expected testimony, his work situation, and his anticipated loss of income.  These same representations were repeated to Judge Hollander, who, in ordering the deposition to proceed, seemed persuaded by the financial hardship which could result to Mr. Alvarenga if delayed.  At a minimum, Plaintiff's counsel should not be permitted to recover attorney's fees for the misleading email exchange with counsel (Ex. 8) on July 25, 2020, or the remote hearing before Judge Hollander on July 27, 2020.

18

ii.      **Stipulation Regarding a Covered Enterprise**

In support of their Motion, Plaintiff's counsel argues that they were forced to conduct discovery and incur fees over whether the Armour Entities met the definition of a "covered enterprise."  ECF 114-1, pp. 21-22.  Counsel argues that the issue was "disputed by Defendants until the eve of trial." *Id.*  Either Plaintiff has a faulty recollection, or is intentionally misrepresenting this issue.  Very early in the case, Plaintiff requested that Defendants agree on stipulations concerning the "covered enterprise" issue, and whether the individual Defendants were "employers" under the applicable statutes.  Although there was some initial confusion on the part of Defendants' counsel as to the extent of Mrs. Stouffer's involvement with the Armour Entities, by March 9, 2021, the date of Defendants' Answers to Plaintiff's First Set of Interrogatories, Defendants were clear that Mrs. Stouffer was not Plaintiff's employer under the economic reality test.  Indeed, all of the sworn testimony and discovery responses from Defendants, and all of the documentary evidence produced in discovery, supported this fact.

In July 2020, prior to the depositions of Mr. and Mrs. Stouffer, Plaintiff's counsel again reached out about the proposed stipulations.  In response, on July 21, 2020, Defendants' counsel responded and agreed to stipulate that the corporate defendant was an "enterprise engaged in commerce" under the relevant statutes.  Attached to Defendants' email was a fully executed, ready-to-file Stipulation, which Defendants anticipated would be filed by Plaintiff.   A copy of said email and the attached Stipulation are collectively attached s Exhibit 10.

On December 23, 2022, upon review of Plaintiff's initial draft of the Pretrial Order, Defendants were surprised to see that Plaintiff had included a requested stipulation in Section VI.A.j. that "Defendants were a covered enterprise under the FLSA during the period July 29, 2016 to August 8, 2018."  Although Defendants believed this was already a stipulated and

undisputed fact, Defendants *again* agreed to the "proposed stipulation."  The relevant portion of Plaintiff's proposed Pretrial Order from 12/23/22 is attached as Exhibit 11.

This is another instance of Plaintiff contending there was a disputed issue when none exists.  Defendants did not agree to stipulate to the "covered enterprise" issue on the *eve of trial* as contended, but instead had agreed to such stipulation more than *thirty (30) months* prior to trial.  Plaintiff's counsel should not be entitled to any fees or costs expended pursuing this issue through discovery or otherwise at any point after July 21, 2020.

## C.  Dubious and Disputed Billing Practices

Following receipt of the Motion, Defendants were astonished to see the extraordinary amount of time and fees expended on "Trial Preparation and Post-Trial Motions" and "Attending Trial."  Plaintiff's counsel is requesting fees in the amount of $140,850.50 based on 421.8 hours in the first category, and $44,640.00 based on 95.5 hours in the latter.  This adds up to a total of **$185,490.50** for trial preparation and trial in a case where Plaintiff's "home run" was $51,320.62 ($25,660.31 plus enhanced damages in the same amount) based on the damages sought at trial.

### i.  Billing Nearly Twenty-Four Hours in a Single Day

This outrageous time expenditure prompted counsel to seek to identify outliers in the requested fees. In one of the more unseemly and improbable instances of overbilling, between this case and another, the following entries were recorded for Mrs. Melehy on January 19, 2023:

| Case | Date | Timekeeper | Description | Time | Rate | Total |
|------|------|-----------|-------------|------|------|-------|
| Guillen | 1/19/2023 | Suvita Melehy | Continue to prepare, highlight and redact trial exhibits for inclusion in Exhibit Binder to be delivered to the Court[5] | 4.3 | $575.00 | $2,472.50 |

---

[5] Arguably, these are clerical tasks which should not be billed at an attorney's rate.

| Paredes | 1/19/2023 | Suvita Melehy | Meeting with Flor De Paredes and Francisco Lopez in preparation for trial[6] | 6.0 | $180.00 | $1,080.00 |
|---------|-----------|---------------|------------------------------------|-----|---------|-----------|
| Paredes | 1/19/2023 | Suvita Melehy | Preparing for cross-examination of Jennifer Hoang, last minute witness recently identified by Defendants | 1.3 | $575.00 | $747.50 |
| Paredes | 1/19/2023 | Suvita Melehy | Preparing for cross-examination of Phu Ly, new witness recently identified by Defendants | 2.1 | $575.00 | $1,207.50 |
| Paredes | 1/19/2023 | Suvita Melehy | Preparing for cross-examination of Truc Nguyen, new witness recently identified by Defendants | 1.8 | $575.00 | $1,035.00 |
| Paredes | 1/19/2023 | Suvita Melehy | Conference with Trial Witness Michelle Williams regarding her text messages | 1.2 | $575.00 | $690.00 |
| Paredes | 1/19/2023 | Suvita Melehy | Review and select portions of text message for counter-trial exhibit, after receiving Defendants' Trial Exhibits | 1.5 | $575.00 | $862.50 |
| Paredes | 1/19/2023 | Suvita Melehy | Telephone conversation with Camille Davis, Witness for Trial | 1.0 | $575.00 | $575.00 |
| Paredes | 1/19/2023 | Suvita Melehy | Review Defendants' trial exhibits served by Defendants | 2.8 | $575.00 | $1,610.00 |
| Paredes | 1/19/2023 | Suvita Melehy | Identify and select additional trial exhibits based upon the exhibits served by Defendants and include additional exhibits left out of Plaintiff's selection of trial exhibits previously provided to Court | 1.7 | $575.00 | $977.50 |
| **Totals** | | | | **23.7** | | **$11,257.50** |

See ECF 114-2, p. 29; and see billing attachment in *Paredes v. Zen Nails Studio*, No. 8:20-cv-02432-TDC, ECF 112-2, pp. 13, 49, a copy of which is attached as Exhibit 12.

