# EXHIBIT 2

**IN THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF MARYLAND
(Northern Division)**

| | | |
|---|---|---|
| **JESUS NEHEMIAS** | * | |
| **MONTANO GUILLEN** | | |
| | * | |
| **Plaintiff** | | |
| | * | |
| **v.** | | **Civil Action No. 1:19-cv-02317-DLB** |
| | * | |
| **ARMOUR HOME** | | |
| **IMPROVEMENT, INC.,** *et al.* | * | |
| | | |
| **Defendants** | * | |

**DECLARATION OF HOWARD B. HOFFMAN**

1. I, Howard B. Hoffman, Esq., am at least 18 years of age and competent to testify, and I am not a party to, or related to a party, in this action.  I have never served as counsel to any party to this action.  I am the principal attorney of Hoffman Employment Law, LLC.

2. For the reason below, I believe I am qualified to testify as an expert witness in the following: (1) the general attorney rates for lawyers whose practice concentrate in employment law; (2) the general manner in which law firms reasonably litigate a claim by an individual for damages under the FLSA, particularly in a case such as this; (3) the education and work of legal assistants (and paralegals); (4) the overall reasonableness of fees requested by Plaintiff, and my impression of what fees would be sufficient to incentivize counsel to undertake representation of the Plaintiff in this case.  Where appropriate, I have cited case law which may inform the basis for my opinion(s).

3. It is my position that I am qualified to render an opinion in this case, as to each of these issues, to assist the Court in reaching a fair determination as to the parties' fee dispute.  My opinions are informed by years of actual experience, as identified below, research,

observations, and review of court decisions (including decisions in which I may have represented a party). This opinion is provided for use in this case alone, and I am receiving hourly compensation of $350/hour for my time in reviewing the Plaintiff's Fee Petition (and attachments) and preparing this Declaration.

### *My Background*

4. It is my opinion that my experience and education is not unlike Plaintiff's two Declarants, Mr. Omar Melehy and Mrs. Suvita Melehy, although there are some differences. By way of background, I am an attorney in private practice, and I concentrate on employment law. From 1999 to 2002, I practiced in two prominent boutique employment law firms representing management clients. I have been practicing law since December 1999. I am admitted to the Maryland bar (since 1999), the District of Columbia bar (since 2007), and the Virginia bar (since 2015), as well as the U.S. Court of Appeals for the Fourth Circuit, the U.S. Court of Appeals for the District of Columbia, the U.S. District Court for the District of Maryland,[1] the U.S. District Court for the District of Columbia, the U.S. District Court for Eastern District of Virginia and the U.S. District Court for the Western District of Virginia. I have extensive experience prosecuting and defending wage and hour cases and other employment law cases. I opened my own law practice in 2002, and on July 1, 2018, the practice began operating as Hoffman Employment Law, LLC ("Hoffman Law"). I employ one associate attorney, but at other times, have employed more than one associate attorney and other support staff.

5. I am an honors graduate of University of Maryland School of Law (May, 1999), where I was the recipient of the "Shawe & Rosenthal" employment law prize, and the "Joseph

---

[1]     I gained admission to this Court in January 2000.

Bernstein Prize" (for excellence in legal writing).

6.  I have been a Contributing Revisions Editor, Fair Labor Standards Act (BNA/ABA) from 2002 to 2020.   I was asked to speak at a seminar in December 2012, for Maryland Employment Lawyers Association titled "Bringing Your First FLSA Collective Action: The Guts and Glory of Overtime Wage Cases."   I was selected to speak at a Lorman seminar in June 2013 to discuss principles of law under the FLSA.   Most recently, I received the honor of being designated a "SuperLawyer"® in employment law in Maryland (2016-2023).

7.  I have extensive experience in prosecuting and defending wage and hour lawsuits.   Many of the well-known reported decisions in the District of Maryland addressing overtime and minimum wage rights, are cases that I have either prosecuted (represented the employee) or defended (represented the employer).   These notable and widely cited decisions include, but are not limited to: Rose v. New Day Financial, et al., 816 F.Supp.2d 245, 2011 WL 4103276 (D. Md. Oct. 5, 2011) (Quarles, J.) (represented employer; motion to compel class-waiver arbitration granted); Chapman et al. v. Ourisman Chevrolet Co., Inc., 2011 WL 2651867 (D. Md. 2011) (Williams, J.) (representation of employee class in minimum wage dispute; summary judgment for employer denied); Williams et al. v. ezStorage Corp., 2011 WL 1539941 (D. Md. Apr. 21, 2011) (Bennett, J.) (conditional certification of FLSA collective action on behalf of employees); Gionfriddo et al. v. Jason Zink, LLC, et al., 769 F.Supp.2d 880 (D. Md. 2011) (Bennett, J.) (represented employer in FLSA case; granting motion for decertification); Dorsey et al. v. The Greene Turtle Franchising Corp., 2010 WL 3655544 (D. Md. 2010) (Blake, J.) (represented employees; grant of conditional certification of FLSA collective action); Williams et al. v. Long (d/b/a "Charm City

Cupcakes"), 585 F.Supp.2d 679 (D. Md. 2008) (Grimm, J.) (represented employees; grant of conditional certification of FLSA collective action (widely cited in District)); Spencer v. Central Services, LLC, et al., Case No. CCB-10-3469, 2012 WL 142978 (D. Md. Jan. 13, 2012) (grant of attorneys' fees and costs in FLSA case); Dorsey et al. v. TGT Consulting, LLC, 888 F.Supp.2d 670, 2012 WL 3629209 (D. Md. Aug. 20, 2012) (Blake, J.) (holding employee's earning statements were insufficient to inform employees of FLSA's tip credit requirements); and Saman v. LDBP, Inc., 2012 WL 5463031 (D. Md. Nov. 7, 2012) (Chasanow, J.) (dismissal of supplemental state claim of wrongful discharge in FLSA case).  Several of the aforementioned decisions resulted in additional precedent setting decisions in that same case, although they are not cited here.  Many of the decisions further resulted in fee decisions awards either to my Firm, e.g., Dorsey, Chapman, Spencer, or awards to opposing counsel representing plaintiffs, e.g., Saman, Gionfriddo.

