**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

JESUS NEHEMIAS MONTANO      *
GUILLEN,
                            *
    Plaintiff,
                            *
v.                                        Civ. No. DLB-19-2317
                            *
ARMOUR HOME
IMPROVEMENT, INC., *et al.*,   *

    Defendants.              *

<u>**MEMORANDUM OPINION**</u>

    Jesus Nehemias Montano Guillen filed suit against Armour Home Improvement, Inc.,

Armour Construction LLC, Robert Stouffer ("Mr. Stouffer"), and Christina Stouffer ("Mrs.

Stouffer") for violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), the

Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. §§ 3-401 *et seq.* ("MWHL"), and

the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§ 3-501 *et seq.*

("MWPCL"). ECF 1 & 33. After a four-day bench trial, the Court found Mrs. Stouffer not liable

because she was not Guillen's employer but found the other defendants liable for $8,777.02 plus

reasonable attorneys' fees and costs. ECF 107, at 1.[1]

    The operative word is "reasonable." Guillen's attorneys at Melehy & Associates, LLC

("M&A") have petitioned for fees and costs that are utterly unreasonable: $233,861.04 in fees and

$32,082.87 in costs, for a total of $265,943.91. ECF 134-1, at 1. The firm has charged for non-

---

[1] The background of this case and the Court's findings of fact and conclusions of law are in the Court's post-trial memorandum opinion, ECF 107. In short, the Court found that Guillen, who did home improvement projects for Armour clients for several years, was an employee under the FLSA, not an exempt independent contractor; that Guillen was not paid for overtime and all the hours he worked; and that Mrs. Stouffer was not his employer. *See id.* at 36.

compensable work. It has overstaffed and overbilled. It has billed based on verifiably inaccurate

claims. Counsel even claim to have paid for free parking. And this is not the first time M&A has

done these things.

The motion is fully briefed. ECF 114-1 (motion for attorneys' fees), 115 (supplement to

motion), 116 (bill of costs), 127 (brief in opposition), 128 (supplement to opposition), 131 (reply),

134 (supplemental motion for attorneys' fees), 135 (opposition to supplemental motion), 136

(reply). No hearing is necessary. *See* Loc. R. 105.6. For the reasons that follow, the motion is

granted in part and denied in part.

Guillen is awarded *reasonable* fees and costs: $31,039.44.

## I.     Discussion

If a plaintiff prevails on an FLSA claim, "[t]he court in such action shall, in addition to any

judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorneys' fee to be paid by the

defendant, and costs of the action." 29 U.S.C. § 216(b). The plaintiff is the prevailing party if they

have succeeded "on any significant issue in litigation which achieves some of the benefit . . . sought

in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). There is no dispute that Guillen

prevailed here.

The amount to award is committed to the district court's "sound discretion." *Burnley v.

Short*, 730 F.2d 136, 141 (4th Cir. 1984). The calculation is a three-step process. *McAfee v. Boczar*,

738 F.3d 81, 88 (4th Cir. 2013). First, the Court must determine the lodestar amount, which is a

"reasonable hourly rate multiplied by hours reasonably expended." *Grissom v. The Mills Corp.*,

549 F.3d 313, 320–21 (4th Cir. 2008). In assessing reasonableness, the Court must consider the

twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th

Cir. 1974):

(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorneys' opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorneys' expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir. 1978) (adopting *Johnson* factors). Second, "the Court must 'subtract fees for hours spent on unsuccessful claims unrelated to successful ones.'" *McAfee*, 738 F.3d at 88 (quoting *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 244 (4th Cir. 2009)). And third, "the court should award 'some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff.'" *Id.* (quoting *Robinson*, 560 F.3d at 244).

In calculating a fee award, a court may not consider the proportionality between the damages secured for the plaintiff and the fee requested. *See City of Riverside v. Rivera*, 477 U.S. 561, 561 (1986); *Jones v. Southpeak Interactive Corp. of Del.*, 777 F.3d 658, 676 (4th Cir. 2015). Accordingly, the Court does not do so here. The plaintiff "bears the burden of demonstrating that the requested fees are reasonable." *Jones v. Dancel*, 792 F.3d 395, 404 (4th Cir. 2015) (citing *Fair Hous. Council of Greater Wa. v. Landow*, 999 F.2d 92, 97–98 (4th Cir. 1993)).

A prevailing plaintiff is entitled to recover costs as well, but "only for reasonable litigation expenses." *Id.* (quoting *Daly v. Hill*, 790 F.2d 1071, 1084 (4th Cir. 1986)).

As the Supreme Court has warned, "determination of fees should not result in a second major litigation." *Fox v. Vice*, 563 U.S. 826, 838 (2011) (quotation omitted). To that end, district courts "need not, and indeed should not, become green-eyeshade accountants." *Id.* Instead, they may "take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorneys' time." *Id.* The goal: "rough justice." *Id.*

### A.  Lodestar Amount

In this part, the Court calculates the lodestar fee. First, the Court identifies the reasonable hourly rates for the work performed. Second, the Court identifies the total number of hours reasonably expended on the work, reducing the number of hours billed in each litigation category by removing unreasonable entries, reducing the number of hours in the category by a certain percentage, or both. As part of that discussion, the Court resolves a debate between the parties about the proper method for counting hours reasonably expended. Third, the Court reduces the total number of hours reasonably expended to account for M&A's pervasive, repeated failure to exercise reasonable billing judgment, which compromises the reliability of its timekeeping records and raises serious questions about whether M&A prepared the motion in good faith. In sum, the Court determines that the lodestar fee is $43,406.51.

#### 1.  Rates

First, the Court must determine whether M&A's proposed hourly rates are reasonable. The question is whether "the requested hourly rates are consistent with 'the prevailing market rates in the relevant community for the type of work for which [counsel] seeks an award.'" *McAfee*, 738 F.3d at 91 (quoting *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990)). As the party seeking fees, M&A bears the burden of proving that the rates it requests are reasonable. *See id.* (citing *Plyler*, 902 F.2d at 277).

Omar Vincent Melehy ("Mr. Melehy"), who has 36 years of experience, billed at $625 per hour. ECF 114-1, at 7. Suvita Melehy ("Ms. Melehy"), who has 27 years of experience, billed at $575 per hour. *Id.* Andrew Balashov ("Mr. Balashov"), who has seven years of experience, billed at $350 per hour. *Id.* M&A billed the work of its paralegals at $180 per hour. *Id.*

These hourly rates exceed this Court's Local Rules' Guidelines. Loc. R. App. B.3(c), (e) (D. Md. July 1, 2023). The Guidelines provide that an hourly rate of $300–$475 is reasonable for an attorney who has been practicing for 20 or more years, like Mr. Melehy or Ms. Melehy; an hourly rate of $165–$300 is reasonable for an attorney who has been practicing for five to eight years, like Mr. Balashov; and an hourly rate of $150 is reasonable for a paralegal. The Guidelines rates are presumptively reasonable. *See Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 509 (D. Md. 2000); *Hernandez v. Nelson Precast Products, LLC*, No. LKG-21-2814, 2023 WL 7089919, at *6 (D. Md. Oct. 26, 2023).

M&A has not borne its burden of proving that the Court should deviate from the presumptively reasonable rates set forth in the Guidelines. M&A emphasizes that the Guidelines have not been updated in several years. Although that is true, that fact does not mean that these rates are unreasonable. In fact, in the last several years, the clear consensus among judges in this district in FLSA fee petition decisions has been that the Guidelines rates are reasonable—including in cases involving M&A. *See, e.g.*, *De Paredes v. Zen Nails Studio, LLC*, No. TDC-20-2432, 2023 WL 8235753, at *3 (D. Md. Nov. 28, 2023); *Carrera v. EMD Sales, Inc.*, No. JKB-17-3066, 2021 WL 3856287, at *6 (D. Md. Aug. 27, 2021); *Ramnarine v. Rainbow Child Dev. Ctr., Inc.*, No. PWG-17-2261, 2022 WL 16709764, at *7 (D. Md. Nov. 4, 2022).

As for evidence, M&A offers primarily the affidavit of Michal Shinnar, an employment attorney with over nine years of experience, who attests that the rates M&A requests are reasonable. *See* ECF 114-6, ¶¶ 1, 4, 12–14.[2] However, the Court finds more persuasive the affidavit

---

[2] M&A also filed copies of affidavits that were submitted in support of its fee petitions in previous cases. *See* ECF 114-4; ECF 114-11. The Court declines to consider these. However, even if the Court were to consider them, they would not change the Court's findings. Indeed, the *Carrera* Court considered these affidavits and did not find them a reason to deviate from the Guidelines rates. *Carrera*, 2021 WL 3856287, at *5.

of Howard B. Hoffman, an employment attorney with 23 years of experience, which the defendants submitted. *See* ECF 127-2, ¶¶ 1, 4, 10. Whereas Shinnar offers only brief and relatively vague support for M&A's rates, *see* ECF 114-6, ¶¶ 12–14, Hoffman offers a thorough, detailed critique, *see* ECF 127-2, ¶¶ 18–29. On Hoffman's account, "well-seasoned lawyers" serving clients like Guillen in this community command rates between $275 and $475 per hour. *Id.* ¶ 21. He cautions that he is not aware of any employment attorney in the region who actually receives $625 per hour in employment law cases like this one. *Id.* And he identifies important questions that M&A leaves unanswered, like how many (if any) of M&A's clients have actually paid the rates M&A claims it commands in cases like this one. *Id.* ¶ 20.

For these reasons, the Court joins the consensus of other judges in this district and finds that the reasonable rates for M&A are at the high end of the Guidelines: $475 per hour for Mr. Melehy, $475 per hour for Ms. Melehy, $300 per hour for Mr. Balashov, and $150 per hour for M&A's paralegals. *See De Paredes*, 2023 WL 8235753, at *3; *Carrera*, 2021 WL 3856287, at *6; *Ramnarine*, 2022 WL 16709764, at *7.[3] The reasons justifying the Guidelines rates in *Carrera* apply with equal force here: neither the "complexity of the questions posed in this case nor the skill required to effectively litigate this case under the second and third *Johnson* factors merit an

---

[3] In *Alvarenga Melgar v. CCC USA, LLC*, No. DLB-22-283, 2023 WL 6381438 (D. Md. Sept. 29, 2023), the Court reached a different conclusion. Following the reasoning of *Orellana v. ACL Cleaning, LLC*, No. DKC-19-2318, 2022 WL 3586513, at *2 (D. Md. Aug. 22, 2022)—which granted an unopposed M&A fee petition—this Court found that reasonable rates for M&A's services would be $625 per hour for Mr. Melehy, $575 per hour for Ms. Melehy, $350 per hour for Mr. Balashov, and $180 for the paralegals. *Alvarenga Melgar*, 2023 WL 6381438, at *3. There, however, the Court awarded fees in the context of an uncontested fee petition after a default judgment. *See id.* at *1. Now, with the benefit of subsequent decisions, full briefing, and persuasive evidence like the Hoffman declaration, the Court concludes that the Guidelines identify the correct rates for M&A in this case.

increase in the hourly rates awarded in a reasonable attorney's fee." *Carrera*, 2021 WL 3856287, at *6.