Notably, this is not the first time Ms. Melehy has made such outlandish billing claims. In the case of *Carrera v. EMD Sales*, following a trial in which judgment was entered in favor of plaintiff, the parties engaged in preliminary settlement discussions concerning legal fees. In support of their fees, Melehy & Associates forwarded billing records to opposing counsel

---

[6] This charge was inexplicably billed at a paralegal rate and is included in the "Interpreting Category." Although counsel may claim this was in inadvertent error, Maria Aguilar charged for the same amount of time on the same date for interpreting for clients "in a trial prep meeting with Suvita Melehy." ECF 112-2, p. 13.

seeking an impossible amount of 25.8 hours covering a single day. See billing attachment in *Carrera v. EMD Sales*, No. 1:17-cv-03066-JKB, ECF 275-5, p. 50, a copy of which is attached as Exhibit 13.  In this instance, it is difficult to accept that Ms. Melehy spent 23.7 hours of billable time (23.8 if you include unbilled time) in a single day, but these calculations are based on fee petitions prepared and submitted by her firm.  Even if this egregious error can be chalked up to an inputting error or a not-so-isolated instance, it calls into question the accuracy of Melehy & Associates' fee petitions and billing practices generally.

### ii.  Inflated, Erroneous and Dubious Billing

In another instance of dubious billing practices, on Sunday, March 15, 2020, during the very early days of the pandemic, counsel for Defendants wrote to Ms. Melehy and inquired as to whether it made sense to postpone the deposition during this period of uncertainty.  Later that evening, Ms. Melehy responded:

> I just spent six and a half hours today with my client and our Spanish
> Language Paralegal preparing for my client's deposition and reviewing with
> my client the documents produced in discovery. I am unwilling to postpone the
> deposition in light of the fact that your office is merely "considering" cessation
> of in-person meeting.

See email exchange between counsel on 3/15/20, attached as Exhibit 14.

Based on counsel's indignant response, in which she stated it would "invariably lead to higher attorney's fees" if postponed, Defendants' counsel opted to proceed with the deposition. Upon receipt of Plaintiff's Motion, and recalling this specific email, Defendants' counsel decided to verify the billing entry for the deposition preparation with Plaintiff on Sunday, March 15, 2023.  Surprisingly (or not), there was no entry for Ms. Melehy on Sunday, March 15, 2020, but instead, there was a *seven (7) hour* entry for Ms. Melehy the following day, *March 16, 2020*.

ECF 114-2, p. 18.[7]   In one of the few instances where counsel had the ability to confirm the accuracy of the billing records, the entry was inflated. While arguably a minor overbilling in the scheme of things, it begs the question as to whether *all* the billing records are similarly inflated.

Yet another series of dubious billing entries involve the communications with and preparation of an affidavit for an individual named Jose Antonio.  Over the course of seven (7) weeks, from March 19, 2020 through May 8, 2020, there are approximately thirty-one (31) billing entries referencing Mr. Antonio. ECF 114-2, pp. 3-4. Although many of these entries are listed under "no charge time," Plaintiff's counsel is still seeking fees in the amount of $2,408.50 for services related to this individual.  The broader question is why?  Although much of the claimed expense appears to have been incurred preparing an affidavit for this individual, Mr. Antonio was not identified in Plaintiff's Answers to Interrogatories or his Supplemental Answers as having personal knowledge regarding the allegations in the Complaint, and no information or documentation regarding him was produced by Plaintiff.  Ex. 5 and Ex. 6.  The Court should discount and disregard any charges related to this undisclosed individual.

In another series of dubious billing entries, Plaintiff seeks excessive reimbursements for the delivery of trial binders to the Court in Baltimore on two separate occasions.  On January 20, 2023, and again on February 3, 2023, Plaintiff's incurred mileage expenses and round-trip delivery charges for their employee, Mirian Martinez, charged at paralegal rates.  ECF 114-2, pp. 29, 31; and ECF 115, p. 6.  In the former instance, Ms. Martinez spent 1.4 hours delivering "trial binders" to the courthouse for a "billable" charge of $252.00 (at $180 per hour), plus $43.43 for mileage, for a total of $295.43 for this round-trip delivery.  In the latter instance, Ms. Martinez

---

[7] There is also a corresponding interpreting entry for Maria Augilar on March 16, 2020, also for 7.0 hours.  ECF 114-2, p. 42.

spent 1.1 hours delivering "supplemental exhibits" for a charge of $198.00, plus $43.43 for mileage, for a total of $241.43 for the delivery.

Again, it is preposterous that Defendants must examine forty-six (46) pages of claimed fees in an effort to hold Plaintiff's counsel accountable. Not only is the exercise time-consuming and costly for Defendants, it is an exercise which would not have to be undertaken if Plaintiff's counsel was submitting accurate and proper billing records. These and similar-type billing entries should not be credited.

### iii. Trial Preparation

Considering the number of witnesses and the relative simplicity of the issues and evidence, it is absolutely shocking that Plaintiff's counsel claims to have expended 421.8 hours preparing for trial (of which 62.4 was "not billed") and, after reductions, are seeking attorney's fees for trial (and post-trial motions) in the amount of $88,735.82. This in and of itself is shocking for a case where Plaintiff's best-case scenario was an award between $50,000-$60,000. When examined on a more granular level however, the absurdity of Plaintiff's excessive trial preparation is exposed as overkill and outrageous. For instance, in order to prepare for the depositions of Mr. and Mrs. Stouffer, Mr. Melehy claims to have expended an astounding 39.9 hours. ECF 114-2, pp. 30-35. Similarly, Mrs. Melehy claims to have spent 36.5 hours meeting with Plaintiff to prepare for his testimony in the days prior to trial. ECF 114-2, pp. 31-34.