8.  As a member of the Virginia Bar, I take at least 12 hours of continuing legal education each year, with some hours dedicated to the issue of legal ethics, and most of the substantive courses dedicated to litigation and employment law.

9.  Based on my education and experiences, I consider myself knowledgeable of the ethics in billing fee paying clients and I consider myself knowledgeable in the litigation of legal fees (either on behalf of my client or defending a fee claim by an adversary).

10. Additionally, and like Mr. Melehy's claim of representing Section 1983 plaintiffs, in my twenty-three (23) years of practice, I have represented the interests of law enforcement whistleblowers, including in front of the U.S. Court of Appeals for the Fourth Circuit.  The cases that I prosecuted on behalf law enforcement whistleblowers, include Andrew v. Clark, 561 F.3d 261 (4th Cir. 2009) (representation of law enforcement officer in claim of

First Amendment retaliation and due process); <u>Durham v. Jones</u>, 737 F.3d 291 (4th Cir. 2013) (affirming judgment of judgment was obtained in the amount of $1,112,200.00 against Somerset County Sheriff; defeating claims of qualified immunity in First Amendment retaliation case).   Another very significant decision that I successfully handled, though not published, is <u>Lane v. Anderson</u>, 660 F. App'x 185, 196 (4th Cir. 2016) (reversing grant of 11th Amendment immunity for Baltimore City Sheriff).

11. Moreover, my work frequently casts me into the spotlight.  By way of example, I have been quoted, or my work has been featured, in the following news articles: "Deputy Gets Powers Back," The Maryland Daily Record, Pg. 1A, Aug. 14, 2013; "Tip & Fight; Famed Baltimore Restaurant Sip & Bite on the Hook for Unfair Labor Practices," Baltimore City Paper ("Mobtown Beat column"), Aug. 21, 2013; "Sheriff Owes Deputy $1.1M," The Maryland Daily Record, Pg. 1A, December 11, 2013; "Pet Peeve – Outcry Over Baltimore County Animal Shelter Erupts in Free-Speech Lawsuit," Baltimore City Paper ("Mobtown Beat column"), June 4, 2014; "State Courts Can Decide Overtime Disputes, Enhance Damages," The Maryland Daily Record, Pg. 1A, Aug. 18, 2014.  While not employment related, my Section 1983 work on behalf of animal advocates in Baltimore County, <u>see Fancy Cats Rescue Team, Inc., et al. v. Baltimore County, Md., et al.</u>, JKB 14-1073, 2015 WL 268665 (D. Md. Jan. 21, 2015) gained nationwide attention.   <u>See</u> <u>http://www.chicagotribune.com/lifestyles/pets/ct-pets-shelter-silence-0129-20150129-story.html</u> ("Bredar's decision could have implications around the country.").

12. Like Mr. Melehy, I have tried many jury trials, bench trials, administrative hearings, evidentiary hearings, and the like.  I received a jury verdict of over $1 million dollars in the <u>Durham</u> case, <u>supra</u>, affirmed on appeal.   Ms. Melehy has not indicated in her

Declaration substantial experience before juries.  She indicates that she has taken over 68 depositions, which for a lawyer with 27 years of experience, is nominal, because a busy employment litigator might take that many depositions within a three (3) to four (4) year period (although depositions are becoming less common, due to the expense associated with them).  I would be hard pressed to come up with a number of depositions that I have taken in 23 years of active litigation practice, but they would be measured in the hundreds. I would like to know how many wage cases that Mrs. Melehy handled prior to 2018.

13. I have been opposite the Melehys in one current case pending Trial in the U.S. District Court for the District of Columbia.  <u>Romero v. RBS Constr. Corp.</u>, No. CV 18-00179 (EGS), 2022 WL 522989, at *18 (D.D.C. Feb. 22, 2022) ("Defendants are granted summary judgment on the lack of enterprise coverage under the FLSA for both Plaintiffs").

14. I respect Mr. Melehy's desire as an attorney, to assist civil rights claimants.  I certainly feel the same way.  I find it curious that he appears to find employment discrimination claims less desirable than wage/hour claims.  (ECF Doc. 114-3, ¶ 28 ("Although the civil rights work is personally rewarding, it is difficult to sustain as civil rights plaintiffs are rarely able to afford the full cost of representation.")  Yet, the same can be said for wage/hour cases, especially extended odysseys like the one incurred here – surely the Plaintiff did not pay Melehy & Associates, LLC ("M&A") any monies.  *See* ECF Doc. 114-5.  I think Mr. Melehy does this inquiry a disservice by not candidly admitting the very obvious:  he and his wife have chosen to practice a high volume wage/hour law practice because those cases are more desirable to him because they are less risky, easier to win, and therefore have the potential to be more profitable in statutory fee awards, given the relaxed burdens of proof that often (*but not always) tilt towards the favor of the employee.  But given the relaxed

burdens of proof, query whether the engagement of commercial litigation tactics (discovery trench warfare like what occurred here), may establish a reasonable number of hours – more about this, *infra*.