Ordinarily, the Court would apply these rates to the fee petition by adjusting each billing entry to reflect the correct rate. Here, though, a line-by-line approach would be impractical and exceedingly time-consuming because the billing records contain hundreds of entries spanning nearly 50 pages. *See* ECF 134-1. Instead, the Court will apply an across-the-board reduction to the lodestar fee of 10 percent. That is smaller than the percentage reductions to any of the individual rates, so the cut does not unfairly reduce M&A's award.[4] Nor does the cut unfairly burden the defendants. A 10 percent reduction is in the ballpark of the individual reductions and most billing entries were for lower-paid timekeepers. Admittedly, this approach is imprecise. Yet precision is not required. *See Fox*, 563 U.S. at 838. "Rough justice" is justice enough. *Id.*

Accordingly, the Court will reduce the lodestar award by 10 percent from the amount M&A sought to approximate the effect of adjusting each line to reflect the reasonable hourly rates.

### 2. Hours

Second, the Court must determine whether the number of hours that counsel worked is reasonable. The party seeking fees "must provide 'detailed records' that specify 'the services performed, by whom they were performed, the time expended thereon, and the hourly rate charged.'" *Matias Guerra v. Teixeira*, No. TDC-16-618, 2019 WL 3927323, at *2 (D. Md. Aug. 20, 2019) (quoting *Bel Air Plaza Ltd. P'ship v. Ross Dress for Less, Inc.*, No. CCB-14-2533, 2016

---

[4] The reasonable rate for Mr. Melehy's work, $475, is 24 percent lower than the rate he billed, $625. The reasonable rate for Ms. Melehy's work, $475, is 17 percent lower than the rate she billed, $575. The reasonable rate for Mr. Balashov's work, $300, is roughly 14 percent lower than the rate he billed, $350. And the reasonable rate for the paralegals, $150, is about 17 percent lower than the rate they billed, $180.

WL 3440191, at *1 (D. Md. June 23, 2016)). The plaintiff has provided these records. *See* ECF 114-2 & 134-1. However, as the Court will explain, they are pervasively flawed.

At the outset, the Court notes that while the sole expert declaration M&A proffers in support of its fee petition endorses the reasonableness of M&A's requested rates, the declaration says nothing whatsoever in support of the reasonableness of M&A's hours billed. *See* ECF 114-6. That omission is even more striking because the same declarant attested to the reasonableness of the hours M&A billed in a previous case in this district mere months earlier. *See* ECF 112-10, ¶ 15 in *De Paredes*, 2023 WL 8235753. By contrast, the defendants' expert provides an extensive and detailed critique of M&A's billed hours and its costs. *See* ECF 127-2. So there is no independent evidence that the number of hours M&A billed for is reasonable, and there is significant evidence that it is unreasonable.

### a.  Counting Reasonable Hours

The Court will review each category of billing to determine whether the hours billed are reasonable. Before doing that, the Court must address M&A's unprecedented and inaccurate approach to counting these hours.

To repeat, there is a "three-step process" for computing an award of attorneys' fees. *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013). Going step by step, in order, matters:

> [I]n calculating an appropriate attorneys' fee award, a district court must *first* determine the lodestar amount (reasonable hourly rate multiplied by hours reasonably expended)[.] . . . *[A]fter* calculating the lodestar figure, the court *then* should subtract fees for hours spent on unsuccessful claims unrelated to successful ones. *Once* the court has subtracted the fees incurred for unsuccessful, unrelated claims, it *then* awards some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff.

*Grissom*, 549 F.3d at 320–21 (quoting *Johnson v. City of Aiken*, 278 F.3d 333, 337 (4th Cir. 2002)) (internal quotation marks omitted) (emphasis added). It is imperative to go one step at a time

because each step addresses a different issue. As the Supreme Court has explained, an award might be excessive because the prevailing party billed for "hours that were not reasonably expended." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) (quotation omitted). Or an award might be excessive because the prevailing party "achieved only partial or limited success." *Id.* Or both. These are two distinct excesses that the Court must eliminate at two distinct stages of the process.

In its fee computation spreadsheet, M&A basically follows these rules. *See* ECF 114-1 & 134-1. The firm calculates the "Initial Lodestar" by multiplying the "Total Hours Expended" in each category by the rate of the timekeeper, then adding up the "Total Fees Sought" for each category. *See* ECF 114-1 & 134-1. After that, the firm deducts from the lodestar for hours it is not permitted to bill for anyway. Then M&A deducts again from the categories in which the firm concedes that it has billed too many hours, slashing 15 percent from motions practice, 10 percent from trial preparation, and 20 percent from trial attendance. Finally, having computed that revised lodestar, M&A applies a 30 percent reduction for lack of success—a concession, the firm says, that the results it secured for Guillen warrant only 70 percent of the fee it would otherwise merit. In its spreadsheet, M&A has proceeded from initial lodestar to revised lodestar to final fee.

In briefing, however, M&A does not follow the rules. In a section entitled "INITIAL LODESTAR – THE HOURS EXPENDED BY PLAINTIFF ARE REASONABLE," ECF 114-1, at 12, M&A takes up the task of identifying the "reasonable hours" figure for the lodestar analysis. At this stage, the firm's obligation is to justify the number of hours billed for each task or litigation phase—what M&A calls on its spreadsheet, "Total Hours Sought." M&A does not do that. Instead, M&A tries to justify a billable hour count that is at least 30 percent lower than the billable hour count in "Total Hours Sought." ECF 114-1, at 15–26. For instance, in "Total Hours Sought," M&A billed for 72.2 hours of deposition work. ECF 134-1, at 1. Yet in its brief, M&A contends that the

Court should evaluate whether it was reasonable for M&A to bill not for 72.2 hours, but for 50.54 hours. ECF 114-1, at 23. What is that lower number? Why is it relevant? M&A makes similar maneuvers to defend the reasonableness of the hours it billed for individual activities. *See* ECF 131, at 14–15. When the defendants point out that M&A billed an unreasonable number of hours on a particular task, M&A counters that it billed (at least) 30 percent fewer hours than the defendants claim. *Id.* Why?

The answer, disclosed only in a footnote, is that M&A brought the third step (the rate of success reduction) into the first step (the "reasonable hours" count) to understate the number of hours for which it is seeking fees. *See* ECF 114-1, at 15 n.6. This was not a mistake on M&A's part. In defense of this patently incorrect approach, M&A denounced the *defendants'* computations as "deceptive, because Defendants deliberately refer to the pre-reduction hours to make it appear that Plaintiff's counsel is seeking fees for an excessive number of hours." ECF 131, at 14. In fact, it is M&A that is referring to "deceptive" computations.

Counting in the way M&A proposes skews the fee analysis in its favor. Here is an example. M&A tried to bill nearly 24 hours of Ms. Melehy's time on a single day. ECF 127, at 24–25. M&A would have had the Court evaluate that bill like this. First, the Court would apply the rate of success deduction to the number of hours billed: cutting 24 hours by the suggested 30 percent to get 16.8 hours. Second, the Court would ask whether *that* figure, 16.8 hours, is a reasonable number of hours to have spent on the tasks listed. Because it is plausible (albeit unlikely) that Ms. Melehy devoted 16.8 hours to her work that day, the Court might not make any cut, or at most a modest one. So third, the Court would multiply 16.8 hours by the reasonable hourly rate for Ms. Melehy's services, $475, to get the final fee for her work that day: $7,980. Counting this way means that the fee is cut only once (for degree of success) rather than twice (once for degree of success and once

for the reasonableness of billed time). By making M&A's hours billed seem more reasonable than they are, M&A's counting method protects its recovery from a second, independent reduction for excessive billing—or at least minimizes the latter.

Counting the correct way would yield a significantly lower fee than counting M&A's way. First, the Court would determine whether 24 hours in one day is a reasonable number of hours to expend on the listed tasks. Finding that 24 hours is not only unreasonable, but implausible, the Court would revise the number downward—say, to what the M&A method would suggest: 16.8 hours. Second, the Court would multiply 16.8 hours by the reasonable rate for Ms. Melehy's services ($475) to yield the total fee sought: $7,980. Third, the Court would reduce that figure to account for M&A's partial success—taking their suggestion, 30 percent. That would yield the final fee award: $5,586. That is 30 percent less than what M&A's method yields. The reason is simple. Counting correctly means the fee is cut twice, rather than once: once for the unreasonableness of the number of hours M&A billed and once for the limited degree of success M&A achieved for Guillen. M&A wants to make one cut disappear.

M&A's method is wrong. As the Supreme Court, the Fourth Circuit, and courts in this district have uniformly held, *first* the court determines whether the number of hours billed was reasonable and multiplies that by the reasonable rate, *then* the court reduces the resulting fee to account for the rate of success. *See, e.g.*, *Hensley*, 461 U.S. at 434–36; *McAfee*, 738 F.3d at 88; *Grissom*, 549 F.3d at 320–21; *De Paredes*, 2023 WL 8235753, at *2–4; *Carrera v. EMD Sales, Inc.*, No. JKB-17-3066, 2021 WL 3856287, at *3–4 (D. Md. Aug. 27, 2021); *see also Pub. Int. Rsch. Grp. of N.J., Inc. v. Windall*, 51 F.3d 1179, 1190 (3rd Cir. 1995) ("It is, however, essential to calculate the lodestar before considering adjustments. Only after the lodestar is determined does the district court have discretion to consider results obtained."). M&A's approach conflates two

11

distinct questions: whether the firm expended a reasonable amount of billable time on a particular task or litigation phase and how successful it was for its client. In so doing, M&A's approach shields its billing from the scrutiny it deserves.[5]

For the purpose of evaluating whether the hours expended on the case were reasonable or excessive, the Court will consider the "Total Hours Sought." Only after determining the reasonable number of hours for each task or litigation phase will the Court independently deduct for the degree of success.

### b.  Case development

Now, on to the hours billed for each litigation category. These sections address several *Johnson* factors, including "the time and labor expended," "the novelty and difficulty of the questions raised," "the skill required to properly perform the legal services rendered," "the experience, reputation, and ability of the attorney," and the "attorneys' fees awards in similar cases." *See Barber*, 577 F.2d at 226 n.28.

M&A claims to have spent 24.6 compensable hours on case development for a total of $11,022.50. ECF 134-1, at 1. The entries for this time describe activities like meeting with Guillen and conferring with opposing counsel. *Id.* at 2–7. Many of these entries reflect a reasonable amount of time spent on reasonable activities. Nevertheless, the Court does not find that under the circumstances of this straightforward FLSA case handled by attorneys with extensive experience in FLSA cases, 24.6 hours of work on case development were warranted. Accordingly, the Court will reduce these hours by 50 percent.