Yet another example is the time spent "outlining" Mr. Alvarenga's trial testimony. On February 15-16, Mr. Balashov claims to have spent a total of 3.0 hours outlining said testimony. ECF 114-2, p. 35. Considering Mr. Alvarenga was on the stand for less than an hour, it is hard to accept that it would take three times as long to reasonably and efficiently outline the testimony. In sum, the amount of time claimed to have been spent by the Melehy team preparing

24

for a four-witness trial is unfathomable.  Defendants contend that the claimed attorney's fees are every bit as exaggerated and inflated as Plaintiff's claimed wage loss.

### iv.  Feeding the Staff

Moreover, according to the cost itemizations, even though a significant amount of the time expended on January 19, 2023, was spent on the Paredes case, Plaintiff's counsel is requesting reimbursement for two separate meals consumed by staff on that same date - $112.13 and $14.18 from Panera Bread.  ECF 115, pp. 5, 145-146.   It is shocking that counsel would seek reimbursable expenses for feeding their office during the workday, as though, but for their trial preparation efforts, the Melehy staff would not have had lunch that day.  In addition, Plaintiff seeks reimbursement for a *dine-in* lunch for three (3) in the amount of $90.22 at the Jewel of India following the Pretrial Conference on February 2, 2023. ECF 115, pp. 5, 148.  This pattern continued all through the week where Plaintiff's counsel repeatedly asks Defendants to feed them lunch during trial preparation efforts, and then throughout trial.  ECF 115, pp. 5, 149-159.  Through these requests for reimbursement, Plaintiff is seeking to unreasonably foist the expense of feeding counsel and their staff onto Defendants.  Consistent with their billing practices, this cost-shifting scheme is as audacious as it is outrageous. Ex. 2, ¶ 34.

### v.  The Need for Two Attorneys, a Paralegal and Two Interpreters at Trial

Notwithstanding the fact that this was a four (4) witness bench trial with relatively uncomplicated (albeit disputed) legal issues, Plaintiff's counsel handled the trial as though it was a complex, multi-week trial, staffing the courtroom each day with two attorneys, a paralegal who assisted with numerous binders utilized by Plaintiff and operated the electronic evidence presentation, and a staff member to interpret communications with the Plaintiff.  As the Court may have observed from the presentation by Defendants, a single attorney was obviously capable of examining the limited number of witnesses and presenting evidence using the courtroom's

various presentation options.  In his Declaration, Mr. Hoffman makes similar observations about the claimed "need" for multiple attorneys and a paralegal at trial. Ex. 2, ¶ 28.

In arguing that the "nature and complexity" of the case justified the need for two attorneys throughout trial, Plaintiff writes:

> It was essential for the Plaintiff to have two trial counsel because of the division of roles between Mr. and Mrs. Melehy. Ex. B ¶ 40. Mr. Melehy examined Mr. and Mrs. Stouffer and took responsibility for delivering the closing argument. Id. Suvita Melehy took responsibility for the remaining witnesses, including the Plaintiff, and addressing certain objections which were raised with the Court as to specific testimony and exhibits. Id.

> ECF 114-1, p. 23.

Plaintiff's logic is flawed and self-serving.  After all, it is axiomatic that if one chooses to divide roles and responsibilities between two different people, one will, by definition, need two lawyers to handle the case.  By necessity, the manner in which Plaintiff's counsel intentionally divided the labor multiple attorneys were required.

Moreover, the decision to involve Omar Melehy during the lead-up to trial, rather than Andrew Balashov, the attorney most involved in the litigation up to that point (see Ex. 2, ¶ 28), required excessive fees in order to get Mr. Melehy familiar with the case and up to speed. The first billing entry for Mr. Melehy under the category of "Trial Preparation and Post-Trial Motions" was on February 1, 2023, less than two weeks before trial.  ECF 114-2, p. 30.  In the intervening period, Mr. Melehy billed for 40.9 hours at $625.00 per hour, almost all of which was spent preparing for the direct examination of Mr. Stouffer and Mrs. Stouffer. ECF 114-2, pp. 30-35.  It difficult to understand why so much time and effort is required to prepare for two witnesses considering the staff at the Melehy firm had spent 16.7 hours "outlining" the depositions (ECF 114-2, pp. 19-20) and the sheer volume of time spent identifying, assembling, and highlighting relevant exhibits.  A review of the "trial preparation" records reveals numerous

26

other examples of such overbilling and/or over-preparation, whether the *36.5 hours* Suvita

Melehy claims to have spent meeting with Guillen to prepare for his testimony (ECF 114-2, pp.

31-34) or the time spent combing through and assembling exhibits (considering most or all of the

voluminous exhibits were utilized to try to establish liability for Christina Stouffer or to push

back against Plaintiff's exaggerated claims).

> As noted in the First Circuit case of *Lipsett v. Blanco*,

>> As a general matter, "the time for two or three lawyers in a courtroom or
>> conference, when one would do, 'may obviously be discounted.'" *Hart v.
>> Bourque*, 798 F.2d 519, 523 (1st Cir. 1986)  (quoting *King*, 560 F.2d at
>> 1027); *accord Grendel's Den,* 749 F.2d at 953. Fee-shifting statutes are
>> designed to "ensure effective access to the judicial process for persons with
>> civil rights grievances," *Hensley*, 461 U.S. at 429 (citation and internal
>> quotation marks omitted), not to serve as full employment or continuing
>> education programs for lawyers and paralegals. A trial court should ordinarily
>> greet a claim that several lawyers were required to perform a single set of tasks
>> with healthy skepticism. *See United Nuclear Corp. v. Cannon*, 564 F. Supp.
>> 581, 590 (D.R.I. 1983) (suggesting that, in fee-shifting milieu, district courts
>> "must zealously guard against any propensity to over-staff litigation"). In the
>> last analysis, however, staffing issues are often best resolved by the trial court's
>> application of its intimate, first-hand knowledge of a particular case's nuances
>> and idiosyncrasies. *See*, *e.g.*, *Wagenmann v. Adams*, 829 F.2d 196, 224-25 (1st
>> Cir. 1987).