### General Attorney Rates In The Locality

15. I represent employers and employees on an hourly basis, but it is not at all clear to me that M&A does so – and at what degree of frequency and what level.

16. I am aware of no cases where M&A represented an employer in any precedent setting case, but that might have occurred (I just know of none). My clients range from large employers of (1,000 persons or more), to small "mom & pop" employers. Without an exception, fee paying employers push back on legal fees. My fee-paying employees are generally limited to those seeking advice and consultation regarding employment severance agreements. Employees are generally unable to pay legal fees for any litigation (although my practice does not generally involve the *defense* of non-competition agreements, where such a fee arrangement is more likely, *and potentially paid by an employer*). If an employee has a viable claim, I generally will agree to take the case on a contingency/statutory-fee basis. If I am not enthusiastic enough to take an employee's claim on a contingency/statutory-fee basis, I will not take the case at all – even if the employee wanted to pay me – because I do not want to represent an employee who both loses their *case* and *their money*. Few employees, facing a career-ending termination, can afford representation, including risking so much in a case with little prospect of success. For that reason, I overwhelmingly do not charge employees for employment litigation (discrimination, terminations, retaliation, adverse actions), because employees are in a poor position to financially afford what is often years of litigation. Simply put, if I am unwilling to represent them on a

contingency/statutory-fee basis, I am unwilling to take their "last dollar" to pursue a cause that likely will not have a successful outcome. For this reason, there may be a relatively rare occasion I might turn down a wealthy employee client who might want to "risk it all," but I do not think these persons form a sufficiently large percentage of the "market" of potential employee clients.

17. I do not believe that my approach is different than other employment lawyers serving employees in the Mid-Atlantic, after talking with other employment lawyers in the area. However, employment lawyers may have some difference in their *consultation* policies and the focus of the type of cases that they are interested in taking. For example, some lawyers may only be interested in sexual harassment claims. Some may charge monies to assist employees in the filing of an "attorney prepared charge of discrimination."

18. There is a claim made by Mr. Melehy that in the last two years, M&A had an "estimated" fee-paying clients for the hourly fees set forth in Mr. Melehy's Declaration. (ECF Doc. 114-3, ¶ 29). This allegation is "estimated," does not identify the timekeeper(s) involved, nor the nature of the matter. This allegation does not identify whether it was even employment work (versus bankruptcy work, which Mrs. Melehy practices, which is compensated at higher rates in my experience). I find this highly suspect. *If these were employment law matters, I would like to compare how those matters were staffed versus the staffing in this case*. These facts, if appropriately developed, would assist me in forming certain conclusions regarding M&A's billing practices *in this case* and whether these rates are indeed competitive. I would like to know how many individuals and businesses have declined M&A's services after receipt of their hourly rate demands.

19. Nevertheless, I do believe, as a general matter, that an attorney's actual billing rate *may* be a useful starting point to evaluate a reasonable hourly rate.  I also believe that opposing counsel's actual billing may be a useful starting point to evaluate a reasonable hourly rate. That said, no one would expect a reasonable lodestar rate to be the claimed hourly rate of an attorney (or the opponent's lawyer's hourly rate).[2]

20. That said, in order to evaluate M&A's claim of fees, I would need to know more about their generalized claims that they charge $625.00/hour for Omar Melehy, for example, or $575/hour for Suvita Melehy, or $350/hour for Andrew Balashov.  What considerations went into the setting of those rates?  With those rates, I doubt that M&A is even attempting to be competitive with other employment law firms in Montgomery County, Maryland, whether serving workers or small/medium employers (larger employers may be paying those rates, or potentially greater rates).  I would want to know about the number of such clients and the frequency in which they bill actual paying clients, whether those invoices are heavily discounted, and whether their services are terminated in favor of lawyers whose rates are more in line with community standards.  I have not encountered M&A doing employment defense (hourly) work, but perhaps they might do some.  Again, I would like to know whether Mrs. Melehy's hourly rate is for bankruptcy work.

21. I am aware of no lawyers in the Montgomery County, Maryland area that can generally command a rate of $625/hour in employment cases, especially representing individual employees.  Charging $625/hour is difficult: as mentioned, individuals have been typically

---

[2]     My opinion is informed by research I have conducted in this area: "No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success." City of Detroit v. Grinnell Corp., 495 F.2d 448, 470 (2d Cir. 1974), abrogated by Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000).

fired and do not have sufficient means, and businesses have many legal options as consumers.  The competition for employers is fierce and obtaining that work often requires getting into "beauty contests" with law firms who have marketing prowess.  My general awareness of market rates led me to conclude that well-seasoned lawyers, representing individuals and small to medium sized businesses in Montgomery County, Maryland, are between $275/hour and $475/hour.  Large businesses with very established relationships who rely on "corporate" law firms, and who may be more dependent on those law firms, may charge more in hourly legal fees than $400/hour, perhaps as high (or even higher) as the amounts claimed by M&A, but I cannot say those hourly fees are reasonable.  Moreover, it is my experience that fee paying clients of <u>any size</u> are extremely suspicious of the use of multiple time-keepers and aggressively review invoices when multiple time-keepers are used in a single case.  To utilize a billing associate attorney, much less a billing paralegal in this billing environment, requires that the client see very clearly the value of that timekeeper (and often have developed a relationship of trust with them).