---

[5] In its reply brief, M&A runs the same maneuver the opposite way: urging the Court to limit its rate-of-success reduction to 30 percent because of the reductions made to the lodestar. ECF 131, at 14. Whether it is shifting Step 3 into Step 1 or shifting Step 1 into Step 3, double-counting is double-counting. And double-counting is wrong.

Consider one example of unreasonable case development activity. The defendants challenge a couple dozen billing entries totaling $2,408.50 for at least 6.2 hours of interactions M&A had with an individual identified as Jose Antonio. In these entries, M&A seeks to recover for drafting and revising an affidavit from Antonio, as well as related activities like speaking and corresponding with him about it. *Id.* at 3–4. But Guillen never filed any affidavit from Antonio. And no one by that name served as a witness in the case. M&A maintains that it was reasonable to devote this time to working with Antonio because he "had knowledge about Defendants' pay practices," even though he ultimately declined to participate in the case. ECF 131, at 19. Yet Guillen never disclosed Antonio to the defendants in his answers to their interrogatories or his supplemental answers. *See* ECF 127-5, at 3–8; ECF 127-6, at 3; ECF 131, at 19 (conceding that Guillen did not disclose Antonio to the defendants). Twice, Guillen purported to identify, under penalty of perjury, "any and all persons who have personal knowledge of the facts and allegations set forth in Plaintiff's Complaint." *See* ECF 127-5, at 3–8; ECF 127-6, at 3. Twice, he did not mention Jose Antonio. That leaves the Court with a dilemma. If, as Guillen twice attested under penalty of perjury, no such person belonged on the list of "any and all persons who have personal knowledge" of the case, then it was not reasonable for Guillen's counsel to devote so much time to developing him as a witness. If, as Guillen says now, Antonio had personal knowledge of the defendants' pay practices, then it was reasonable to bill for time working with him, but he should have been disclosed to the defendants. Unwilling to assume that the plaintiff committed perjury, the Court finds instead that it was unreasonable for the plaintiff's counsel to devote this time to working with Antonio.

Altogether, considering defects like this one and the level of skill required to advance this relatively uncomplicated case, the Court finds that only 12.3 hours of work on case development were reasonable.

### c.  Pleadings

M&A reports spending 5.6 compensable hours on the pleadings, for a total bill of $2,222. ECF 134-1, at 1. That time—devoted to preparing the original complaint and the first amended complaint, which was filed after discovery clarified some of the facts—was reasonable. The Court does not deduct any hours from this category.

### d.  Discovery

M&A billed for 95.5 hours of written discovery. ECF 134-1, at 1. That is significantly more hours than is reasonable. Consider an example M&A ultimately concedes. When M&A filed this petition, it asserted that it conducted discovery throughout the case on whether the two business defendants qualified as "covered enterprises" under the FLSA. *See* ECF 114-1, at 21–22. The defendants, they said, disputed this issue until "the eve of trial" in February 2023. *Id.* at 22. In fact, the defendants stipulated to the plaintiff's position on this issue in July 2020—two and a half years before trial. ECF 127, at 23. Confronted with that fact, M&A backed down, acknowledging that what it wrote in the petition was "mistaken." ECF 131, at 16–17. Yet the firm did not deduct any discovery-related hours to correct the error.

In any event, it is the Court's assessment that a case of this simplicity did not demand over 90 hours of written discovery. And that assessment is confirmed by how little of the material M&A developed proved useful at trial.

Accordingly, the Court reduces the plaintiff's billed hours for discovery by 40 percent.

e. **Depositions**

M&A billed for 72.2 hours of deposition work. ECF 134-1, at 1. That is significantly too many hours for this relatively simple case. Only four witnesses were deposed: Guillen, the Stouffers, and Salvador Alvarenga. Alvarenga's deposition involved little preparation since M&A substituted him for another deponent at the last minute. In fact, the Alvarenga deposition is a case study in M&A's unreasonable use of time in this category. Ms. Melehy expected that the deposition would be "very brief – probably less than two hours," ECF 127-8, at 4, but for reasons unclear, M&A ultimately billed for 6.5 hours, ECF 134-1, at 20.

M&A's scheduling of the Alvarenga deposition reflects poor judgment in the firm's management of billable time. On Friday, July 24, 2020, Ms. Melehy informed the defendants that she would need to postpone the deposition scheduled for 9:00 a.m. on Tuesday, July 28 to 11:00 a.m. on that same day. ECF 127-8, at 7. When the defendants accepted that brief delay, they also asked to confirm that the deponent would be David Hernandez, the individual M&A had identified when the firm scheduled the deposition. *Id.* at 5–7. Ms. Melehy responded that the deponent would be Alvarenga. On Saturday morning, the defendants objected and requested the postponement of the deposition; after all, M&A had never disclosed Alvarenga to them and the defendants did not know who he was. Later that morning, Ms. Melehy objected strenuously to the defendants' request to postpone the deposition. "Mr. Alvarenga," she wrote, ". . . has already taken the whole day off on Tuesday in order to attend his deposition. It would be a great imposition to ask him to lose another day's worth of pay by rescheduling." ECF 127-8, at 4.[6] When the defendants asked the Court to postpone the deposition, Ms. Melehy again reported that Alvarenga had taken the day off

---

[6] Ms. Melehy also wrote that she expected Alvarenga would "refute a majority of the testimony of both Mr. and Mrs. Stouffer." ECF 127-8, at 4. As it turned out, Alvarenga undermined much of the testimony of her client, ECF 127-7, at 3–5, as he would again at trial.

from work and that postponement would be a hardship for him. ECF 127, at 20–21. In reliance on

that representation, the Court declined to postpone the deposition. *Id.*

> At the deposition on Tuesday, however, Alvarenga undermined Ms. Melehy's statements:
>
> Mr. Futrovsky: I apologize that you're missing work today to sit for this deposition. Where is your current place of employment?
>
> Mr. Alvarenga: I am working with a lady and I was supposed to go actually, today, to cut her grass, but I couldn't go because of this situation.
>
> Mr. Futrovsky: I'm sorry. When did you notify her that you were unable to go because of this deposition?
>
> Mr. Alvarenga: I didn't really give her much explanation. I just told her I would go the next day.
>
> Mr. Futrovsky: Okay. If you had called her – strike that. When did you tell her that?
>
> Mr. Alvarenga: Yesterday.

ECF 127-7, at 5. This testimony calls into question the veracity of Ms. Melehy's representations

to defense counsel on Saturday and to the Court at a call on Monday that Alverenga had already

taken off work for the deposition and that it would be "a great imposition to ask him to lose another

day's worth of pay by rescheduling." ECF 127-8, at 4; ECF 127, at 20–21. At the very least,

Alvarenga's testimony suggests that Ms. Melehy's statements to the defendants and the Court were

inaccurate.[7]

---

[7] Surprisingly, M&A does not really contest the defendants' account of the Alvarenga deposition dispute. Nowhere does M&A say that Ms. Melehy had a reasonable basis to believe that she was telling the truth. Nowhere does M&A even say that she believed, reasonably or not, that she was telling the truth. M&A take pains to point out that the defendants' argument "assumes that Mr. Alvarenga never told Plaintiff's counsel on or before July 25 that he had already requested time off work." ECF 131, at 16. But M&A does not say that he did. Even though M&A submitted a declaration from Mr. Balashov to explain a different error, the firm offered no declaration to explain why Alvarenga's deposition testimony refuted Ms. Melehy's claims to the defendants and the Court about why the deposition could not be postponed. The Court need not decide whether

The point of recounting this dispute over deposition scheduling is this: When M&A realized that it would not be able to depose the originally scheduled deponent, the only reasonable use of everyone's time would have been to postpone the deposition, not to hastily substitute one deponent for another on seemingly false pretenses.

The Court finds that the number of hours it would have been reasonable to bill for depositions is 50 percent lower than what M&A claims.

### f. Motions practice

M&A billed for 113.4 hours of motions practice. ECF 134-1, at 1. Most of these hours are for work on its opposition to the defendants' motion for summary judgment and the plaintiff's subsequent successful motion for reconsideration. *See id.* at 21–23; ECF 114-1, at 26. In its petition, M&A proposed a voluntary reduction of 15 percent to their hours in this category. *See* ECF 134-1, at 1; *see also* ECF 114-1, at 26. The defendants do not dispute specifically any of M&A's billing entries for motions practice. The Court finds that a 15 percent reduction is sufficient to make the hours billed for motions practice reasonable.

### g. Attending court hearings

M&A billed 11 hours for attending court hearings. ECF 134-1, at 1. Generally, these hours track the lengths of these hearings accurately and reflect reasonable staffing decisions. However, for two reasons the Court must strike the 2.8 hours M&A claims for Christina Melehy's presence in court on February 2, 2023. *See* ECF 134-1, at 24. First, M&A billed for 2.8 hours of Christina Melehy's time attending a two-hour hearing. Even Mr. Melehy's time entry for the same event accurately reflects the fact that the hearing was two hours, not 2.8. Second, even if M&A had billed

---

Ms. Melehy intentionally misrepresented the facts to conclude that this episode reflects very poorly on M&A's management of deposition time.

accurately for the number of hours Christina Melehy spent in court, billing for that time was unreasonable. Mr. Melehy, a practitioner with 36 years of experience, easily could have handled a two-hour pre-trial hearing himself. M&A may recover only for 8.2 hours for hearing attendance.

### h.  Trial preparation and post-trial motions

M&A billed 352.2 hours for trial preparation and post-trial motions. ECF 134-1, at 1. Counsel have billed far too many hours for this category for this case. This case featured a four-day bench trial. It involved only a handful of witnesses. It presented no novel issues of law, just the standard wage-and-hour law issues that counsel have specialized in for years or decades. By even M&A's account, it involved only a dozen or so hours of post-trial motions practice. M&A's performance at trial did not convince the Court that counsel prepared particularly well, either.

Recently, Judge Chuang concluded that the number of hours that would be reasonable for these same attorneys to spend preparing for a five-day trial on comparable issues with a comparable number of witnesses was about 178 hours. *De Paredes*, 2023 WL 8235753, at *5. The Court agrees with Judge Chuang's reasoning. Preparing for this case and engaging in post-trial motions practice should not have taken more than 178 hours. M&A's offer to reduce their request by 10 percent is not enough. Accordingly, the Court reduces the billable hours in this category by 50 percent to roughly align the totals between the two similar cases.

### i.  Attending trial

M&A billed 95.5 hours for trial attendance. That figure is unreasonable three times over. First, the firm billed for more hours attending trial than there were hours of trial to attend. M&A claims its timekeepers attended trial for 29.5 hours: 7.5 hours on the first three days and 7 hours on the fourth. ECF 134-1, at 38. The minute entries tell a shorter story. True, the first day of trial ran 7.5 hours. ECF 94. But the second was only 7 hours. ECF 95. The third dropped to 6 hours.