> *Lipsett v. Blanco*, 975 F.2d 934, 938-39 (1st Cir. 1992) (citations omitted).

At trial, the Court observed first-hand that a single attorney (i.e., Defendants' counsel)

was capable of examining all witnesses, handling the electronic evidence, and making all

arguments to the Court.  Simply because Plaintiff's counsel opted to divide the labor in a way

that involved multiple attorneys and clerks does not mean it was warranted or necessary, nor

does it mean the excessive numbers of hours claims are reasonable.  The Court is urged to view

these billing records "with healthy skepticism."

### vi.  Billing Clerical Tasks at Paralegal Rates

Plaintiff has also forced Defendants to sift through the forty-six (46) pages of time entries in Exhibit A to the Motion in an attempt to ferret out the legitimate charges from the improper charges, and the reasonable charges from the excessive ones. ECF 114-2.  In another billing irregularity, Plaintiff repeatedly charged paralegal rates of $180.00 per hour for purely clerical tasks.  For instance, during the pre-trial period, paralegal Christina Melehy made the following billing entries: Another example of such over-preparation (or overbilling), is the inordinate amount of time and effort expended on binder preparations, where it appears a total of 78.9 hours was expended. ECF 114-2, pp. 28-34.

Similarly, although only a charge of .4 hours, Plaintiff is seeking reimbursement at $180 per hour for "calendaring internal trial prep deadlines and associated tasks" on April 28, 2022. ECF 114-2, p. 24. Plaintiff's counsel also seeks reimbursement at either an attorney's rate or the paralegal rate for having its staff members repeatedly "communicate" with the interpreters, the expert witness and court staff.  ECF 114-2, pp. 25, 31. These are clearly clerical tasks, and not something which justifies charges at hundreds of dollars per hour. There are a multitude of similar charges sprinkled throughout the records, and it is unreasonable to for Defendants to have to identify each and every improper charge buried in the dozens of pages of time entries.

Plaintiff should know better considering they have prepared and submitted a multitude of fee petitions over the years.  In fact, in a recent decision from this Court in the case of *Molina v. KP Stoneymill, Inc.*, No. 19-3123, 2021 WL 2805838 (D. Md. Jul. 6, 2021), *a case in which Melehy & Associates was seeking attorneys' fees and costs*, Judge Simms wrote the following:

> [T]he Court observes a few entries for "preparing the complaint package," and "calendaring deadlines," and "preparing documents for mediation." These are non-compensable forms of clerical work that have been stricken. *Two Men & A Truck/Int'l, Inc. v. A. Mover, Inc.*, 128 F. Supp. 3d 919, 929-30 (E.D. Va. 2015) (forms of non-compensable clerical tasks include "collating and filing

28

documents with the court, issuing summonses, scanning and mailing documents, *reviewing files for information*, printing pleadings and preparing sets of orders, *document organization, creating notebooks or files*, updating attorneys' calendars, *assembling binders*, emailing documents or logistical calls with the clerk's office") (citations omitted); *see also Missouri v. Jenkins by Agyei*, 491 U.S. 274, 278 n.10, 109 S. Ct. 2463, 105 L.Ed. 2d 229 (1989) ("*purely clerical or secretarial tasks should not be billed at a paralegal rate*, regardless of who performs them").

*Id.* , at *16-17 (emphasis added).

The numerous hours expended "preparing trial binders and exhibits," "preparing exhibit binder for Omar Melehy," "organizing exhibits for paginating," "calendaring" and "communicating" about scheduling issues constitute purely clerical tasks which should not be billed at a paralegal rate.  This was explained to Plaintiff's counsel by this Court in the *Molina* case, yet here they are again requesting payment from Defendants at excessive rates for the same types of clerical tasks.  In another stunning display of overbilling, as explained *supra*, Plaintiff's counsel is seeking reimbursement at $185.00 per hour (plus mileage!) for hand-delivering trial notebooks to the Court on two separate occasions.[8]  Regardless of whether this was a mere oversight or whether Plaintiff is actually requesting reimbursement at these rates, it is patently unfair to shift this burden to Defendants to dig through the minutiae and pluck out improper or overbilled charges which *Plaintiff knows* should not have been included in the first place.

**vii. Other Excessive Costs Incurred**

In addition to the improper and excessive charges discussed above, there are several other examples of excessive charges incurred pursuing Plaintiff's exaggerated claims.  For instance, after pursuing a Motion to Compel to obtain virtually every email ever sent by Mrs. Stouffer

---

[8] Plaintiff's counsel seeks "reimbursement" for round-trip deliveries made by Mirian Martinez to the courthouse in Baltimore.  For the time expended on 1/20/23, Plaintiff seeks $295.43 ($252.00 paralegal time plus $43.43 in mileage), and on 2/3/23, $241.43 ($198.00 paralegal time plus $43.43 in mileage). ECF 114-2, pp. 29, 31; ECF 115, p. 6.

through the Armour email address, Defendants produced over 30,000 pages of emails.  In order to upload the email and conduct the search, Defendants used Logikcull, the same third-party vendor that Plaintiff used.  Once Defendants had identified and produced the responsive emails, Defendants' counsel downloaded the emails and maintained them on a server, at which point the project with Logikcull was terminated.  Defendants were easily able to search the emails using the search function for pdf files.