22. I therefore do not agree that M&A should be awarded the requested hourly fees, because there is insufficient information to inform my opinion as to their actual billing rates (based on generalized claims; anyone with a plaintiff's practice can set an hourly rate but how many actually pay it?) and the rates are not consistent with the heavy competition amongst lawyers and law firms for fee-paying clientele (and the quality of those seasoned lawyers competing for that work that charge between $275/hour and $475/hour).

23. I do not find Mrs. Melehy's experience in employment law, and in particular, wage/hour, to be appropriately described.  She may have decades of legal experience, but she may have only five (5) years of employment law experience.

24. I also do not agree that the hourly rate for Mr. Balashov is reasonable.  I find it difficult to charge $350/hour to individuals and businesses, after 23 years of practice.  (Even if you can charge $350/hour, there is usually a total limit that any legal consumer is able to spend/afford).

25. Thus, I do not believe – based on the information provided to me (ECF Doc. 114 and its attachments) that the claimed hourly rates are reasonable.  Moreover, I do not believe that the hourly rates are reasonable for the additional following reasons:

26. First, when I first began practicing as a solo lawyer, there were few lawyers in the State of Maryland taking FLSA cases.[3]  Over the last twenty (20) years, the number has grown exponentially.  The competition among lawyers for *Plaintiff side FLSA cases* is very substantial.  There are many lawyers who take worker FLSA cases and do not otherwise take employment cases, principally because they believe the cases are easy.  (This is not to say that they handle those cases well).  If the goal is to achieve a fee that will incentivize counsel to take a case, query whether the competition for those cases should inform the reasonable hourly fee.  Quite clearly, the M&A law firm finds these cases very desirable because they have filed so many of these and have so many pending.  (ECF Doc. 114-3, ¶ 37 (reciting how they have gone from 5 to 23 wage/hour cases *alone* in DC during the pendency of this case).  Based on my review, this FLSA case could not have been more straightforward and that is true regardless of whatever the Defendants did to challenge the Plaintiffs – denials of coverage are easy to address in discovery and trial and claims of

---

[3]      Mr. Melehy's partner, Phil Zipin, Esq., was one of them – but I did not understand that Mr. Melehy concentrated on unpaid wage claims.  I certainly was not familiar with Mrs. Melehy until I represented a defendant that their clients sued.

independent contractor status are relatively easy to evaluate and address in litigation. This case was always straight-forward and M&A knew that, and knew the outcome of *some* judgment in favor of their client was likely certain.

27. In contrast, where an FLSA case is precedent setting, involve class action treatment, may face long and difficult odds, and where there are few (if any) lawyers looking to pursue such a case (lack of a "market"), then hourly rates that even *exceed* that requested by M&A would be entirely reasonable. This is because of the need for skilled legal services where no market for such service exists. A recent case from the US Court of Appeals for the Third Circuit, representing a precedent setting decision involving the rights of inmates under the FLSA, is one such clear example. *Burrell v. Staff*, 60 F.4th 25, 48 (3d Cir. 2023) ("Plaintiffs thus sufficiently allege that, while working at the Center, they were the employees of the County, the Authority, and the Corporation, acting as joint employers.").

28. Other examples perhaps exist, but this very straightforward case would be highly desirable amongst the employment bar representing employees, with liability being fairly transparent. I can think of multiple law firms and lawyers that would be very eager to represent the workers in this case, many of whom would be able to speak Spanish or not need translation services from a staff member. Simply put, the competition for this case is intense whereas the competition to advance other employment cases, such as termination/retaliation cases or lesser desirable or riskier FLSA cases (such as inmate FLSA rights), not so much. I see this case requiring no specific skill set and I would have been able to handle this case quite easily five years out of law school. I would have staffed this case with just my associate Jordan S. Liew, Esq. as the lead, providing him with minimal supervision. It is my opinion that the issues and needs of this case only required

a single lawyer with Mr. Balashov's experience and education to obtain a positive result, not two partners, an associate, and five paralegals.  I question why Mr. Balashov, who is described as a senior associate, was apparently not allowed to try this case.  There is a pattern of both Mr. and Mrs. Melehy serving as Trial counsel in small and straightforward FLSA cases.  There is nothing in the record, much less anything convincing in the record, which suggests that the result here would have been different had Mr. Balashov handled the Trial in this case.  The Defendants were represented by one lawyer at Trial:  I fundamentally do not understand why two lawyers were necessary.  The explanations for this practice are merely a rhetorical exercise.  It is therefore my opinion that there was no need for two senior experienced lawyers at this Trial (along with their daughter, billing as a paralegal).

29. Thus, the desirability of this case (competition amongst lawyers for FLSA cases), combined with the relatively straightforward and easy issues, does not warrant substantial hourly fees to incentivize counsel to accept this case – and what it takes to incentivize counsel to take an FLSA case such as this is the ultimate lodestar.  We would have accepted this case on a statutory fee basis, if we knew that liability was fairly certain and we would have been willing to do so applying our historical rates located in Appendix B rates (found in the US District Court's Local Rules).  I strongly believe that other lawyers would similarly take this case if they could be awarded similar rates located in Appendix B (found in the US District Court's Local Rules).[4]  Mr. Melehy should be compensated at \$475/hour;

---

[4]     I do question Appendix B's emphasis on years of experience as a yard stick to measure the *range* for hourly fees.  In my opinion, a lawyer's level of experience is not a precise correlation to their skills and hourly rates that they may charge.  In this case, where is the explanation of why Andrew Balashov, with eight years of experience, could not have tried this case?  The better inquiry in setting a fee is to determine what fees would be sufficient to incentivize counsel to take the case, combined with the litigation needs of the case (skill required and tenacity of counsel),

Mrs. Melehy compensated at $400/hour; and Mr. Balashov compensated at $300/hour. (Paralegals to be discussed, *infra*). These rates, while nine years out of date and deserving of judicial review, would reasonably incentivize professional counsel to undertake this representation.