ECF 96. And the fourth was not even 4.75 hours long. ECF 98. At best, these discrepancies reveal that counsel were reckless in failing to confirm their figures. At worst, these discrepancies suggest that counsel intentionally misrepresented how much time they spent in court in the hope of securing a bigger payout. Either way, M&A's billed hours for trial attendance are unreasonable because they are inaccurate.

Second, M&A unreasonably overstaffed this trial. Each day of trial, the firm billed for the time of two senior attorneys (Mr. and Ms. Melehy) and one paralegal (Christina Melehy). On two days, they billed for the travel time of a second additional paralegal (Emily Wilson). Under our Local Rules, whether it was reasonable to compensate the prevailing party for the attendance of more than one attorney at trial is a function of "the complexity of the case and the role that each lawyer is playing." D. Md. Local R. App. B.2(c) n.*. What Judge Chuang wrote the last time M&A staffed a comparable trial with two attorneys and one paralegal rings true here:

> [T]he case was straightforward, presented no novel issues of law, had a limited number of testifying witnesses, and was defended by only a single attorney. While it may have been the preference of Plaintiffs' counsel to divide trial responsibilities between two attorneys, the Court does not find that, under the circumstances, it is reasonable to include the second attorneys' trial and travel time in the fee award. Similarly, Plaintiffs' decision to task a paralegal with exhibit responsibilities during trial was a matter of preference rather than one of litigation necessity, particularly where defense counsel had no paralegal assistance.

*See De Paredes*, 2023 WL 8235753, at *5. "Properly reducing allowable hours because of overstaffing of attorneys . . . falls soundly within the district court's proper discretion in determining an attorneys' fee award." *Trimper*, 58 F.3d at 76–77. Like Judge Chuang, the Court adjusts the hours for trial attendance downward to cover only those worked by one attorney and half the time of one paralegal. *See De Paredes*, 2023 WL 8235753, at *5.

Third, M&A needlessly prolonged this trial with unhelpful testimony and dilatory questioning. As counsel should have anticipated from Alvarenga's deposition, Alvarenga's

19

testimony undermined Guillen's own testimony on several key points, including how closely Mr. Stouffer directed Guillen's work, whether Mrs. Stouffer directed Guillen's work at all, whether the Stouffers shorted them on their paychecks, and how often the two men would travel to Home Depot to pick up supplies before a job. *See* ECF 107, at 5–6, 10, 15, 19–21. Ultimately, the Court found that much of Guillen's testimony—particularly on these contested questions—was not credible. *Id.* at 9, 9 n.3, 15, 16, 19, 21. Making matters worse, M&A hoped that the testimony of its fifth witness—the firm's own paralegal, Emily Wilson—would aid the Court in determining damages. *See* Feb. 16, 2023 Trial Tr. 37:22–24 ("This [testimony and exhibit] is just an aid to the Court. It's prepared with the assistance of counsel. It's not evidence. It's just to explain how we came up with this."). It did not. If anything, the apparent inconsistencies in her calculations and the unjustified assumptions underlying them undermined Guillen's case because they "result[ed] in obvious overestimates." *See* ECF 107, at 17.

Then there was M&A's time management at trial. Counsel pursued so many futile, irrelevant, and repetitive lines of questioning that the Court regularly had to beseech them to keep the proceedings moving. *See, e.g.*, Feb. 13, 2023 Trial Tr. 25:8 ("THE COURT: What are we doing here?"); *id.* at 101:9–11 ("THE COURT: Why don't we move on from this line of questioning until this gets resolved because this is incredibly inefficient."); *id.* at 107:23–24 ("THE COURT: Go ahead, ask a few more questions but let's move this along."); *id.* at 168:15–16, 20–21 ("THE COURT: Why don't you help me understand why a picture of a printer is relevant? . . . MR. MELEHY: The picture isn't really relevant, honestly, your honor."); Feb. 14, 2023 Trial Tr. 125:5–6 ("THE COURT: There's a lot of repetition."); *id.* at 136:10–11, 17–19 ("THE COURT: I just want to manage our time effectively today. . . . I don't want to prevent you from eliciting testimony that is relevant. I want to be clear. But I just want to be as efficient as we can."); *id.* at 137:6–7

("THE COURT: Just for efficiency['s] sake, we've reviewed this text several times today."); *id.* at 139:11–12 ("THE COURT: I need some guidance as to what the purpose of so much questioning on this is."); *id.* at 139:22–23 ("THE COURT: . . . if you think you need more, I will allow it but I'm struggling with how much more we need."); *id.* at 140:3–4 ("THE COURT: I'm just actually not understanding the importance of this after we've had a lot of testimony on it."); *id.* at 147:5–6 ("THE COURT: I don't want to tell you how to try your case but you're wasting precious time."); Feb. 15, 2023 Trial Tr. 85:7–8, 9 ("MR. FORSTER: Objection, Your Honor. Covered this repeatedly. THE COURT: Sustained."); *id.* at 126:14–17 ("THE COURT: What are we looking at here as far as time? Is there anything we can stipulate to? This is an admission, this is admitted. Why does he need to be crossed on it?"); Feb. 16, 2023 Trial Tr. 115:8–10 ("THE COURT: I'd like to proceed now."); *id.* at 156:20–21 ("THE COURT: All right, okay. Anything else? Some of this is repetitive."). If M&A had exercised better judgment, the trial would have been significantly shorter. As this court recently observed of M&A, "much of the time and expense incurred through the course of litigating this case was more attributable to Plaintiffs' counsel's inability to crisply present evidence than any inherent complexity in the legal and factual questions at issue." *See Carrera v. EMD Sales, Inc.*, No. JKB-17-3066, 2021 WL 3856287, at *8 (D. Md. Aug. 27, 2021).

Perhaps aware that the hours they claimed were patently unreasonable, M&A proposed to reduce their fees for trial attendance by 20 percent. That is nowhere near enough. M&A billed for more trial hours than took place. The firm billed for the attendance of over twice as many staff as was reasonable. And the firm did not use its time in court as reasonably as it should have. Accordingly, the Court reduces the billable hours for trial attendance by 75 percent.

### j.   ADR/Settlement

M&A billed for 23.95 hours on settlement. ECF 134-1, at 1. The defendants do not dispute the reasonableness of devoting that many hours to settlement, so much as they dispute the reasonableness of M&A's settlement demands. The Court need not resolve that dispute to identify how many hours M&A reasonably devoted to settlement efforts.

However, the Court must note the troubling fact that M&A frequently overstated its fees on the quarterly reports it provided to the defendants during the course of the litigation. On the defendants' account, M&A overstated its billables in 10 out of 14 quarters; as a result, the rolling total bill M&A reported quarterly to the defendants exceeded the actual total bill in 13 out of 14 quarters—every quarter after the first. ECF 127-18, at 2. M&A admits that its quarterly reports were often inaccurate, but M&A denies that it consistently overstated its fees. ECF 131, at 19–20. On M&A's account, only 7 out of 14 quarterly reports overstated its fees and the rolling total on the quarterly reports exceeded the actual total in only 9 out of 14 quarters. ECF 131-5, at 1. On any account, M&A's quarterly reports were frequently inaccurate; that is a problem in its own right. But in addition, the defendants are correct: M&A's quarterly reports systematically overstated its fees. M&A reached its smaller discrepancy figures by comparing its quarterly reports with "the Firm's attorneys' fees before any no-charge and/or deletions were applied." ECF 131-4, ¶ 2. But those deductions are not voluntary acts of charity. They are essential acts of accurate accounting. M&A has no right to collect for hours "that are excessive, redundant, or otherwise unnecessary," *see Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983); *Doe v. Kidd*, 656 F. App'x 643, 656 (4th Cir. 2016), or for non-compensable tasks like clerical work, *see Castillo Pacheco v. Mezeh-St. Mary's LLC*, No. TDC-21-2521, 2023 WL 5411071, at *4 (D. Md. Aug. 22, 2023). "Hours that are not properly billed to one's client also are not properly billed to one's adversary

pursuant to statutory authority." *Hensley*, 461 U.S. at 434 (quoting *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C. Cir. 1980) (en banc)). Yet M&A admits that its original billing entries, before the no-charges and deletions, included hours spent on unnecessary, redundant, and non-compensable work—including hours billed to the wrong case. *See* ECF 114-1, at 12. So M&A is comparing its quarterly reports to an inflated baseline. By contrast, the defendants are comparing the quarterly reports with M&A's attorneys' fees as billed in the fee petition—that is, after mandatory no-charges and deletions. ECF 127-19, ¶¶ 1–2. That figure more accurately captures the fees M&A could collect in its fee petition. The upshot: M&A consistently overstated its fees in its quarterly reports to the defendants.

M&A's nearly uniform overstatement of its fees in its quarterly reports appears to have contributed to the protraction of settlement talks and perhaps even to their failure.[8] From the defendants' perspective, M&A's inflated fee reports made it harder for the defendants to determine whether or how to settle this case by making it seem like counsel were entitled to more fees than they actually were. ECF 127, at 36–37. Accurate quarterly reports are important ingredients to constructive settlement talks. Accordingly, the Court reduces the billable hours for settlement by 25 percent.

### k. Fee petition

At first, M&A billed for 26.4 hours preparing this fee petition. ECF 114-1, at 1. After briefing on the petition, M&A filed a supplemental motion that more than doubled that figure to 61.5 hours. ECF 134-1, at 1.

---

[8] The undersigned was not involved in settlement discussions and does not know why the case did not settle. But this is the type of case that should have settled long before trial. The Honorable Beth P. Gesner, a recently retired Magistrate Judge who served this Court for 24 years, tried valiantly to settle the case. Judge Gesner met with the parties and communicated with them at several points in the litigation. Despite her efforts, the case did not settle.

A district court may award the prevailing party "fees on fees": "fees incurred in litigating the question of fees." *Mercer v. Duke Univ.*, 401 F.3d 199, 202 n.3 (4th Cir. 2005) (citing *Trimper v. City of Norfolk*, 58 F.3d 68, 77 (4th Cir. 1995)). Nevertheless, it is within the district court's "discretion to determine exactly what amount would compensate the party sufficiently for the time spent on the fees phase of a lawsuit," including by reducing the award to eliminate time spent unreasonably. *Trimper*, 58 F.3d at 77 (citing *Daly v. Hill*, 790 F.2d 1071, 1080 (4th Cir. 1986)).

First, the Court eliminates all of the hours the supplemental motion added to this category. Even M&A acknowledges that the defendants identified multiple defects in the initial petition. As the Court details throughout this opinion, many of these defects were egregious. To be sure, not all of the defendants' arguments were persuasive. Nevertheless, it is unreasonable for M&A to bill the defendants for time M&A spent defending and revising a profoundly flawed fee petition it never should have filed in this condition in the first place.