Plaintiff however, appears to have stored the emails on the Logikcull server for a total of twenty-five (25) months, incurring total charges of $6,409.01 for storing emails with the third-party vendor.  ECF 115, pp. 4, 109-133.  Almost all of these charges could have been avoided by downloading the emails to a private server and searching the emails or, alternatively, conducting the search through Logikcull and identifying helpful emails and *then* downloading to a server.  Instead, Plaintiff's counsel needlessly paid a monthly fee to store the emails for more than two (2) years, and now seek to shift the expense for these excessive charges to Defendants.

Similarly, Plaintiff seeks reimbursement for photocopying charges in the amount of $6,847.38, after making a "voluntary reduction" from the original amount of $11,412.30.  ECF 115, pp. 2, 40-68.  In support of its billing, Plaintiff contends copies are "billed to the client" at $.20 per page for non-color copies, and $.50 per page for color copies, although it is unlikely that Melehy & Associates' clients are actually reimbursing them at that inflated rate.  Further, considering most of the large volume exhibits were utilized to argue about the status of Mrs. Stouffer and Plaintiff's inflated wage claims, it is clear that significant, additional reductions would be appropriate.

Yet another example of apparent overbilling involves the interpreting services utilized by Plaintiff at trial.  Plaintiff opted to engage two (2) Spanish-speaking interpreters for trial, when only one was really needed.  In fact, considering Plaintiff's counsel opted not to have the

interpreters present for the last day of trial, and instead had their staff member, Maria Aguilar, interpret for Plaintiff, there is a question as to whether court-certified interpreters were really needed for anything other than Guillen's trial testimony. ECF 114-2, p. 43. Moreover, Plaintiff is requesting that Defendants pay for a cancellation fee of $822.44 (in addition to the $1,440.00 claimed for Ms. Aguilar's interpreting services) due to Plaintiff's last-minute decision not to have court-certified interpreters present for the final day of trial. ECF 115, pp. 4, 142.

These are some of the many examples of Plaintiff's counsel having incurred excessive and unnecessary costs in pursuit of Plaintiff's exaggerated and embellished claims, and now seek to have Defendants cover those costs. The Court should refuse to reward counsel for their wastefulness by refusing to award any unnecessary and excessive costs claims, and then apply further reductions based on Plaintiff's dismissed claims against Mrs. Stouffer and the overall lack of success.

### D.     Plaintiff's Outrageous Settlement Demands

In response to Defendants' request for early mediation, Plaintiff's counsel made their initial, outrageous settlement demand in February 2020 (Ex. 1), and persisted with such unreasonable demands throughout. Plaintiff's settlement demands were comprised of two constants – exaggerated wage claims and ever-increasing, inflated attorney's fees claims. In addition, early in the case, Plaintiff's counsel made it clear that they would not settle for less than Plaintiff's "full measure of damages." See email exchange between counsel attached as Exhibit 15.[9] Ultimately, it was these unreasonable and exaggerated claims which drove the litigation and prevented the parties from reaching a reasonable resolution.

---

[9] As referenced *supra*, Plaintiff's counsel waived any claims to confidentiality regarding settlement discussions by referencing specific offers and demands in their billing records. ECF 114-2, pp. 38-39.

It cannot be disputed that a significant portion of the legal fees claimed by Plaintiff were incurred by pushing his inflated wage claims and the claims brought against Christina Stouffer. Nonetheless, Defendants *did* make reasonable offers to resolve the case.  In or about March 2022, Judge Gesner inquired as to whether the parties were willing to engage in additional settlement negotiations in light of the dismissal of Mrs. Stouffer as a defendant on summary judgment.  As all parties were well-aware, in the absence of a judgment against both Mr. *and* Mrs. Stouffer, any future creditor would be unable to execute against marital assets, which would make collection of a large judgment next to impossible.  Nonetheless, Defendants offered to renew the same offer of $25,000 originally made at the settlement conference.  See email correspondence attached as Exhibit 16.  In response, Plaintiff demanded a total of $215,000 to resolve the lawsuit, essentially doubling-down on Guillen's wage claims and apparently oblivious to the collectability issues with Mrs. Stouffer out of the case. See email correspondence attaches as Exhibit 17; and see Ex. 2, ¶ 41.

In addition to the outrageous settlement demands, Defendants ability to resolve the case was also impacted by the Quarterly Statements prepared by Plaintiff's counsel.  Presumably in an effort to pressure Defendants into a settlement to put a halt to the escalating legal fees, a careful comparison of Plaintiff's billings records (ECF 114-2) and the Quarterly Statements submitted by Plaintiff's counsel shows that Plaintiff consistently overstated the then-current legal fees incurred in their periodic updates.  See spreadsheet and quarterly statements collectively attached as Exhibit 18; and the Declaration of Kimberly Paz concerning the preparation of the spreadsheet attached as Exhibit 19.  For instance, in reporting the fees "incurred" through the last quarter of 2019, when the case was in its infancy, Plaintiff's quarterly statement indicated new charges of $14,756 (when combined with the charges from the third quarter of 2019, showed total charges of $18,008), whereas, according to the billing records submitted with the Motion,

the charges for the fourth quarter of 2019 totaled $8,857 (and total charges of $12,816.50).  This lack of consistency between the quarterly statements and the actual time records is concerning and call into question the accuracy of the quarterly statements, the time records recently submitted, or both.  At a minimum, the inflated and inaccurate hours reported in the quarterly statements misled Defendants and gave them the false impression that more fees had been incurred.

### III.  ARGUMENT

The Supreme Court, when discussing the balancing act of determining awards of reasonable attorneys' fees, acknowledged "the congressional purpose to provide plaintiffs asserting specified federal rights with 'fees which are adequate to attract competent counsel, but which do not produce windfall to attorneys.'" *Hensley v. Eckerhart*, 461 U.S. 424, 443-44 (1983). In *Hensley,* the Supreme Court, although addressing a different fee-shifting federal statute, noted that it was not meant to become a "relief fund for lawyers." *Id.* at 446. The same holds true in FLSA litigations. Congress "left the district courts with discretion to set the precise award in individual cases and to deny fees entirely in 'special circumstances' when an award would be 'unjust,' even if the plaintiff prevailed." *Id.* Moreover, while the Court has considerable latitude in calculating the appropriate attorneys' fees and costs, it also has an affirmative duty to ensure that whatever amount it awards is "reasonable." *Id.* at 446-447.