### *General Manner In Which Law Firms Litigate Cases Such As This*

30. It is my opinion that a reasonable fee in an FLSA case should be informed by the needs of the FLSA case itself.  In this regard, first, I think of <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 687–88 (1946) which provides a relaxed burden on an employee to demonstrate their hours of work in the absence of an employer's records.  To be sure, an employee should be reasonably allowed to challenge the denials of an employer and impeach the employer.  But extensive ESI discovery demands from email and cell phones is totally out of character with the needs of this case and the same result could have been achieved without this emphasis.

31. Second, in considering a reasonable fee in an FLSA case, the fee should be directly related to the complexity of the issues encountered and mostly the "militant" tone set by both parties, particularly the employer.  In determining the needs of a case, I think of the colorful language of the United States Court of Appeals for the First Circuit's widely cited decision, <u>Gay Officers Action League v. Puerto Rico</u>, 247 F.3d 288, 298 (1st Cir. 2001) ("After setting such a militant tone and forcing the plaintiffs to respond in kind, it seems disingenuous for the Commonwealth to castigate the plaintiffs for putting too many troops into the field" and "[w]here tag teams of attorneys are involved, fee applications should be

measured by the degree of success.

scrutinized with especial care. Moreover, the level of scrutiny should increase in direct proportion to the number of lawyers employed.").

32. I believe it is incumbent on lawyers pressing "private attorney general" actions to not employ commercial litigation law firm techniques, if they hope to properly present a fee petition and claim that it is reasonable. That, of course, may not be avoidable in certain cases where a "militant tone" is set by an employer. Gay Officers, supra.

33. Here, based on a review – albeit somewhat brief of the records – it is quite clear to me, to a reasonable degree of professional certainty, that: (a) Plaintiffs did not need as many as eight (8) timekeepers for this matter; and (b) the manner in which M&A is litigating a straightforward, single-Plaintiff FLSA case is generally excessive, unreasonable, and does not deserve the number of hours requested.  Instead, it appears that every effort is made to squeeze (and even stretch) every conceivable amount of time and cost out of this litigation. I am particularly surprised that the Plaintiffs would seek to recover the costs of their meals and even snacks (e.g., cookies, chips, etc. from Costco) from the Defendants. See (ECF Doc. 115, pg. 307-322); Lowery v. Cash's Cabanas, Inc., No. 3:08-CV-186-MCR-MD, 2011 WL 679457, at *8 (N.D. Fla. Jan. 4, 2011), report and recommendation adopted, No. 3:08CV186 MCR MD, 2011 WL 674800 (N.D. Fla. Feb. 16, 2011) (in an FLSA case, the Court observed that "from the first client contact, counsel could or should have known that defendants comprised a relatively small regional operation rather than a corporate giant committing nationwide FLSA violations. Instead, counsel's billing practice seems to have treated the case as an ATM machine.").  I would never charge a fee-paying client for my snacks for Trial, and I am unaware of any lawyers who do so.

34. A more difficult question is the legal community's billing treatment with respect to foreign language translation.  Generally speaking, if I was looking to represent a group of Spanish-speaking workers (which we have done), we have arranged for translation but not charged opponents to use a translation service.  If I was going to concentrate on wage/hour cases involving foreign-language speaking clients (which I have *not done*), particularly at the volume that M&A *apparently* does, I would either (i) hire staff who would translate; or (ii) hire an interpreter.  Either way, I would consider the cost of translation to be a cost of doing business, as I cannot conceive of representing a fee-paying foreign language speaking client and charging them for translation.  In any event, when lawyers look to charge down to the chocolate chip cookie that they purchased, the Court can be absolutely sure that the most aggressive billing arrangement is being put into place – and it is my opinion that this billing arrangement does not represent the legal community's practices – nor importantly is repayment of meals from Popeyes® (*allegedly required for conference prep sessions*) and chips from Costo required in order to sufficiently incentivize counsel to take this otherwise straightforward case.

35. In light of billing for snacks, there is something even more astonishing:   I happen to have been retained as a fee expert in De Paredes, et al. v. Zen Nails Studio, LLC, et al., 20-2432 (TDC), a similar case also filed by M&A and also tried to a judgment by both Mr. and Mrs. Melehy.  In Zen Nails, Mrs. Melehy sought compensation for at least 19.4 hours in a single workday (January 19, 2023).  Zen Nails Studio, LLC, 20-2432 (ECF Doc. 112-2, pg. 13 (6.0 hrs) and pg. 49 (13.4 hours totaled)).   In contrast, Mrs. Melehy sought compensation of 4.3 hours on January 19, 2023 in this case.  ECF Doc. 114-2, pg. 29 (4.3 hours).  For Mrs. Melehy to be believed, she would have had to have *performed billable work* for 23.7

hours in a 24 hour day – which is totally impossible in my opinion.  And this is just these two cases that I have tangential involvement in.  What about other matters that she may have billed time to?  It would be a reasonable conclusion for the Court to draw that Mrs. Melehy's hour of work records are not accurate.  Submitting a fee petition is a very serious matter involving professional responsibility and this Court should hold an evidentiary hearing and require M&A to produce their billing software (and any audit trail) in its native format so that the Court can appropriately handle this petition.[5]

36. It is my opinion that a single lawyer, perhaps with the assistance of a single paralegal (as defined below) or an associate attorney could have handled all aspects of this case, from pleading to trial.  The fact that the Defendant was represented by at Trial by a single lawyer should provide some indication that the needs of this case were not so great as to demand eight (8) timekeepers, with two senior lawyers at Trial, seeking to bill their daughter as a paralegal.