Second, the Court reduces the initial fee petition hours by 30 percent to account for hours billed for redundant work. At least three of the documents M&A billed for preparing are substantially similar to corresponding documents they billed to prepare a few months earlier in *De Paredes*: the fee petition memorandum, the affidavit of Mr. Melehy, and the declaration of Michal Shinnar. Several sections of the argument in the fee petition in this case are substantially similar to the corresponding sections of the fee petition in *De Paredes*. *See* ECF 112 in *De Paredes v. Zen Nails Studio, LLC*, Civ. No. TDC-20-2432. And in that case, much of the writing was billed to a paralegal, Emily Wilson. M&A cannot reasonably be compensated now at attorneys' rates for repeating work for which they were already compensated at a paralegal's rate. Billing for the affidavit of Mr. Melehy and the Shinnar declaration is even more unreasonable. Only a handful of the 43 paragraphs in Mr. Melehy's affidavit in this case, ECF 114-3, differ in any way from his

affidavit in *De Paredes*, ECF 112-3 in Civ. No. TDC-20-2432. The Shinnar declaration in this case, ECF 114-6, differs from the Shinnar declaration in *De Paredes*, ECF 112-10 in Civ. No. TDC-20-2432, in only one material respect. In *De Paredes*, Shinnar devoted one paragraph to explaining why she thought that M&A had billed for a reasonable number of hours. ECF 112-10, at 15 in Civ. No. TDC-20-2432. Here, that paragraph is gone. *See* ECF 114-6. M&A cannot be compensated lavishly for copying and pasting.

### l.  Interpretation / Translation

M&A billed for 83.9 hours of interpretation and translation services provided by its paralegals. ECF 134-1, at 1. This court routinely awards costs in FLSA cases for the time a paralegal spent providing interpretation services. *See, e.g.*, *Castillo Pacheco*, 2023 WL 5411071, at *1, *3, *5 (awarding costs for time paralegal spent interpreting except "[w]here these billing entries make no reference to interpretation services, and the submitted materials include separate charges for interpretation services"); *Carranza v. Ramirez*, No. PWG-20-2687, 2022 WL 4080310, at *2, *5–6 (D. Md. Sept. 6, 2022); *Molina v. KP Stoneymill, Inc.*, No. GLS-19-3123, 2021 WL 2805838, at *7 (D. Md. July 6, 2021) (awarding $95 per hour for paralegal work that included interpretation, but declining to award costs "at the same rate as a paralegal with legal training and experience").

Guillen and Alvarenga speak Spanish only. For that reason, any time that it was reasonable for M&A to be working with them, it was reasonable for M&A to bill for interpreting and translating on their behalf. The problem is that as explained above, the Court has been compelled to reduce the hours M&A billed in the categories that cover this work because the number of hours spent on the underlying tasks were unreasonable. Accordingly, the Court will reduce the number of hours for interpretation and translation by 50 percent, which is the extent that the Court reduced

the hours billed in the categories that covered most of the underlying activities—case development, depositions, and trial preparation and post-trial motions—but less than the Court reduced the other major category at issue, trial attendance.

### m. Damage Calculations

M&A billed for 7.9 hours of computing damages. The Court's firsthand experience presiding over this case persuades it that M&A devoted too much time to this task and did not spend that time effectively. As the Court noted in its post-trial opinion, the damages calculations M&A prepared were not credible. ECF 107, at 17–19. In the end, the Court was forced to calculate damages itself. The Court reduces M&A's damage calculation hours by 25 percent.

### n. Discovery Disputes

M&A billed for 12 hours of work on discovery disputes. ECF 134-1, at 1. After carefully reviewing the record, particularly Judge Copperthite's discovery order, ECF 38, and Judge Hollander's memorandum opinion on the plaintiff's motion to extend discovery, ECF 42, the Court finds that most of these hours were created by unreasonable litigation decisions by M&A.[9] As Judge Hollander concluded, M&A failed to use its discovery time diligently and manage disputes in a timely fashion. ECF 42, at 4–5. Although M&A defeated the defendants' bid to postpone the deposition of Alvarenga, that hardly weighs in M&A's favor; the deposition itself revealed that M&A prevented the postponement of the deposition by making questionable factual assertions. *See* ECF 127, at 20–21. M&A cannot reasonably recover for time spent on discovery disputes it unreasonably created. Accordingly, the Court reduces the hours billed in this category by 50 percent.

---

[9] This was case was originally assigned to Judge Ellen L. Hollander and was reassigned to this Court on August 26, 2021. ECF 66.

### o. Post-judgment collections

Finally, M&A claims 1.1 hours on post-judgment collection efforts. The defendants concede that figure and take responsibility for it. ECF 135, at 2. The Court finds that 1.1 hours is reasonable.

### p. Billing judgment

A prevailing party seeking fees "has a duty to exercise 'billing judgment' to exclude from a fee request hours that are excessive, redundant or unnecessary." *Trimper*, 58 F.3d at 74. If the prevailing party does not, the court has the power and the duty to adjust the award downward. *See id.*; *Spell v. McDaniel*, 852 F.2d 762, 767–71 (4th Cir. 1988) (reducing requested award by about 70 percent for poor billing judgment because the "petition claims such an inflated expenditure of time in so many particulars and overall that it is impossible for this court to cull in detail the justified from the unjustified"); *Harwood v. Am. Airlines, Inc.*, 37 F.4th 954, 960–61 (4th Cir. 2022) (affirming categorical reduction for pervasive "impermissible billing" for non-compensable tasks like clerical work). In addition, "[w]here the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley*, 461 U.S. at 434; *see also Trimper*, 58 F.3d at 77.

Billing judgment requires billing accurately, with supporting documentation, for compensable tasks only. In their initial petition, M&A "no-charged" $30,298.50 in fees "that were duplicative, redundant, entered in the wrong case, unnecessary, or for time spent pursuing motions or claims which were completely unsuccessful." ECF 114-1, at 12; ECF 114-2, at 1. After the defendants identified what M&A conceded were inappropriate or inaccurate entries, the "no-charge" figure rose to $32,441.50. ECF 134-1, at 1.

Still, M&A has not exercised reasonable billing judgment. Not even close. While a line-by-line audit of the request is neither necessary nor possible, M&A has billed for so many unnecessary, non-compensable, or verifiably inaccurate entries that the Court cannot accept its submission at face value.

Here are a few examples, which are illustrative but far from exhaustive:

- **Double billing**: M&A billed $2,817.50 for one 4.9-hour trial preparation meeting between Ms. Melehy and Guillen on February 10, 2023. ECF 134-1, at 35. Then M&A billed the same amount for a meeting of the same length between the same people on the same day. *Id.* at 36. As M&A emphasizes elsewhere, "The Plaintiff only speaks Spanish. Therefore, he needed an interpreter for all meetings and verbal communications with counsel." ECF 114-1, at 16. But M&A only billed for one 4.9-hour session of interpretation that day—another $882.00. ECF 134-1, at 46. What happened is clear: Ms. Melehy met with Guillen once but billed twice.[10]

- **Implausible billing**: M&A billed for 23.7 hours of Ms. Melehy's time in a single day: 4.3 hours in this case and 19.4 hours in a different case. *See* ECF 114-2, at 29; ECF 127-12, at 2–3. Pressed to account for that extraordinarily implausible claim, M&A retracted it. ECF 131, at 17. On M&A's new account, a paralegal performed the 4.3 hours of work attributed to Ms. Melehy in this case on that day. *Id.* at 17–18. Who, specifically? M&A says it does not know. ECF 131-6, at 1–2.

---

[10] M&A may have even triple billed. On March 6, 2020, Ms. Melehy billed for corresponding by email with opposing counsel. ECF 134-1, at 3. Then she billed for what appears to be the same correspondence again. *Id.* Then again. *Id.* at 39. Ms. Melehy seems to have billed three times, for three different lengths of time, for a single activity that should never have taken more than a few minutes anyway. Out of an abundance of caution about the possibility that these entries reflect three different actions in the same email chain, the Court does not find that M&A triple billed.

- **Impossible billing**: As the Court noted above, M&A billed for more hours attending trial than there were hours of trial to attend, for three out of four days of the trial.

- **Non-compensable work**: "Clerical work is not billable to an adversary." *Castillo Pacheco v. Mezeh-St. Mary's LLC*, No. TDC-21-2521, 2023 WL 5411071, at *4 (D. Md. Aug. 22, 2023) (citing *Ramirez v. 316 Charles, LLC*, No. SAG-19-3252, 2021 WL 662185, at *3 (D. Md. Feb. 19, 2021)). Nevertheless, M&A billed the defendants for clerical work in virtually every category, including for tasks as mundane as putting dates on a calendar. To cite just one example of non-compensable clerical work M&A billed at paralegal or attorney rates: M&A billed for at least 60 hours of making binders—over $12,000 in binder bills—and refused to retract that request after the defendants rightly challenged it.

These implausible, inaccurate, and inappropriate billing entries compel the Court to find that M&A has not exercised reasonable billing judgment.

There's more. Under pressure from the defendants, M&A confessed to three errors in its fee petition: billing nearly 24 hours of Ms. Melehy's time in one day, billing for the delivery of exhibit binders to the Court, and billing for entering deadlines on the calendar. ECF 131, at 3. Here is how M&A explained those errors:

> Plaintiff's counsel spent a considerable amount of time reviewing the accuracy of the time records prior to submitting them, but given the volume of entries, time constraints, and issues that arose from combining time records from M&A's current billing system (Clio) with records from its legacy system (Abacus), not all the errors were fixed before the records were submitted to the Court.

*Id.* This explanation is as troubling as it is baffling. First, M&A's transition from one billing system to another is not a plausible explanation for the three errors M&A invokes the transition to explain. M&A cannot seriously contend that switching from Abacus to Clio created previously nonexistent billing entries for delivering binders or calendaring deadlines. And in the affidavit M&A submitted

to explain why it billed almost 24 hours of Ms. Melehy's time in one day, M&A did not even try to attribute that preposterous claim to its billing system switch. *See* ECF 131-6, ¶¶ 4, 8. M&A's explanation undermines its credibility.

Second, M&A's admission that its billing system transition created "issues" that precluded it from ensuring that it submitted an accurate fee petition casts serious doubt on the accuracy of its entire filing. *See* ECF 131, at 3. In effect, M&A has conceded that because it changed billing software, it prepared the fee petition in reliance on records that deviate from the ones it created as it performed its work. (As the Court has already noted, M&A's quarterly reports consistently overstated its fees—so M&A seems to have exaggerated even those relatively contemporaneous records, too.) And it is certainly curious that the resulting errors uniformly overrepresented M&A's entitlement to fees.