### A.    Initial Calculation of Attorneys' Fees and Costs

Coincidently, in a prior lawsuit in which Melehy & Associates sought a fee award, this Honorable Court has previously outlined the methodology in calculating an award for attorneys' fees and costs in *Carrera v. EMD Sales, Inc*., No. JKB-17-3066, 2021 WL 3856287, (D. Md. Aug. 27, 2021), pertinent portions of which are restated here:

33

The Supreme Court has explained that "[a] reasonable attorney's fee is one that is adequate to attract competent counsel, but ... [that does] not produce windfalls to attorneys." *Blum v. Stenson*, 465 U.S. 886, 897 (1984) (internal citation and quotation marks omitted). The amount of attorney's fees to be awarded is within this Court's "sound discretion." *Burnley v. Short*, 730 F.2d 136, 141 (4th Cir. 1984). The Supreme Court has cautioned that "determination of fees 'should not result in a second major litigation.'" *Fox v. Vice*, 563 U.S. 826, 838 (2011) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). As a result, although counsel for the prevailing plaintiff must submit the requisite proof of its entitlement to an award, "trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Id.*  To determine what constitutes a reasonable award, courts use a three-step process. First, the Court calculates the lodestar amount, defined as "the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum*, 465 U.S. at 888. In calculating the lodestar, the Court Considers the factors set forth in *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013) (citing *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009)). The *Johnson* factors are as follows:

(1) the time and labor required;
(2) the novelty and difficulty of the questions;
(3) the skill requisite to perform the legal service properly;
(4) the preclusion of employment by the attorney due to acceptance of the case;
(5) the customary fee;
(6) whether the fee is fixed or contingent;
(7) time limitations imposed by the client or the circumstances;
(8) the amount involved and the results obtained;
(9) the experience, reputation, and ability of the attorneys;
(10) the "undesirability" of the case;
(11) the nature and length of the professional relationship with the client; and
(12) awards in similar cases.

*Johnson*, 488 F.2d at 717–19. As the Supreme Court explained in *Perdue v. Kenny A. ex rel. Winn*, "the lodestar figure includes most, if not all, of the relevant factors constituting a reasonable attorney's fee." 559 U.S. 542, 553 (2010) (internal quotation marks omitted). Thus, "there is a 'strong presumption' that the lodestar figure is reasonable, but that presumption may be overcome in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Id.* at 554. Second, the Court must "subtract fees for hours spent on unsuccessful claims unrelated to successful ones." *Robinson*, 560 F.3d at 244. Third, "the court should award 'some percentage of

34

the remaining amount, depending on the degree of success enjoyed by the plaintiff.'" *McAfee*, 738 F.3d at 88 (quoting *Robinson*, 560 F.3d at 244).

*Carrera v. EMD Sales, Inc.*, No. JKB-17-3066, 2021 WL 3856287, at 3-4.

In applying the *Johnson* factors, it becomes clear that the fees being sought by Plaintiff are drastically inflated and should be reduced by this Court. For one, it is clear there was nothing complex or novel about this case, which involved an overtime claim based on checks provided to Plaintiff during the statutory period, and the calculation of reasonable damages derived therefrom. The only complexities arose from having to disprove Plaintiff's exaggerated claim that he went to Home Depot or another supply store "every morning" before traveling to the job site, and, as discussed *supra*, from Plaintiff's relentless and far-reaching effort to establish that Mrs. Stouffer was a statutory employer. These issues, among others, are what added complexity to an otherwise straightforward wage claim.

Another significant *Johnson* factor which drove up the legal fees was the hourly rates sought by Plaintiff for attorney time and paralegal time. Although Plaintiff's counsel routinely seeks hourly rates in excess of the Appendix B rates, the Court has routinely applied Appendix B rates in contested cases handled by the Melehy firm. See *EMD Sales*, ("Upon consideration of the parties' arguments and the relevant Johnson factors, the Court finds that deviation from the Appendix B rates is inappropriate in this case. . . . Additionally, as described in more detail below . . . the Court does not believe that the complexity of the questions posed in this case nor the skill required to effectively litigate this case under the second and third Johnson factors merit an increase in the hourly rates awarded in a reasonable attorney's fee); *Molina*, No. 19-3123, 2021 WL 2805838 ("In addition, in our district, Appendix B to the court's Local Rules sets forth the rules and guidelines for attorney's seeking fee awards in cases such as this one."); *Pacheco v. Mezeh-St. Mary's*, No. 8:21-cv-02521-TDC, ECF 50, p. 5 (D. Md. Aug. 22, 2023)

("Nevertheless, based on the present record and a consideration of the relevant Johnson factors, the Court finds that the legal work conducted here, in a case that did not involve dipositive motions practice, depositions, or trial was not particularly novel or complex, and did not require skill beyond the typical case. Under these circumstances, the Court will not approve hourly rates above those contemplated by the Local Rules. Indeed, where these rates have been consistently published in the Local Rules, application of hourly rates within the guideline ranges is consistent with the sixth *Johnson* factor, the attorneys' expectations at the outset of the litigation."). Moreover, in an unrelated wage case involving Plaintiff, Guillen's counsel submitted a Joint Motion regarding the approval of the settlement in in which they agreed that the Appendix B rates were "more than reasonable." *Guillen v. Pro Services*, No. 1:20-cv-00055-RDB, ECF 36, p.5 (D.Md. February 2, 2021).

As noted in the Declaration of Howard Hoffman, market rates in suburban Maryland are more in line with Appendix B rates than the excessive rates requested by Plaintiff's counsel for their time and for paralegal time. Ex. 2, ¶¶ 21-22. In sum, Defendants contend there is no reason for the Court to make an upward adjustment from the Appendix B rates, and instead, posit that a downward adjustment may be appropriate based on the straightforward, uncomplicated nature of the case. *Id*. at ¶¶ 26-33.