37. The billing statements represent a veritable swarm of entries, and I have not been retained to opine on them line-by-line, nor would it necessarily be useful or helpful.  Fox v. Vice, 563 U.S. 826, 838 (2011) ("trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection.").

---

[5]      There was also an allegation in Carrera et al. v. EMD Sales, Inc., et al., 17-3066 (JKB) that Mrs. Melehy billed *over* 24 hours in a single day.  Carrera et al. v. EMD Sales, Inc., et al., 17-3066 (ECF Doc. 275, pg. 3).  I render no opinion on the merits of that argument.  Rather, I reference this because these issues appear to be present in the billing records of Mrs. Melehy in another case, and this warrants serious review.

38. You do not need to read much to reach this conclusion.  There are individuals claimed to be "paralegals" who are billing for leaving a voicemail.  See e.g. (ECF Doc. 114-2, pg. 3, 04/09/20 time entry by Maria Aguilar, "Left voicemail for Jose Antonio regarding his affidavit; Memorandum to file.").  Indeed, there appear to be no less than twenty-six (26) separate entries billing for merely leaving a voicemail.  Not only are "paralegals" billing for leaving a voicemail, there are billing entries when they have *attempted* to make a call, and did not even leave a voicemail.  See e.g. (ECF Doc. 114-2, pg. 13, 8/13/2020 time entry by Maria Aguilar, "Attempt to contact client regarding the final release document he was going to get notarized; Memorandum to file.").When "paralegals" are being instructed to bill for a voicemail or even attempting a phone call, that would indicate to me that a law firm has very carefully inculcated aggressive billing practices for its staff members.  There is also the issue of bill or time-padding.  For example, Mr. Balashov billed for research into general employer liability under the FLSA for owners and officers, but M&A has ample prior experience in this basic and fundamental employment law issue.  (Indeed, their own Complaint pleads it).  In another example, Emily Wilson conducted research on "the functionality of Wi-Fi calling" which appears not related to any issue in this case, but general office operations.  ECF Doc. 114-2, pg. 31, 2/3/2023 time entry by Emily Wilson.  Every single piece of paper, every email, every "everything" appears to be read, touched, and billed by each available timekeeper.

39. However, there was a Trial in this case, and liability was not conceded.  The Defendants violated the FLSA, but that does not allow them to be sanctioned with unreasonable attorneys' fees and costs.  But putting the Plaintiffs through whatever burdens of proof that they have – especially when doing so resulted in Plaintiff being awarded a fraction of what

he was seeking – is hardly an opportunity for the vigorous level of billing that is exemplified here. The Plaintiff cannot claim that his position was even close to being fully vindicated here. It is my opinion that this case does not present any greater difficulty than any other contested FLSA case.

40. Moreover, I find it perplexing that M&A can continue to demand fees in excess of Appendix B, and then take credit in citing a "global" reduction of their fees. Any across-the-board fee cut should be made after proper hourly rates are determined. M&A continues to tilt against windmills in its demands for rates in excess of Appendix B. Skapinetz v. CoesterVMS.Com, Inc., No. CV 17-1098-PX, 2021 WL 1634712, at *9 (D. Md. Apr. 27, 2021) ("The Court cannot see how it would be equitable to impose on Defendants the cost of counsel's tilting at legal windmills."). But as noted above – this is not the sort of precedent setting, novel, or otherwise "hard-to-find-a-lawyer-to-take the case" case which would warrant fees in excess of Appendix B – regardless of the age of those fee determinations.

41. In general, my review of the billing records is generally frustrated as I cannot determine the amount of time and effort that went into trying to hold the spouse liable. Based on the Court's detailed Memorandum Opinion, I can assess that it was a very large part of this case. The failure to obtain a judgment against both spouses may seem inconsequential, but M&A appears to have tilted against legal windmills and doggedly pursued this claim because they transparently wanted to maintain both spouses as judgment debtors. This would have been a major strategic (and legally consequential) loss for the Plaintiff. I do not believe, based on Plaintiff's submissions, that the loss of that issue is adequately explained in the exercise of billing discretion.

42. Finally, I am troubled by Plaintiff's counsel's letter of representation with the Plaintiff. (ECF 114-5).  The Plaintiff appears to be an unskilled laborer, with a poor understanding of English (hence the alleged need for translation services).  He signed a letter agreeing to extremely high hourly rates which indicate that he must pay those rates *himself* if he discharges M&A.  The letter itself refers to a "deferred hourly" arrangement (whatever that means), creates assignments of interest and liens and references excessive hourly rates not recognized under Appendix B of the Local Rules in this District.  How does M&A and its client address, under the terms of the letter, a compromise settlement?  For example, if the worker recovers $100,000.00, and M&A claims to have incurred $150,000.00 in fees, then M&A would get to keep the entire $100,000.00.  An ordinary layperson would understand that they must comply with their lawyers' demands for fees from the employer, lest they be stuck paying those fees.