Third, and most importantly, M&A's statement is a confession that M&A did not exercise reasonable billing judgment. If the "volume of entries" was too high for M&A to verify them, *see id.*, then M&A should have excised the entries it could not confirm. If "time constraints" prevented M&A from ensuring the accuracy of its fee petition, *see id.*, then M&A should not have submitted it and expected the Court and the defendants to do the work M&A did not do. M&A cannot admit that it billed inaccurately and for non-compensable work because it could not be bothered to exercise billing judgment and then expect the Court to award the full amount it requests.

To be clear: No one doubts M&A made some effort to weed out unjustified or inaccurate entries. No one doubts that the endeavor may have taken "a considerable amount of time." *See id.* And no one demands perfection. But M&A did not come anywhere close. This is not a case where the Court can find that M&A made a good faith attempt to exercise billing judgment and a few trivial errors slipped through despite M&A's best efforts. This is a case where so many obviously

and egregiously unjustifiable entries so permeate the fee petition that the Court can only conclude that M&A failed to exercise reasonable billing judgment.

To mitigate the risk that M&A's failure to exercise billing judgment imposes baseless or otherwise unreasonable fees on the defendants, the Court reduces the entire lodestar amount by 50 percent. *See Carrera v. EMD Sales, Inc.*, No. JKB-17-3066, 2021 WL 3856287, at *8 (D. Md. Aug. 27, 2021) ("a further global reduction of 35% is warranted to trim the fat from this padded fee application") (citing *Gonzalez v. Scalinatella, Inc.*, 112 F. Supp. 3d 5, 29 (S.D.N.Y. 2015)); *see also Spell*, 852 F.2d at 767; *Harwood*, 37 F.4th at 960–61 (reaffirming that a district court has the discretion to "make across-the-board reductions" rather than "targeted reductions").

### q. Repeat offenders

This is not the first time M&A has exercised demonstrably poor billing judgment. In the last year alone, multiple courts have denounced the firm for exploiting the fee petition process to turn "run-of-the-mill wage dispute[s]" into "windfall[s]—not for plaintiff, but for plaintiff's counsel." *See, e.g.*, *Munoz v. Telligent Masonry LLC*, No. 21-2789, 2023 WL 6389129, at *1 (D.D.C. Oct. 2, 2023); *Brackett v. Mayorkas*, No. 17-988, 2023 WL 5094872, at *8 (D.D.C. Aug. 9, 2023). In pursuit of "patently unreasonable" fees, *see Munoz*, 2023 WL 6389129, at *1, M&A has submitted petitions loaded with "bloated" time entries, *see Brackett*, 2023 WL 5094872, at *8, and fees for "unnecessary" motions, *see id.* In case after case, the firm has "billed excessive time on straightforward tasks" and "overstaffed," "employ[ing] a small army" of timekeepers, "several of whom often billed simultaneously." *Id.* at *7. It is no wonder that courts have expressed "doubt as to whether each of plaintiff's claimed costs [is] submitted in good faith." *See Munoz*, 2023 WL 6389129, at *10. M&A has a penchant for petitioning for fees that are "simply unacceptable." *See id.*

Nor is this the first time M&A has been called out for overbilling in these specific ways. In a previous case in this district, M&A attempted to bill the defendant for 25.8 hours of Ms. Melehy's time in a single day. ECF 127-13, at 2 (citing ECF 275-5, at 50 in *Carrera*, No. JKB-17-3066). Courts in this district and others have put the firm on notice that it may not bill for clerical work since at least 2021. *See Munoz*, 2023 WL 6389129, at *9 ("Plaintiff's counsel has been personally admonished for claiming time for such work in prior cases.") (citing *Molina v. KP Stoneymill, Inc.*, No. GLS-19-3123, 2021 WL 2805838, at *6 (D. Md. July 6, 2021)). Multiple courts in multiple jurisdictions have stricken fees for making binders from M&A's prior fee petitions. *See Munoz*, 2023 WL 6389129, at *9; *Carranza v. Ramirez*, No. PWG-20-2687, 2022 WL 4080310, at *3 (D. Md. Sept. 6, 2022); *Molina*, 2021 WL 2805838, at *6. And M&A has attributed so many of its billing errors to inadvertent spreadsheet mistakes that over three years ago, one court advised the firm "that a refresher course in how to use Excel might be prudent." *See Chaten v. Marketsmart LLC*, No. PX-19-1165, 2020 WL 4726631, at *7 n.9 (D. Md. Aug. 4, 2020), *report and recommendation adopted*, 2020 WL 13569350 (D. Md. Sept. 17, 2020). The criticisms courts have directed at M&A are not hyperbole. While M&A did not have the benefit of *Brackett*, *Munoz*, and *De Paredes* when the firm filed the original fee petition in this case, all three of those cases were decided before M&A filed its supplemental fee petition. And none of those cases said anything M&A should not have known already.

This is not even the first time M&A has been denounced as a "repeat offender." In *Munoz*, for example, the court observed that M&A's billing for non-compensable tasks

> is especially probative of the need for a downward adjustment in this case because counsel is a "repeat offender." . . . Plaintiff's counsel's inclusion of non-compensable clerical time entries in their fee request further confirms a need for a downward adjustment of the fee award in this case, especially because plaintiff's counsel has been notified of the improper nature of these requests in previous cases.

*See Munoz*, 2023 WL 6389129, at *9. *Munoz* was decided late last year. As early as 2020, M&A was admonished by a judge in this district for its repeated poor judgment in the fee petition process. *See Chaten*, 2020 WL 4726631, at *7 ("Plaintiff's counsel should not expect Defendants to compensate them for their mistake, especially when this is not the first time that such an Excel-spreadsheet error has occurred.").

The persistence of M&A's failure to exercise billing judgment bears on multiple *Johnson* factors. *See Barber*, 577 F.2d at 226 n.28. First, these prior rulings against M&A on comparable fee requests made it unreasonable for M&A to expect to recover for these entries. Second, these reprimands speak to the awards for similarly flawed entries in similar cases: zero. Third, these authorities confirm the customary fee for like work: again, zero. And considering the matter holistically, the fact that M&A has been repeatedly warned that the firm may not engage in these billing practices makes it even more unreasonable for counsel to have tried again here. "[B]ecause plaintiff's counsel has been notified of the improper nature of these requests in previous cases," a further reduction is necessary. *See Munoz*, 2023 WL 6389129, at *9 (reducing a fee award to M&A by two-thirds in part because of M&A's repeated, pervasive billing for non-compensable work) (citing *Baylor v. Mitchell Rubenstein & Assocs.*, 857 F.3d 939, 955 (D.C. Cir. 2017) (Henderson, J., concurring)). Accordingly, the Court reduces the entire lodestar amount by another 25 percent because M&A are repeat offenders.

**B.  Unsuccessful Claims**

The next step of the fee analysis is to "subtract fees for hours spent on unsuccessful claims unrelated to successful ones." *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013) (quoting *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009)). Guillen did not prevail on his

claim against Mrs. Stouffer. But that claim was related to his successful claims against the other defendants. For that reason, the Court does not subtract any fees at this step.

### C. Degree of Success

Finally, the Court determines whether to adjust the fee award downward to reflect M&A's limited success for its client, Guillen. A district court should reduce the lodestar if "the relief, however significant, is limited in comparison to the scope of the litigation as a whole." *McAfee*, 738 F.3d at 92 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 439–40 (1983)). The Supreme Court has described the plaintiff's degree of success as "the most critical factor" in determining what constitutes a reasonable fee. *Id.* (quoting *Hensley*, 461 U.S. at 436). To identify "the extent of the relief obtained," a court "must compare the amount of the damages sought to the amount awarded." *Mercer*, 401 F.3d at 204. Nevertheless, "[t]he difference between the amount recovered and the damages sought is not the only consideration." *Id.* at 205–06 (quotation omitted). In addition, "nonmonetary goals, such as vindicating rights and deterring future violations, can be served by FLSA litigation and can be a measure of a plaintiff's success." *Butler v. Directsat USA, LLC*, No. DKC-10-2747, 2016 WL 1077158, at *6 (D. Md. Mar. 18, 2016); *see also City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986) (acknowledging that "a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards"). Moreover, "the scope of the litigation as a whole" includes the number of successful versus unsuccessful claims, *see Hetzel v. Cnty. of Prince William*, 89 F.3d 169, 173–74 (4th Cir. 1996), and the scale, length, and complexity of the litigation, *see Oliphant v. Charlotte Mem'l Hosp. & Med. Ctr.*, 925 F.2d 1457 (Table), at *4 (4th Cir. 1991).

Guillen succeeded. But not nearly as much as he sought. This case resulted in a judgment against Guillen and in favor of Mrs. Stouffer and a judgment in favor of Guillen and against the

other defendants. ECF 108. M&A concedes that it secured only 17 percent of the damages sought at trial: $8,777.02 out of $51,320.62. ECF 114-1, at 12. Nevertheless, the firm contends that only a 30 percent reduction for lack of success is warranted. *Id.* at 12–13. The defendants suggest that M&A should receive less than 10 percent of what it seeks. *See* ECF 127, at 45.

The Court concludes that in light of M&A's modest success for Guillen, the lodestar fee award should be reduced by 50 percent. $8,777.02 is paltry in comparison to the more than $50,000.00 Guillen sought at trial. And it is especially meager in comparison to the scope of this case—nearly four years of litigation from the filing of the first complaint to the issuance of the judgment, including settlement negotiations, discovery disputes, dispositive motions practice, and a bench trial. The inadequacy of the award is even starker in light of the fact that M&A had reason to lower its expectations by the end of this case's first year, after the depositions cast serious doubt on the credibility of Guillen's most sweeping claims and the likelihood that the firm could prove them at trial. What's more, M&A completely failed on one of the most litigated questions: whether Mrs. Stouffer was Guillen's employer.

Moreover, this case did not meaningfully develop the law or make any distinctive contribution to the wider public good. The social value of the judgment is basically limited to the damages recovered for Guillen. Still, what little effect Guillen's victory may have in deterring future FLSA violations counsels against a 90 percent reduction to the lodestar. In this context, a 50 percent reduction for a 17 percent success is appropriate. *Cf. Prison Legal News v. Stolle*, 681 Fed. App'x 182, 185–86 (4th Cir. 2017) (affirming 45 percent reduction for rate of success where plaintiff secured injunction but not damages).

Return to *De Paredes*, the recent, comparable wage-and-hour case in this district in which M&A represented the plaintiffs against three defendants. *See De Paredes v. Zen Nails Studio, LLC*,

No. TDC-20-2432, 2023 WL 8235753 (D. Md. Nov. 28, 2023). There, the plaintiffs received about 60 percent of the recovery they sought: $66,991.64 out of $111,946.72. *Id.* at *6. To account for this incomplete success, the court reduced the lodestar amount by 35 percent. *Id.* As the court explained:

> Although Plaintiffs succeeded in establishing liability on both the FLSA and MWHL claims, the Court did not agree with them on their calculation of the hours worked and, in fact, made determinations about their work schedules that did not credit all of the assertions of Plaintiffs and resulted in a substantially lower recovery.