**B.      Reduction for Unsuccessful Claims**

The Supreme Court in *Hensley* made clear that "the most critical factor" in determining an appropriate award for attorneys' fees "is the degree of success obtained." *Hensley,* 461 U.S. at 436.

> "If . . . a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a

36

plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained."

*Id.*

In considering reductions based on unsuccessful claims, courts may look to settlement negotiations between the parties. *Thomas v. National Football League Players Ass'n*, 273 F.3d 1124, 1130 n.9 (D.C. Cir. 2001). Although Federal Rule 408 imposes restrictions on the admissibility of settlement negotiations, the 4th Circuit, along with several other jurisdictions, have routinely held that settlement negotiations may be considered in determining an amount of reasonable attorneys' fees. *Nelson v. Cowles Ford, Inc.,* 77 F. App'x 637, 644 (4th Circ. 2003); *see also Gorrell v. Wake Cty., No. 5:21-CV-00129-M, 2022 U.S. Dist. LEXIS 141068, at \*28 n.4 (E.D.N.C. Aug. 8, 2022)*. In *Mullen v. United States Army Criminal Investigation Command,* 2012 U.S. Dist. LEXIS 93977 (E.D. Va. 2012), a District Court in this Circuit was tasked with deciding a plaintiff's request for attorneys' fees under a federal statute.[10] The Court in *Mullen* relied on the Third Circuit's decision in *Lohman v. Duryea Borough,* 574 F.3d 163 (3d Cir. 2009) to determine that Federal Rule 408 "does not bar a court's consideration of settlement negotiations in its analysis of what constitutes a reasonable fee award in a particular case." *Id.*

In *Lohman,* the plaintiff sought attorneys' fees and costs after a partially-successful claim relating to his wrongful discharge from employment. *Lohman*, *supra.* The defendants in the case had previously made several offers of settlement, including one for $75,000.00, all of which were rejected by the plaintiff before trial, where the jury awarded the plaintiff just $12,205.00. *Id.* After the plaintiff requested $112,883.73 in attorneys' fees and costs, the trial court engaged

---

[10] 5 U.S.C. § 552(a)(4)(E), part of the "Freedom of Information Act," states that courts "may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case . . . in which the complainant has substantially prevailed."

in the lodestar analysis under *Johnson* and subsequently used the previous offers of settlement to gauge the degree of success obtained by the plaintiff. The Court, in considering whether to allow evidence of the prior settlement negotiations, opined:

> "While evidence of settlement negotiations is inadmissible to prove the merit or lack of merit of a claim, the use of such evidence as bearing on the issue of what relief was sought by a plaintiff does not offend the clear terms of Rule 408. Such evidence can be relevant when comparing what a plaintiff "requested" to what the plaintiff was ultimately "awarded." We noted in *Washington* the "settled principle . . . that counsel fees should only be awarded to the extent that the litigant was successful." *Washington*, 89 F.3d at 1042. *Hensley* instructs us that "[t]here is no precise rule or formula" for determining how a fee should be adjusted to reflect limited success. *Hensley*, 461 U.S. at 436. These determinations are appropriately committed to the discretion of the district court "in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Id*. at 437. While evidence of settlement negotiations is only one indicator of the measure of success, it is a permissible indicator that is not precluded by Rule 408."

*Lohman* at 167.

Rule 408 promotes the public policy favoring compromise and settlement of disputes.

*Macsherry v. Sparrows Point, LLC*, 973 F.3d 212. Instead, Plaintiff's counsel has utilized Rule 408 and the FLSA to do exactly the opposite, asserting unreasonable wage claims and demands, which made settlement an impossibility while driving up the costs of litigation. In this case, Defendant made a reasonable settlement offer at a mediation conference in March of 2020. Instead of resolving the case at that point, Plaintiff instead chose to continue the long journey to trial. Ultimately, as explained *supra*, following trial, judgment was entered in favor of Mrs. Stouffer and against Plaintiff, and Plaintiff was awarded $8,777.02, or just 17% of the damages sought at trial.  Under *Lohman* and *Hensley*, this is the degree of success is the single-most important factor, and this Honorable Court should take this into consideration in determining Plaintiff's degree of success, and reduce the attorneys' fees and costs accordingly.

38

**C.      Reduction for Unreasonable Settlement Demands**

From the onset of this case, Plaintiff's counsel has aggressively litigated its exaggerated and unsupported wage claims with the obvious intent of driving up attorneys' fees and costs in an effort to force capitulation by Defendants. By making completely unrealistic settlement demands with scant evidence (i.e., Plaintiff's testimony found to be not credible) to support their valuation, Plaintiff's counsel made settlement virtually impossible, and now seek to punish Defendants for the time spent pushing back against inflated and unreasonable wage claims.[11]

Defendants offered to settle the dispute for $25,000 in March 2020, and Plaintiff should not now be rewarded for this strategy of prolonging litigation in an effort to inflate fees. Indeed, district courts within this Circuit have come to this conclusion. "While there is no decision directly on point, there is analogous authority for the sensible proposition that a party should not be permitted to increase a fee award by making unreasonable settlement demands that unnecessarily prolong the litigation." *EEOC v. Nutri/System, Inc.*, 685 F. Supp. 568, 577 (E.D. Va. 1988). The District Court in *EEOC* cites to *Vocca v. Playboy Hotel of Chicago, Inc., 686 F.2d 605 (1982),* in which the Seventh Circuit upheld a denial of a fee in an age discrimination case after the plaintiff continued to make unreasonable settlement demands and refused an early settlement offer which was close to the final settlement figure. *Id.* Indeed, even the Supreme Court of Maryland has addressed this issue, finding that "a party should not be permitted to increase a fee award by prolonging the litigation as a result of making unreasonable settlement demands or rejecting reasonable settlement offers." *Friolo v. Frankel*, 91 A.3d 1156, 1169 (D.Md. 2014).  Defendants submit that a further downward adjustment to Plaintiff's claimed fees and costs is warranted.