43. Our letters of representation make clear that the decision to settle is left to the client, i.e., the worker, and that they may withdraw from FLSA litigation subject to the Court's approval, but I do not see that here.  Instead, I think there is some confusion – perhaps deliberate – in this letter that leaves an unsophisticated legal consumer wondering what happens to their financial obligations if they want to settle their claim, *but their lawyer is not happy with the potential legal fee award.*  In my opinion, the M&A letter of representation takes too much of an interest in the client's case, both as a practical and legal matter.  As a practical matter, I would like to know how Plaintiff's counsel presented settlement offers to the Plaintiff, if those offers were made in a single number.  Alternatively, if a number was presented for the Plaintiff's compensatory and liquidated damages, and a separate number was presented as an award for Plaintiff's counsel, I would

like to know what was presented, and how and why that settlement offer was rejected. Lawyers have a professional responsibility when taking on a statutory fee case. The letter of representation does not clearly address what happens when the client seeks to settle for an amount that is contrary to their lawyer's advice, particularly when that "advice" concerns the lawyer's own legal fee. Such a situation can result in a client being held hostage to their own lawyer's pecuniary interests. How lawyers address this concern with their clients matters, because it can have an impact on the litigation. I would like to know how M&A navigated these potentially competing interests.

### *The Education and Work of Legal Assistants (Paralegals)*

44. I also seek to opine on the proper use of the term "legal assistant" and/or "paralegal" and how they are used in litigation and how a Court would properly compensate them. The use of the term "paralegal" is susceptible to various meanings, and this can result in excessive fee reimbursement requests, as the case is here.

45. As an initial matter, following my graduation from the University of Maryland, College Park, I received a graduate legal assistant certificate from Georgetown University (1993). I worked as a paralegal for two prominent law firms from 1994-1996.

46. In my view, a paralegal is to an attorney as a registered nurse is to a physician. Unlike a registered nurse, a paralegal does not need to be licensed, at least in the State of Maryland.

47. Paralegal education can be either at the associate degree level, the bachelor's degree level, or the graduate level (typically a graduate certificate). See https://www.americanbar.org/groups/paralegals/profession-information/educational-information-for-paralegals/

48. My graduate paralegal studies were very similar to my first year of law school (the course titles, the reading of case law, the nature of the "Socratic" instruction, and the intensity). Indeed, my legal research and writing course was taught at the Georgetown Law Center by one of their instructors and it was an identical course. Like law students, we were trained to write appellate briefs.

49. It is my understanding that this same training occurs throughout ABA-approved paralegal programs. As such, a paralegal possesses the skills of a first-year law student upon graduation and after several years, paralegals can possess the skills equal (or in many cases superior) to a first year associate.

50. But the use of the term "paralegal" or "legal assistant" are susceptible to abuse. A paralegal is not every member of a law firm who is not a lawyer. Just like registered nurses are more skilled than licensed practical nurses or nursing assistants, a paralegal is not a fancy title for a legal secretary. But these issues may be confusing because there is no licensing requirement for paralegals and some lawyers believe that a paralegal can develop paralegal skills "on the job." I do not agree, and in my opinion, I believe that paralegal education is a prerequisite to being identified as a paralegal.[6]

51. In my review of the paralegals that have been billed in this matter, I see only one that has completed paralegal education (Nicholas Blackmore is the only "paralegal" who has a Certificate in Paralegal Studies from the Paralegal Institute of Washington D.C.). (ECF Doc. 114-3, ¶26). Accordingly, in my opinion, there is only one paralegal timekeeper.

52. In addition, I do not see paralegal work being done. I see secretarial time being billed and even worse, being generally billed at the highest possible rates under Appendix B.

---

[6]     One could possibly do "paralegal-like" work, but a paralegal requires some paralegal training.

53. I would not bill my clients at $185/hour for high-school or undergraduate educated persons working as paralegals.  The work of these individuals generally appears very junior and very unskilled, and there is staff turnover (the impact of which is not readily explained).  None of these paralegals are doing paralegal tasks, such as drafting basic discovery or pleadings.  Knox v. Hooper's Crab House, Inc., No. 1:17-CV-01853-JMC, 2019 WL 6117713, at *5 (D. Md. Nov. 18, 2019) ("Fees for work performed by paralegals are generally recoverable, *but only to the extent that they reflect tasks traditionally performed by an attorney* and for which the attorney would customarily charge the client.").  Instead, two of the paralegals appear to almost exclusively be used as translators, and while M&A also claims they are responsible for implementing the Firm's e-discovery protocols, this appears to be nothing more than ensuring their clients don't delete data from their phones.

54. Moreover, training for individuals, whether or not paralegal, should not be at the expense of an opponent.  This practice appears especially apparent in this case, where one of the paralegals, Christina Melehy, appears to be related to Mr. and Mrs. Melehy, and only began law school this fall.  M&A insists that she needed to attend trial to note take and manage the exhibits – even though there were two other highly experienced lawyers at the trial table.  M&A does not explain why the non-speaking attorney could not handle exhibits, and why a "litigation paralegal" needed to also attend trial.  It would be reasonable to conclude, based on the familial relationship and the unnecessary redundancy of Christina Melehy's presence, that she attended the Trial solely as a form of training and experience building.[7]

---

[7]     To be clear, I do not think there is anything specifically improper with children or relatives working for or with family members who are lawyers, but this is not an excuse to pass the expense of training to an opponent, and such individuals should bill no differently than any other legal professional.