*Id.* That rationale applies to this case with at least as much force. Here, too, Guillen succeeded in establishing the liability of several defendants. And here, too, the Court awarded Guillen a significantly smaller recovery than he sought because the Court did not find many of his key claims credible. But unlike in *De Paredes*, here, the plaintiff did not establish the liability of every defendant—he fell short as to Mrs. Stouffer, whose status featured prominently in the litigation. And Guillen was substantially less successful than the plaintiffs in *De Paredes*. The plaintiffs in *De Paredes* recovered over three times more of the damages they sought (60 percent) than Guillen recovered in this case (17 percent). There, a 35 percent reduction for 60 percent success was appropriate. By that logic, a 50 percent reduction for 17 percent success is not only appropriate— it is relatively generous to M&A.

M&A's defense of its request for a reduction no greater than 30 percent centers on two cases. Neither proves persuasive. In *Butler v. Directsat USA, LLC*, the plaintiffs in an FLSA collective action secured a settlement for $36,000 on their claims for $300,644.94—a recovery of about 12 percent. 2016 WL 1077158, at *6. In light of their limited success, the court reduced the lodestar by 33 percent. *Id.* But the court emphasized that it was limiting the reduction because the defendants had litigated the case "tenaciously." *Id.* at *7. Unlike *Butler*, this case did not end in a

relatively early pre-trial settlement, but rather only after a trial—so the relief here is more "limited in comparison to the scope of the litigation as a whole." *See McAfee*, 738 F.3d at 92 (quoting *Hensley*, 461 U.S. at 439–40). And whereas the *Butler* court emphasized that it limited the degree-of-success reduction because the defendants had litigated the case "tenaciously," *Butler*, 2016 WL 1077158 at *7, here it is the Court's assessment that plaintiff's counsel were primarily responsible for unreasonably protracting the litigation. These distinctions warrant a greater reduction for M&A's limited success than the reduction in *Butler*.

In *McNeil v. Faneuil, Inc.*, No. 4:15-cv-81, 2017 WL 9771834, (E.D. Va. Nov. 8, 2017), FLSA class-action plaintiffs settled their claims against the defendant for unpaid overtime for $285,000, roughly 17 percent of their claim for $1,696,060.66. *Id.* at *11. The court reduced the lodestar amount by a mere 10 percent. *Id.* However, *McNeil* says next to nothing about why the court chose 10 percent. Here is the entirety of the court's reasoning:

> [T]he Court finds that some reduction based on the plaintiffs' actual success relative to their initial time and compensation claims is appropriate. "There is no precise rule or formula" for reducing a fee award for a lack of success but the court "may simply reduce the award." At this stage, the Court will reduce the amount of attorneys' fees by 10% to account for the degree of success achieved by plaintiffs.

*Id.* (quoting *Hensley*, 461 U.S. at 436–37). The Court will hew closer to *De Paredes*, which justifies its reduction on compelling terms that apply directly to this case, than to *McNeil*, which does not justify its reduction at all.

After consideration of the course of this specific case and reflection on the relevant case law, the Court exercises its discretion to reduce the lodestar by 50 percent to account for M&A's limited success in this case.

### D.  Shocking the Conscience

There is one more fee question the Court must address. The Fourth Circuit has held that a district court may deny a fee petition outright when the request is so excessive as to "shock the conscience of the court." *Fair Hous. Council of Greater Wa. v. Landow*, 999 F.2d 92, 94 (4th Cir. 1993). In fact, the Fourth Circuit has held that a district court may deny an outrageous fee request without any detailed analysis whatsoever. *Id.* at 96 (citing *Sun Publ'g Co. v. Mecklenburg News, Inc.*, 823 F.2d 818, 819 (4th Cir. 1987)). Although *Landow* concerned 42 U.S.C. § 1988, *see id.*, courts have not hesitated to translate the generally applicable principles for fee awards under that statute to fee awards under the FLSA. *See, e.g.*, *Carrera v. EMD Sales, Inc.*, No. JKB-17-3066, 2021 WL 3856287, at *3–4 (D. Md. Aug. 27, 2021). The defendants argue that M&A's fee petition demands that remedy.

*Landow* is worth recounting. There, the plaintiff brought a case involving two independent causes of action. *Landow*, 999 F.2d at 94. After a five-day bench trial, the plaintiff lost on the claim to which they had devoted "the overwhelming majority" of their time. *Id.* at 94–95. But they won on one subpart of a secondary claim. *Id.* Afterwards, the plaintiff claimed that they had incurred $604,113 in attorneys' fees and costs and moved for "only" $537,113, after deductions for work on their unsuccessful claims. *Id.* at 95. The plaintiff's records were a mess: The plaintiff failed to distinguish fees attributable to one claim and fees attributable to another, they did not clearly identify what they excluded or why, and the individual entries offered little more than "general descriptions" like "review discovery and draft discovery." *Id.* Indeed, "the district court refused to rely on the time sheets" the plaintiff submitted because they were "so grossly in excess of any realistic amount as to be unworthy of consideration, even as a starting point." *Id.*

Understandably frustrated by the plaintiff's exorbitant fee request and the flawed supporting documents, the district court pointedly noted that "if there are motions for attorneys' fees and expenses that should be disallowed in their entirety simply because of the outrageously excessive amount requested, the pending motion would fit the bill." *Id.* Nevertheless, concerned that it did not have the discretion to deny the petition outright, the district court awarded the plaintiff $20,000. *Id.* But the district court made one request of the Fourth Circuit: "[S]hould this matter be appealed and the appellate court find that this court had discretion to deny all legal fees here, the award of legal fees made herein should be rescinded without remand." *Id.*

Determined to go double or nothing, the plaintiff appealed. *Id.* In response, the defendant appealed too, challenging the decision not to deny the fee petition in its entirety. *Id.* at 95–96. The Fourth Circuit reversed—and left the plaintiff emptyhanded. *Id.* at 97–98.

The Fourth Circuit emphasized that a prevailing plaintiff "may not submit a fee request which is merely an opening bid in the quest for an award." *Id.* at 97 (citing *Lewis v. Kendrick*, 944 F.2d 949, 957–58 (1st Cir. 1991)). The burden of identifying which hours are recoverable rests on the party moving for fees, not the district court. *Id.* at 98. When the plaintiff asks for an unreasonable fee, the district court has no obligation to provide a reasonable one. *Id.* (citing *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980)). "Because of the [plaintiff's] woefully inadequate time records, coupled with its failure to make a good faith effort to exclude fees attributable to unsuccessful claims, we think the [the plaintiff's] fee petition was so outrageously excessive it shocked the conscience of the court." *Id.* at 97.

The pending petition all but demands the same result. M&A's supporting documentation is thoroughly flawed. *See id.* at 95. M&A's fee petition in this case is more like "an opening bid in the quest for an award" than a good-faith account of its fees. *See id.* at 97. It is important to

discourage overbidding like M&A's, for if courts "award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such conduct would be reduction of their fee to what they should have asked for in the first place." *Id.* at 96 (quoting *Brown*, 612 F.2d at 1059). M&A's petition wasted scarce public resources by inducing the Court to weed out many of the firm's excesses line-by-line. The fee award M&A claims it is entitled to—$363,741.75 without costs, "voluntarily" reduced to a mere $233,861.04, ECF 134-1, at 1—is so outrageous as to shock the conscience of this Court. And M&A's petition is worse than the one in *Landow* in at least one important respect: M&A has overbid and under-justified its fee petitions before. "If there are motions for attorneys' fees and expenses that should be disallowed in their entirety simply because of the outrageously excessive amount requested"—and the inadequacy of the evidence for that outrageous amount—"the pending motion would fit the bill." *See Landow*, 999 F.2d at 95.

Nevertheless, like the district court in *Landow*, the Court hesitates to deny the petition outright. In *Landow*, the Fourth Circuit emphasized that it was denying the fee petition at issue for two reasons: the plaintiff's time records did not "specifically allocate the time spent on each claim" and the plaintiff had "fail[ed] to make a good faith effort to exclude fees attributable to unsuccessful claims." *Id.* at 97–98. Here, where the plaintiff did not advance any unsuccessful claims completely distinct from its successful claims, neither factor is present. As inadequate as M&A's time records are, they are not inadequate in that particular way. For that reason—and that reason alone—the Court declines to deny the fee petition wholesale. However, "should this matter be appealed and the appellate court find that this court had discretion to deny all legal fees here, the award of legal fees made herein should be rescinded without remand." *See id.* at 95.

### E.  Fee Summary

The Court calculated M&A's fee award in three steps. First, the Court computed the lodestar fee. To identify the lodestar, the Court a) identified the reasonable rates for M&A's timekeepers, deducting 10 percent from the lodestar fee sought to approximate the appropriate reduction to the rates, b) identified the reasonable number of hours expended in each category, reducing the award in each category where and to the extent that those hours were excessive, and c) reduced the resulting total by 75 percent (the two billing judgment reductions: 50 percent for poor billing judgment and 25 percent for the persistence of poor billing judgment in the face of prior warnings). That yielded a lodestar fee of $43,406.51. Second, the Court considered whether to reduce the lodestar to eliminate hours expended on completely unsuccessful claims. There were none, so the Court did not modify the lodestar on this basis. Third, the Court reduced the lodestar by 50 percent to account for the degree of success. That yielded the final fee award: $21,703.26.