---

[11] Moreover, as explained by Mr. Hoffman, the nature of the fee arrangement between Plaintiff and his counsel may have also stymied a settlement.  Ex. 2, ¶¶ 42-43.

D.       **Plaintiff's Excessive Legal Fees**

There can be no dispute that Plaintiff's exaggerated, embellished and not credible wage

claims significantly added to the attorneys' fees incurred by the parties.  While there can be no

dispute that, if found to be an employee, Plaintiff would be entitled to some measure of damages,

it was his inflated wage claims which were the primary driver of this litigation.  As explained by

Mr. Hoffman, not only are the fees claimed for two attorneys at trial excessive, but the upward

adjustment from the Appendix B rates is not warranted.  Ex. 2, ¶¶ 21-40, 57-59.

Defendants have pointed out a multitude of questions and concerns about the accuracy

and believability of the fees sought in this case, but at its core, Defendants contend that the fees

claimed by Plaintiff's counsel are so grossly excessive so as to "shock the conscience."  Towards

that end, the Fourth Circuit has held that a District Court may, in its discretion, deny a request for

attorneys' fees in its entirety when the request is so outrageously excessive it "'shock[s] the

conscience of the court.'"  *Fair Housing Council of Greater Washington v. Landow*, 999 F.2d

92, 96 (4th Cir. 1993) (*quoting Sun Publishing Co., Inc. v. Mecklenburg News, Inc.*, 823 F.2d

818, 819 (4th Cir. 1987)).  While *Landow* decision involved an attorneys' fees award pursuant to

42 U.S.C. § 1988, and this is a Fair Labor Standards Act (FLSA) case, this Court and others have

repeatedly looked to attorneys' fees litigation decisions involving § 1988, e.g., *Hensley v.

Eckerhart,* 461 U.S. 424 (1983).  The *Landow* Court reasoned that because of the Fair Housing

Council's "woefully inadequate time records, coupled with its failure to make a good faith effort

to exclude fees attributable to unsuccessful claims," "a complete denial of the [Fair Housing

Council's] fee petition would be justified." *Landow*, 999 F.2d at 97.

In the matter *sub judice*, the overstaffing issues, the excessive rates sought, and the

outrageous time claimed to have been spent preparing for and trying this relatively

uncomplicated case time "shock the conscience."  As explained in detail by Mr. Hoffman in his

Declaration, this was a relatively straightforward case, which should have been staffed by a single attorney (and perhaps a paralegal), but instead was overstaffed, excessively billed, and overcharged at unrealistic and undeserved billing rates.  Ex. 2, ¶¶ 16-40, 44-56.

If this case was about obtaining justice for Mr. Guillen, the case would have resolved long ago.  Instead, the case has been about perpetuating Plaintiff's exaggerated and improper claims and excessive legal fees.  The Court should not reward such behavior and, instead, should deny the fee petition in its entirety, or alternatively, award attorney's fees to Defendants.  If the Court is not inclined to completely deny the fee petition, then, at a minimum, Defendants submit that a massive reduction in the fees and costs sought by Plaintiff would be appropriate.  In such event, in order to effect "rough justice" in this case, Defendants submit that a fee award of at most $20,000 and costs of $5,000 would be appropriate.

## IV.  CONCLUSION

In Defendants' view, this litigation was based entirely on exaggerated and embellished claims which left them in a no-win situation.  After all, more than year had passed since Plaintiff last worked for Defendants, and he filed suit against them without any prior mention of his concerns of underpayment.  There does not appear to have been any effort undertaken by Plaintiff's counsel to analyze Guillen's claims in a careful or reasonable manner or to determine whether there was evidentiary support for them.  Instead, Plaintiff and his counsel blindly proceeded with a lawsuit built upon inflated wage claims and ran up exorbitant legal fees by overstaffing and overbilling the case in the process.  Defendants were faced with the impossible choice of defending against the dubious claims and the escalating legal fees, or agreeing to pay an undeserved ransom to Plaintiff and his counsel.  Knowing that Plaintiff's claims were largely exaggerated and embellished, especially in relation to the "early morning" supply store runs and

the inclusion of Mrs. Stouffer as a party, Defendants opted to defend against these claims and let the Court decide the outcome.

Ultimately, although the Court determined that Plaintiff was an "employee" and had been undercompensated, the Court also determined that the claims were exaggerated and that Guillen's testimony was not credible in just about every respect.  Plaintiff's counsel should not be rewarded with a windfall for perpetuating these claims while, at the same time, Defendants should not suffer a steep penalty for defending against Guillen's unsubstantiated claims.

**WHEREFORE**, for the reasons set forth herein, Defendants Armour Home Improvement, Inc., Armour Construction, LLC and Robert Stouffer, oppose Plaintiff's Motion for Attorney's Fees and Costs, and respectfully request that, to the extent this Honorable Court is inclined to award fees and costs to Plaintiff, that it do so in consideration of the arguments raised herein.

Respectfully submitted,

FUTROVSKY, FORSTER & SCHERR, CHRTD.


   /s/ Todd P. Forster
Todd P. Forster – Bar No. 13182
1101 Wootton Parkway, Suite 550
Rockville, Maryland 20852
301-251-8500
301-251-8860 facsimile
tforster@futrovsky.com
*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of October, 2023, a copy of the foregoing Opposition was electronically filed via CM/ECF and served upon:

Omar Vincent Melehy, Esq.
Suvita Melehy, Esq.
Andrew Balashov, Esq.
Melehy & Associates LLC
8403 Colesville Road, Suite 610
Silver Spring, Maryland 20910
*Counsel for Plaintiff*

　　　　　　　　　　　/s/ Todd P. Forster
　　　　　　　　　　Todd P. Forster