55. To be sure, M&A appears to be trying to push down work, although they also appear to push that work *wide*. And, it could be said that some of the more ministerial tasks that was done by staff of M&A might have had to have been done by lawyers, in the absence of staff members. And unless the work is secretarial, there is nothing wrong with lawyers handling lesser-skilled tasks that might be assigned to more junior billers. Brown v. Starrett City Assocs., No. 09-CV-3282 JBW, 2011 WL 5118438, at *5 n. 7 (E.D.N.Y. Oct. 27, 2011) ("It is inevitable in smaller law firms that more experienced attorneys must complete work that would be completed by a junior associate at a larger firm," and, in such circumstances, the hourly rate of an experienced attorney need not be reduced "simply because he performed legal research that could have been completed by a junior associate at a larger firm.") (quoting Serin v. N. Leasing Sys., Inc., No. 7:06-CV-1625, 2011 WL 1467560, at *11 (S.D.N.Y. Apr. 19, 2011), aff'd, 501 F. App'x 39 (2d Cir. 2012)).

56. In Knox v. Hooper's Crab House, Inc., 17-1853 (JMC), we had an FLSA class action on behalf of 50 employees. Inevitably, some of the work was paralegal-level work that we lawyers handled. We asked the Court to award attorney time at $150/hour – not even the highest rate, as requested by M&A for non-lawyers. The Court acknowledged our efforts at billing discretion, but still only awarded us $95/hour. Knox v. Hooper's Crab House, Inc., No. 1:17-CV-01853-JMC, 2019 WL 6117713, at *5 (D. Md. Nov. 18, 2019) ("Plaintiffs' Counsel articulates that it was not required to delegate such tasks as ECF filings and has exercised billing discretion by charging these tasks at a lower rate. (ECF No. 166 at 10). The Court acknowledges that in certain cases, such tasks were billed at a paralegal rate (albeit $150/hour, not the $95/hour now ordered). However, after extensive review of the time entries, the Court agrees that some reclassification is justified, and

includes those reclassifications in its order below. Further, in some cases, the Court has excluded the time sought altogether where purely administrative or clerical."). Without opining on the correctness of that decision, the Court's approach in <u>Knox</u> informs my opinion herein, and I believe that to the extent that any of the claimed paralegal time is compensable, it should be awarded at a lower rate.[8] There is insufficient information to support the highest rate claimed, based on the education and experience and skill-level of the work required of the time-keepers.

### *Impression of Appropriate Fee In This Case*

57. I do not believe that this case was properly staffed. I do not believe that this case required three lawyers and five (5) "paralegals", to recover 17% of Plaintiff's alleged damages.

58. I do not understand why both Mr. and Mrs. Melehy needed to be present at Trial, and why, if both of them were present at Trial, a litigation paralegal also needed to be present.

59. I cannot understand Mrs. Melehy's billing records and I doubt the accuracy of same. I cannot fathom how a law firm would bill a fee-paying client for snacks, and similarly cannot fathom how a firm proceeding on a statutory fee basis could bill its opponent for snacks. I think this speaks volumes as to the request overall. This is not at all normal and customary. In the course of representing businesses and some individuals, I include and bill to my clients any disbursements representing typical costs incurred in this case (e.g., filing fees, postage, copies, conference calls, court reporters, experts, etc.). We do not bill

---

[8]     As I do not employ paralegals, I do not have sufficient basis to render an opinion on their market rates (aside from witnessing Law Firm's seeking reimbursement for experienced bankruptcy paralegals). That said, $95/hour for an entry level paralegal with no paralegal training, performing routine correspondence or review/assembly work would, in my view, be on the lower end of the market rates, potentially too low. By citing <u>Knox</u>, I certainly do not intend to suggest that the Court was correct that attorneys performing paralegal tasks should be paid $95/hour. I note that if $95/hour is appropriate for attorneys performing quasi-legal paralegal tasks, it should be appropriate here with *non-lawyers* performing those tasks.

for WESTLAW (although I acknowledge that some law firms do engage in aggressively billing for that cost) and certainly not for snacks that we eat, or even worse, make available to our clients.

60. Time does not permit me to "green-eyeshade" every aspect of the Plaintiffs' fee and cost requests, i.e., the requested hourly rates and number of reasonable hours.  It is necessary to understand how this case got to this point.  I find it curious that in a time when so many civil cases are settled, and even more so, FLSA cases are settled in advance of Trial, why is it that M&A frequently goes to Trial with both senior lawyers?

61. I believe that a fee of $25,000.00 would appropriately incentivize counsel to have taken this case and prosecute it *in a responsible non-militant manner* and allow for a prompt settlement.  I know that we have settled individual cases at this amount or less.  The lack of success with respect to the spouse, and the lack of financial success, should not be compensated at any rate.  Experienced lawyers should frankly be able to expertly assess the merits of their clients' claims and price them for settlement accordingly.   An experienced lawyer, even a lesser experienced lawyer than Mr. Balashov, should have been able to better assess and anticipate the problems of Plaintiff's credibility *before* the case went to Trial, allowing the parties to engage in appropriate negotiations and discounting of demands – including discounting attorneys' fees.  In a case without any precedential value such as this, it is clear that M&A overplayed their client's hand.

62. This is particularly true in light of the lack of credulity concerning Mrs. Melehy's billing statements and the billing for items such as snacks.

**AFFIANT FURTHER SAYETH NAUGHT**

      I solemnly affirm under the penalties of perjury that the contents of the foregoing affidavit

are true and correct.

_____

Howard B. Hoffman, Esq.
October 16, 2023