**Fee Calculation**

|  | Total Fee Sought[11] | Reductions | Fee Awarded |
|---|---|---|---|
| **Case Development** | $11,022.50 | - 10 percent (rate reduction)<br>- 50 percent (category reduction)<br>- 75 percent (billing judgment reductions) | $1,240.03 |
| **Pleadings** | $2222.00 | - 10 percent (rate reduction)<br>- 75 percent (billing judgment reductions) | $499.95 |
| **Written Discovery** | $32,936.00 | - 10 percent (rate reduction)<br>- 40 percent (category reduction)<br>- 75 percent (billing judgment reductions) | $4,446.36 |

---

[11] The Court uses the label "Total Fee Sought" for consistency with the table in the fee petition, which uses the same phrase for the same pre-reduction figures. *See* ECF 134-1, at 1. As the Court has acknowledged throughout this opinion, M&A has proposed various "voluntary reductions" to the "Total Fee Sought."

| Depositions | $30,807.50 | - 10 percent (rate reduction)<br>- 50 percent (category reduction)<br>- 75 percent (billing judgment reductions) | $3,465.84 |
|---|---|---|---|
| **Motions Practice** | $46,273.00 | - 10 percent (rate reduction)<br>- 15 percent (category reduction)<br>- 75 percent (billing judgment reductions) | $8,849.71 |
| **Attending Court Hearings** | $4,921.50 | - $504.00 (2.8 hours of Christina Melehy's time)<br>- 10 percent (rate reduction)<br>- 75 percent (billing judgment reductions) | $993.94 |
| **Trial Preparation and Post-Trial Motions** | $137,856.00 | - 10 percent (rate reduction)<br>- 50 percent (category reduction)<br>- 75 percent (billing judgment reductions) | $15,508.80 |
| **Attending Trial** | $44,640.00 | - 10 percent (rate reduction)<br>- 75 percent (category reduction)<br>- 75 percent (billing judgment reductions) | $2,511.00 |
| **ADR/Settlement** | $11,488.75 | - 10 percent (rate reduction)<br>- 25 percent (category reduction)<br>- 75 percent (billing judgment reductions) | $1,938.73 |
| **Fee Petition** | $19,809.00 | - Reduced to $8594.00 (original fee petition request)<br>- 10 percent (rate reduction)<br>- 30 percent (category reduction)<br>- 75 percent (billing judgment reductions) | $1353.56 |
| **Interpretation / Translation** | $15,102.00 | - 10 percent (rate reduction)<br>- 50 percent (category reduction)<br>- 75 percent (billing judgment reductions) | $1,698.98 |
| **Damage Calculations** | $1,896.00 | - 10 percent (rate reduction)<br>- 25 percent (category reduction) | $319.95 |

| | | | 75 percent (billing judgment reductions) | |
|---|---|---|---|---|
| **Discovery Disputes** | $4,382.50 | - | 10 percent (rate reduction) | $493.03 |
| | | - | 50 percent (category reduction) | |
| | | - | 75 percent (billing judgment reductions) | |
| **Post-Judgment Collections** | $385.00 | - | 10 percent (rate reduction) | $86.63 |
| | | - | 75 percent (billing judgment reductions) | |
| **Lodestar Total Fee** | $363,741.75 | | | **$43,406.51** |
| **Final Total Fee** | | - | 50 percent (rate of success deduction) | **$21,703.26** |

## F. Costs

M&A also seeks $32,082.87 in costs. ECF 134-1, at 1. As the Court noted earlier, a prevailing FLSA plaintiff is entitled to recover costs "for reasonable litigation expenses." *See Jones v. Dancel*, 792 F.3d 395, 404 (4th Cir. 2015) (quoting *Daly v. Hill*, 790 F.2d 1071, 1084 (4th Cir. 1986)); 29 U.S.C. § 216(b). The Court has the same discretion over an award of costs as it has over an award of fees. *Roy v. Cnty. of Lexington, S.C.*, 141 F.3d 533, 549 (4th Cir. 1998).

The Court highlights several costs that warrant significant reductions. To begin with, M&A incurred $6,409.01 in costs—about 20 percent of the total—for storing emails with a third-party vendor, Logikcull, for 25 months. ECF 115, at 4. As the defendants point out, M&A could have avoided this expense entirely by storing the emails locally on a server of its own. M&A's only response is that it was more convenient to use Logikcull, which has search and organizing features M&A prefers. But the firm is not entitled to recover the cost of every convenience it desires—only the costs that are "relevant and reasonable." *See Am. Med. Sec., Inc. v. Larsen*, 31 F. Supp. 2d 502, 509 (D. Md. 1998). The Court denies these costs.

M&A also billed $1,689.70 for rough transcripts during trial. ECF 116-3, at 2. Beyond a conclusory statement that M&A "needed transcripts of the trial proceedings during trial to prepare

for the direct and cross examination of the witnesses at trial," ECF 116-1, at 6, M&A says nothing

to justify this expense. "[W]hile convenient, contemporaneous transcripts of court proceedings are

not a necessary litigation expense reasonably included in the fee award." *De Paredes*, 2023 WL

8235753, at *6. The Court denies these costs.

Next, M&A claims it incurred $11,412.30 in photocopying charges, but it has requested

compensation for only $6,847.38. ECF 115, at 2. M&A's documentation of and justification for

these expenses is vague and unconvincing. While some entries describe what was being

photocopied or why, many say nothing more than "Photocopies." *See* ECF 116-3, at 1. M&A

includes summaries of its printing activity from Papercut, its printing management software, but

these summaries confirm only how many pages M&A printed each month—not what staff printed

or why. *See id.* at 37–64. In its supporting memorandum, M&A identifies reasonable grounds for

some of its printing and copying activity, like serving paper discovery requests and subpoenas. *See*

ECF 116-1, at 2. But many of M&A's explanations are unpersuasive. *See, e.g.*, *id.* ("Plaintiff

needed paper copies of certain documents while litigating this case because . . . his checks needed

to be organized and inventoried in paper form in order to calculate damages."). The Court reduces

M&A's photocopying costs by an extra 50 percent to $3,423.69.

Additionally, M&A billed $1,065.68 for trial snacks and meals. ECF 115, at 5. As Hoffman

explained in his declaration, "I would never charge a fee-paying client for my snacks for Trial, and

I am unaware of any lawyers who do so." ECF 127-2, ¶ 33. The only case the Court can find where

an attorney attempted to bill for snacks confirms Hoffman's position. *See Cain v. Patel*, No. 19-

cv-1385-RJD, 2022 WL 1306304, at *7 (S.D. Ill. May 2, 2022) (declining to award the cost of

snacks at trial). And as M&A was told the last time they tried to bill for meals, "meals are not a

litigation expense in any manner." *De Paredes*, 2023 WL 8235753, at *6. Perhaps aware of that,

M&A attempted to frame its meals as work. For instance, on February 1, 2023, M&A billed for "Dinner for the office during trial preparation meeting." ECF 115, at 5. The associated receipt shows that M&A dined out at Mi Rancho Restaurant. ECF 116-3, at 143. Curiously, no M&A timekeeper billed for a "trial preparation meeting" or anything like it that day. *See* ECF 134-1, at 31. The next day, M&A billed for "Lunch for inter-office meeting after pre-trial conference to discuss trial strategy." ECF 115, at 5. The associated receipt shows that three people dined out at Jewel of India. ECF 116-3, at 144. Again, nobody billed for any such work. *See* ECF 134-1, at 31– 32. The Court will not award M&A's snack and meal costs.[12]

Further, M&A billed $6,629.99 for third-party translation and interpretation services. ECF 115, at 4–5. Most of these costs are reasonable. However, M&A incurred an $822.44 cancellation fee for cancelling a four-day contract with an interpreter for trial. *Id.* at 5. By M&A's own account, the firm retained three interpreters for trial, then cancelled the third at the start of trial because the other two agreed they could handle it themselves. *See* ECF 131, at 23. M&A should have coordinated with its interpreters in advance to determine which services it would actually need. Its failure to do so was unreasonable. The Court will not award the cancellation fee.

Finally, M&A appears to claim that it paid for free parking. Mr. Melehy declares under penalty of perjury that his firm "seeks the parking and mileage costs incurred by myself and Suvita Melehy to travel to the pre-trial conference and trial, and also for Paralegal Christina Melehy to

---

[12] M&A's reimbursement request for trial snacks and meals consumed while preparing for trial is almost as troubling M&A's request in *Munoz* for the defendants to pay them $10 for "face masks for in office meetings." *Munoz*, 2023 WL 6389129, at *10. The *Munoz* court rejected "as simply unacceptable" the firm's request to recover for "an item that is part of plaintiff's counsel's personal attire and office safety protocol." *Id*. The firm's request for the cost of face masks was reason to "doubt . . . whether [the] claimed costs was submitted in good faith and should be compensated." *Id*.

travel to the trial." ECF 114-3, ¶ 43. The pre-trial conference and the trial took place at the United States Courthouse in Greenbelt, Maryland. Parking there is free.

On November 28, 2023, Judge Chuang rejected this same claim, in the same paragraph of essentially the same affidavit, as frivolous. *See De Paredes*, 2023 WL 8235753, at *6. Accordingly, Judge Chuang directed M&A to identify and remove any such fees from their bill of costs. *Id.* About a week later, M&A filed in this case its supplemental motion for attorneys' fees and costs without acknowledging or correcting the error. *See generally* ECF 134. However, the Court cannot find any discrete charges for parking at the courthouse in M&A's bill of costs. *See* ECF 115, at 5–6. Accordingly, the Court does not strike any particular entries for parking.

These reductions would bring M&A's award of costs down to $18,672.35. However, like M&A's request for fees, M&A's request for costs evinces a grave failure to exercise reasonable billing judgment—a failure that calls into doubt the accuracy and reasonableness of the entire request. And like M&A's request for fees, M&A's request for costs repeats errors courts have called the firm out for before. The firm has been warned not to bill for meals and has been admonished for claiming to have paid for free parking at the Greenbelt courthouse. *See De Paredes*, 2023 WL 8235753, at *6. Accordingly, the Court reduces this amount by an additional 50 percent.

After appropriate line-by-line reductions and an overall reduction to account for the failure to exercise reasonable billing judgment, the Court awards M&A $9,336.18 in costs.

## II.    Conclusion

Most of the time, win or lose, parties bear their own fees and costs. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). Rarely, one party must pay the other's. *See Fox v. Vice*, 563 U.S. 826, 832 (2011). Congress made these exceptions in the service of some

of our legal system's highest ideals: empowering the wronged to vindicate their rights, compensating those who step forward to serve as private attorneys general, and compelling those who violate the law to make those they harm whole. *See id.* at 832–33. In short, we shift fees to keep the promise of equal justice under law to those too poor to pay the price alone. That is why the FLSA holds defeated defendants accountable for the legal expenses of prevailing plaintiffs. *See Fegley v. Higgins*, 19 F.3d 1126, 1134 (6th Cir. 1994). And that is why Guillen receives an award today.

That is also why the integrity of the fee petition process matters. A reasonable fee award serves the plaintiff. An unreasonable award serves only their lawyers. When counsel exploit the right to request a reasonable fee by demanding a windfall, they abuse the trust on which this critical part of our justice system depends. If counsel for every prevailing plaintiff filed fee petitions like M&A's, the system would be unmanageable, unreliable, and unworthy of the people it aspires to serve. We shift fees for plaintiffs, not for lawyers.

Guillen, through counsel, vindicated his rights under the FLSA. M&A is entitled to compensation for its service to Guillen. But M&A is not entitled to the excessive, unjustified, and unreasonable payout they seek. Guillen's petition for attorneys' fees and costs, ECF 114, as revised in his supplemental motion, ECF 134, is granted in part and denied in part. The defendants' motion for leave to file a surreply, ECF 132, is denied as moot. Guillen is awarded $21,703.26 in attorneys' fees and $9,336.18 in costs for a total of $31,039.44. A separate order follows.

Date: March 29, 2024

Deborah L. Boardman
United States District Judge